# EXHIBIT 1
## Unpublished Decisions

Caution
As of: April 20, 2017 3:10 PM Z

# *Crabtree v. Volkert, Inc.*

United States District Court for the Southern District of Alabama, Southern Division

December 7, 2012, Decided; December 7, 2012, Filed

CIVIL ACTION 11-0529-WS-B

## Reporter

2012 U.S. Dist. LEXIS 173792 *; 2012 WL 6093802

CHRIS CRABTREE, et al., Plaintiffs, v. VOLKERT, INC., Defendant.

**Subsequent History:** Later proceeding at *Crabtree v. Volkert, Inc., 2013 U.S. Dist. LEXIS 7532 (S.D. Ala., Jan. 17, 2013)*

## Core Terms

deductions, exemption, summary judgment, employees, plaintiffs', salary basis, real estate, salary, regulation, overtime, partial-day, relocation, retaliation, reimbursed, actual practice, reasons, termination, reasonable factfinder, requirements, correction, window, declarations, services, hired, independent judgment, parties, duties, primary duty, absences, purposes

## Case Summary

### Overview

The court found that there were genuine issues of material fact as to whether the plaintiffs' primary duty included the exercise of discretion and independent judgment with respect to matters of significance, as required by *29 C.F.R. § 541.202(a)*. Those factual disputes precluded entry of summary judgment in the defendant's favor on the "duties test" portion of the FLSA's requirements for the administrative exemption under *29 U.S.C.S. § 213(a)(1)*. The defendant satisfied the salary basis test for the administrative exemption under *29 U.S.C.S. § 213(a)(1)* for the plaintiffs.

### Outcome

The defendant's motion for summary judgment was granted in part and denied in part.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

*HN1*[⤓] Summary judgment should be granted only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*. The party seeking summary judgment bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. If the

Case 1:16-cv-01692-SCJ   Document 27-1   Filed 04/20/17   Page 3 of 80

Page 2 of 22
2012 U.S. Dist. LEXIS 173792, *173792

nonmoving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, the moving party is entitled to summary judgment. In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Summary judgment is justified only for those cases devoid of any need for factual determinations.

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > Cross Motions

*HN2*[⤓] The law is clear that the applicable *Fed. R. Civ. P. 56* standard is not affected by the filing of cross-motions for summary judgment. The United States Court of Appeals for the Eleventh Circuit has explained that cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed. Nonetheless, cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts.

Labor & Employment Law > ... > Scope & Definitions > Exemptions > Executives & Professionals

*HN3*[⤓] As a general rule, the Fair Labor Standards Act (FLSA) requires employers to pay their employees overtime pay of one and one-half times their regular rate for all hours worked in excess of 40 in a particular workweek. *29 U.S.C.S. § 207(a)(1)*. However, the FLSA also creates certain exemptions from those overtime pay requirements. The administrative exemption applies to any employee employed in a bona fide executive, administrative, or professional capacity who is compensated on a salary basis. *29 U.S.C.S. § 213(a)(1)*.

Labor & Employment Law > ... > Scope & Definitions > Exemptions > Executives & Professionals

*HN4*[⤓] The Department of Labor's (DOL) regulations set forth the requirements for the administrative exemption. Both a salary basis test and a duties test must be satisfied. To be eligible for the administrative exemption, an employer must prove that the relevant employees meet two tests: the job duties test and the salary basis test. In applying those tests, the employer carries the burden of proving the exemption, and courts narrowly construe the overtime provisions of *29 U.S.C.S. § 207* against the employer.

Labor & Employment Law > ... > Scope & Definitions > Exemptions > Executives & Professionals

*HN5*[⤓] The applicable Fair Labor Standards Act duties test contemplates that for an employee whose weekly salary exceeds $ 455, the administrative exemption applies only if both of the following requirements are satisfied: (i) the employee's primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (ii) the employee's primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. *29 C.F.R. § 541.200(a)(2)-(3)*.

Labor & Employment Law > ... > Scope & Definitions > Exemptions > Executives & Professionals

2012 U.S. Dist. LEXIS 173792, *173792

*HN6*[🔖] Production work relates to the goods and services that the business contributes to the marketplace, whereas administration relates to running the business. To qualify for the administrative exemption, the employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment. *29 C.F.R. § 541.201(a)*. However, the regulations also specify that work related to management or general business operations" includes work in functional areas such as purchasing, procurement, public relations, government relations, and legal and regulatory compliance. *29 C.F.R. § 541.201(b)*. Nor must the focus be on the employer's business; rather, an employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers. *29 C.F.R. § 541.201(c)*.

Labor & Employment Law > ... > Scope & Definitions > Exemptions > Executives & Professionals

*HN7*[🔖] There is no doubt that to qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. *29 C.F.R. § 541.202(a)*. The regulations emphasize that this is a highly fact-bound inquiry. *29 C.F.R. § 541.202(b)* explains that discretion and independent judgment must be evaluated in the light of all the facts involved in the particular employment situation in which the question arises, and reciting lengthy list of relevant factors. Three noteworthy clarifications of the discretion and independent judgment concept are: (i) that the term implies that the employee has authority to make an independent choice, free from immediate direction or supervision; (ii) that the term excludes the performance of mechanical, repetitive, recurrent or routine work; and (iii) that the employee's primary duty must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources. *29 C.F.R. § 541.202(c)*, *(e)*.

Labor & Employment Law > ... > Scope & Definitions > Exemptions > Executives & Professionals

*HN8*[🔖] For an employee to qualify for the administrative exemption, the regulations provide that an employee must be paid on a salary basis. An employee is considered paid on a salary basis if he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. The salary basis of pay is lacking for employees whose employers have reduced their salaries because of how much or how well they worked.

Labor & Employment Law > ... > Scope & Definitions > Exemptions > Executives & Professionals

*HN9*[🔖] A deduction for a partial day's absence is not one of the allowable deductions. An employer who makes improper deductions from salary shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis.

Labor & Employment Law > ... > Scope & Definitions > Exemptions > Executives & Professionals

*HN10*[🔖] *29 C.F.R. § 541.603(c)* provides that improper deductions that are either isolated or inadvertent will not result in loss of the exemption for any employees subject to such improper deductions, if the employer reimburses the employees for such improper deductions.

2012 U.S. Dist. LEXIS 173792, *173792

Labor & Employment Law > ... > Scope & Definitions > Exemptions > Executives & Professionals

*HN11*[🔽] If an employer has a clearly communicated policy that prohibits the improper pay deductions specified in *29 C.F.R. § 541.602(a)* and includes a complaint mechanism, reimburses employees for any improper deductions and makes a good faith commitment to comply in the future, such employer will not lose the exemption for any employees unless the employer willfully violates the policy by continuing to make improper deductions after receiving employee complaints. *29 C.F.R. § 541.603(d)*. Thus, *29 C.F.R. § 541.603(d)* creates a safe harbor when the following five criteria are satisfied: (i) the employer has a clearly communicated policy prohibiting improper deductions; (ii) that policy includes a complaint mechanism; (iii) the employer reimburses employees for any improper deductions; (iv) the employer makes a good faith commitment to comply in the future; and (v) the employer does not continue to make improper deductions after receiving employee complaints.

Labor & Employment Law > ... > Scope & Definitions > Exemptions > Executives & Professionals

*HN12*[🔽] The "intent" concept surfaces in *29 C.F.R. § 541.603(a)*, which provides that an employer who makes improper deductions from salary shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis. Unfortunately, the parties fail to address in any meaningful way the interplay between *29 C.F.R. § 541.603(a)*, which says the exemption is lost if the employer did not intend to pay its employees on a salary basis, and *29 C.F.R. § 541.603(c)* and *(d)*, which say the exemption is not lost if certain corrective actions are taken.

Labor & Employment Law > ... > Scope & Definitions > Exemptions > Executives & Professionals

*HN13*[🔽] *29 C.F.R. § 541.603(a)* states that the intent inquiry turns on whether an employer has an actual practice of making improper deductions. *29 C.F.R. § 541.603(a)*. In determining whether an actual practice exists, courts must consider factors such as: (i) the number of improper deductions, relative to the number of infractions; (ii) the time period in which improper deductions were made; (iii) the number and geographic location of employees whose salaries were improperly reduced; (iv) the number and geographic location of managers who took the deductions; and (v) whether the employer has a clearly communicated policy prohibiting improper deductions.

Labor & Employment Law > ... > Retaliation > Statutory Application > Fair Labor Standards Act

*HN14*[🔽] In addition to its provisions requiring payment of overtime compensation and minimum wages to nonexempt employees, the Fair Labor Standards Act (FLSA) also prohibits retaliation. In that regard, the FLSA provides that it is unlawful to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter. *29 U.S.C.S. § 215(a)(3)*.

Labor & Employment Law > ... > Retaliation > Elements > General Overview
Labor & Employment Law > ... > Retaliation > Statutory Application > Fair Labor Standards Act

*HN15*[🔽] The legal standard by which claims of Fair Labor Standards Act (FLSA) retaliation are evaluated on summary judgment is substantively identical to that employed in the Title VII of the Civil Rights Act of 1964 retaliation context. Thus, a plaintiff establishes a prima facie case of FLSA retaliation under *29 U.S.C.S. § 215(a)(3)* by establishing three elements: (1) she engaged in activity protected under the FLSA; (2) she subsequently suffered

2012 U.S. Dist. LEXIS 173792, *173792

adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action. If a plaintiff demonstrates a prima facie case, a defendant has the burden of coming forward with a legitimate non-retaliatory reason for its adverse employment action. If the employer asserts a legitimate reason for the adverse action, the plaintiff may attempt to show pretext.

Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof

HN16[ ] In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual. To show that the stated reason is pretext for unlawful retaliation, the plaintiff must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence. Where a defendant has articulated multiple non-retaliatory justifications for its decision, the plaintiff must rebut each of them to withstand *Fed. R. Civ. P. 56* scrutiny.

**Counsel:** [*1] For Chris Crabtree, Lloyd Everhardt, Plaintiffs: Daniel Eduardo Arciniegas, Birmingham, AL; Jon C. Goldfarb, Wiggins, Childs, Quinn, and Pantazis, LLC, Birmingham, AL; Lachlan William Smith, Birmingham, AL.

For Volkert, Inc., Defendant: Tracy P. Turner, LEAD ATTORNEY, Johnstone, Adams, Bailey, Gordon & Harris, Mobile, AL; Jonathan Joseph Beren Segarra, Johnstone, Adams, Bailey, Gordon & Harris, L.L.C., Mobile, AL; Wade B. Perry, Jr., Johnstone, Adams, Bailey, Gordon & Harris, Mobile, AL.

**Judges:** WILLIAM H. STEELE, CHIEF UNITED STATES DISTRICT JUDGE.

**Opinion by:** WILLIAM H. STEELE

# Opinion

## ORDER

This matter comes before the Court on Defendant's Motion for Summary Judgment (doc. 32) and Plaintiffs' Motion for Partial Summary Judgment (doc. 28). Both Motions have been exhaustively briefed and are now ripe for disposition. [1]

## I. Nature of the Case.

Plaintiffs, Chris Crabtree and Lloyd Everhardt, brought this action under [*3] the Fair Labor Standards Act, *29 U.S.C. §§ 201 et seq.* ("FLSA"), against defendant, Volkert, Inc. In their Amended Complaint (doc. 4), plaintiffs allege that Volkert willfully violated the FLSA by (i) failing to pay them overtime compensation for hours worked in

---

[1] The Court notes that neither side's briefs comply with Local Rule 7.1(b). As to defendant's Motion for Summary Judgment, both principal briefs exceed the 30-page limit, with defendant's reply weighing in at nearly double the 15-page cap prescribed by Local Rule 7.1(b). The rule's restrictions are neither advisory nor aspirational; moreover, this is hardly the sort of hyper-technical, complex litigation [*2] that might warrant such overages. Neither plaintiffs nor defendant appear to have sought leave to exceed the limits fixed by Local Rule 7.1(b). Furthermore, neither *Rule 56* Motion is accompanied by suggested determinations of undisputed fact and conclusions of law, or by the proposed order of judgment, as required by Local Rule 7.2(a). Also, while the parties have stuffed the record with nearly 1,000 pages of exhibits, the vast majority of these pages are not referenced or discussed even in passing in the memoranda. The Court will not independently examine uncited portions of the record in evaluating the parties' respective summary judgment arguments. See *Rule 56(c), Fed.R.Civ.P.* (parties must support their factual positions on summary judgment by "citing to particular parts of materials in the record" and the court "need consider only the cited materials"); *Williamson v. Clarke County Dep't of Human Resources, 834 F. Supp.2d 1310, 1314 n.2 (S.D. Ala. 2011)* ("The Court will not scour uncited portions of the summary judgment record for evidence that might bolster either side's arguments.").

2012 U.S. Dist. LEXIS 173792, *2

excess of 40 per workweek, and (ii) failing to maintain accurate records of plaintiffs' hours worked. Volkert denies any such violation, arguing that Crabtree and Everhardt were exempt from the FLSA's overtime provisions pursuant to the Act's administrative exemption. Plaintiff Crabtree also brings a separate FLSA retaliation cause of action, alleging that Volkert terminated his employment when he complained that he was being denied overtime compensation due under the FLSA. Volkert's position is that it discharged Crabtree for legitimate business reasons unrelated to Crabtree's internal complaints concerning uncompensated overtime.

Following the close of discovery, the parties filed cross-motions for summary judgment. Volkert seeks an award of summary judgment on all claims and causes of action joined herein. Plaintiffs, by contrast, move for partial summary judgment, restricted to the issue of whether Volkert violated the salary [*4] basis of pay requirement for the FLSA's administrative exemption. (Doc. 38, at 1 n.1.) Extensive briefing was conducted, after which this action was transferred to the docket of the undersigned.

## II. Relevant Facts.[2]

### A. Defendant's Business and Plaintiffs' Job Duties.[3]

Volkert is an engineering, planning and environmental consultation firm. In this regard, Volkert performs certain consulting or contracting services for governmental agencies or departments on public works projects. Volkert employed Crabtree as a Real Estate Specialist or Senior Real Estate Specialist from July 6, 2010 through September 2, 2011. (Crabtree Decl. (doc. 37, Exh. L), ¶ 1.) [4] Likewise, Volkert employed Everhardt as a Real

---

[2] For purposes of each of the competing motions, the Court construes the record, including all evidence and factual inferences, in the light most favorable to the non-movant. *See Skop v. City of Atlanta, GA, 485 F.3d 1130, 1136 (11th Cir. 2007).* Also, the Court rejects defendant's assertion that plaintiffs' exhibits appended to their response brief "are due to be stricken, or in the alternative, that they are manifestly inappropriate for inclusion in this Court's review of the record" because "[e]xhibits 'attached' to briefs ... are *not* part of the evidentiary record." (Doc. 39, at 3-4.) Nothing in the Federal Rules of Civil Procedure or the Local Rules of this District Court support defendant's belief that exhibits affixed to a brief cannot properly be considered on summary judgment. Moreover, the longstanding practice in this District Court has been to accept summary judgment exhibits for consideration regardless of whether they are "attached" to a brief, presented via notice [*5] of filing, or appended to an attorney's declaration. The Court will not strike exhibits in reliance on an imaginary procedural distinction that lacks reasonable grounding in federal or local practice or applicable law. Defendant's citations to *In re DePugh, 409 B.R. 84, 109-10 (Bankr. S.D. Tex. 2009)* and *Miller v. McMann, 89 F. Supp.2d 564, 569 n.5 (D.N.J. 2000)* are unavailing. *DePugh* concerned U.S. Bankruptcy Court procedures for exhibits that had not been presented at a hearing. Of course, bankruptcy procedures are irrelevant to this matter, and there was no hearing in this case. Meanwhile, *Miller* relied on a local rule in the District of New Jersey that treats briefs and affidavits differently for filing purposes. That rule has no analog in this judicial district. Besides, if *DePugh* and *Miller* did govern here, then the Court might be duty-bound to strike defendant's exhibits under the same reasoning, leaving an entirely barren summary judgment record and foreclosing any meaningful *Rule 56* scrutiny. Such a result would benefit no one.

[3] Only Volkert has moved for summary judgment concerning the job duties portion of the test for the [*6] administrative exemption to the overtime provisions of the FLSA. Accordingly, all record facts concerning plaintiffs' job duties are taken in the light most favorable to Crabtree and Everhardt for purposes of summary judgment, and all reasonable inferences from those facts are drawn in their favor. This is so even though Volkert stridently disagrees with plaintiffs about their job duties and, especially, the extent to which they exercised discretion and independent judgment.

[4] Defendant devotes no less than eight pages of its reply (doc. 39) to arguments that this Court should disregard plaintiffs' affidavits as attorney-drafted documents, self-serving statements, or outright shams. (*See* doc. 39, at 5-12.) These contentions are misguided. Defendant's accusation that plaintiffs' counsel drafted Crabtree and Everhardt's Declarations is much ado about nothing. Even if defendant's counsel had no involvement in preparing defendant's witnesses' summary judgment affidavits (a dubious proposition), the fact remains that neither [*8] the Federal Rules of Civil Procedure nor *28 U.S.C. § 1746* require a declarant to draft his own declaration in his own hand. *See generally Sharpe v. Global Sec. Int'l, 766 F. Supp.2d 1272, 1279-80 (S.D. Ala. 2011)* (rejecting argument that *§ 1746* forbids use of typewritten or computer-generated declarations but instead requires declarant to write out enter declaration in own hand). Nor is there any ban on declarations that serve a declarant's own interests. To the extent that Volkert is inviting the Court to pass judgment on the quality of the evidence or to make credibility determinations on summary judgment, such actions are of course impermissible. *See Strickland v. Norfolk Southern Ry. Co.,*

2012 U.S. Dist. LEXIS 173792, *8

Estate Specialist from December 8, 2008 through August 1, 2011. (Everhardt Decl. (doc. 37, Exh. M), ¶ 1.) In broad-brush strokes, the duties of Crabtree and Everhardt "involved assisting agencies or departments in the acquisition of property for public work projects." (Crabtree Decl., [*7] ¶ 2; Everhardt Decl., ¶ 2.) As employees in Volkert's Real Estate Services Department, plaintiffs "assist[ed] the government agencies in complying with federal funding requirements relating to eminent domain that require public agencies to aquire [sic] real property fairly, expeditiously and cost effectively, and to ensure that displaced persons do not suffer disproportionate injuries as a result of the public works." (Doc. 32, Exh. 21, at #9.) Plaintiffs' work was "divided into two general areas of activity: 'acquisition' of subject properties and 'relocation' of displaced persons and businesses." (Crabtree Decl., ¶ 6; Everhardt Decl., ¶ 4.)

Plaintiffs' evidence is that, in performing such relocation and acquisition functions, their day-to-day activities were guided by the Uniform Relocation Act ("URA") and accompanying manuals issued by Volkert's client agencies. (Id.) On the acquisition side, plaintiffs say, the URA and client manuals required the Real Estate Specialist "to complete a Fair Market Offer based on the property appraisal and to present this Fair Market Offer with the required paperwork to the displacee." (Crabtree Decl., ¶ 7; Everhardt Decl., ¶ 5.) In this regard, plaintiffs did not actually perform or assist in performing property appraisals, but instead received detailed appraisals in an already-completed state. (Crabtree Decl, ¶ [*12] 18; Everhardt Decl., ¶ 15.) Plaintiffs' role was to prepare a "Fair Market Offer" and present it to the property owner; however, plaintiffs "simply copied" that offer from the appraisal document, and lacked authority to deviate higher or lower than the amount specified in the appraisal. (Crabtree Decl., ¶ 19; Everhardt Decl., ¶ 16.) If the property owner rejected the Fair Market Offer, then plaintiffs' role in the negotiation ended, and they had no further involvement in recommending or implementing possible courses of action (i.e., adjustment of offer, preparation of condemnation proceedings, involvement as an expert witness in litigation, etc.). (Crabtree Decl., ¶ 20; Everhardt Decl., ¶ 17.)

On the relocation side, plaintiffs' role was more pronounced. The URA and agency manuals require that (i) comparable housing be identified (for use in computing a replacement housing benefit), (ii) a replacement housing

---

692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," on summary judgment). Defendant's protest that the factual averments contained in these declarations are not "supported by any citation to record evidence" (doc. 39, at 6) overlooks the obvious point that the declarations, themselves, are record evidence. Besides, it is black-letter law in this Circuit [*9] that "even in the absence of collaborative evidence, a plaintiff's own testimony may be sufficient to withstand summary judgment." Strickland, 692 F.3d at 1160; see also Evans v. Stephens, 407 F.3d 1272, 1278 (11th Cir. 2005) ("we accept the nonmovant's version of the events when reviewing a decision on summary judgment"). Defendant's objection that the declarations contain hearsay is similarly misguided because whether the exhibits are or are not admissible as presently submitted is of no moment. Rule 56 does not forbid consideration of hearsay evidence, but only that evidence which cannot be presented at trial in admissible form. See, e.g., Prince Hotel, S.A. v. Blake Marine Group, 2012 U.S. Dist. LEXIS 142911, 2012 WL 4711897, *1 n.5 (S.D. Ala. Oct. 2, 2012) ("Even unauthenticated or otherwise inadmissible evidence is properly considered on summary judgment so long as it can be reduced to admissible form at trial."); Rule 56(c)(2), Fed.R.Civ.P. (explaining that proper objection is that "a fact cannot be presented in a form that would be admissible in evidence"). By all appearances, plaintiffs can shoulder that modest burden at trial. And Volkert's invocation of the sham affidavit rule ignores that rule's narrowly [*10] circumscribed scope, and improperly seeks to extend it well beyond established boundaries to discrepancies that do not reach the level of direct, inherent contradictions. See, e.g., Croom v. Balkwill, 645 F.3d 1240, 1253 n.18 (11th Cir. 2011) ("A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence.") (citation omitted); Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1237 (11th Cir. 2010) (sham affidavit rule "is applied sparingly because of the harsh effect it may have on a party's case," and applies only where there is an "inherent inconsistency between an affidavit and a deposition") (citations omitted); Akins v. Fulton County, Ga., 278 Fed. Appx. 964, 2008 WL 2130748, *3 (11th Cir. 2008) ("We apply the sham affidavit concept to limited circumstances, and thus, every discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence") (citation and internal marks omitted). Many of the purported contradictions identified by Volkert result from tortured apples-to-oranges comparisons, strained readings of the declarations and [*11] deposition transcripts, and apparent confusion as to what plaintiffs' testimony actually was. Without going through defendant's enumerated items one by one, it suffices to say that the "discrepancies" identified in defendant's brief do not "flatly contradict" plaintiffs' depositions in a manner that might justify application of the sham affidavit rule, but instead amount to mere variations that, at best, may give rise to credibility questions for a factfinder to weigh at trial.

benefit be calculated for the displaced person, (iii) advisory assistance be provided to displaced individuals seeking replacement housing or other URA benefits, (iv) actual replacement housing selected by the displaced person be inspected to verify that it is "decent, safe and [*13] sanitary," and (v) appropriate paperwork be completed to transfer relocation benefits to the displaced person upon purchase or lease of replacement housing. (Crabtree Decl., ¶ 8; Everhardt Decl., ¶ 6.)

Crabtree contends that, for the most part, his work for Volkert in 2010 and 2011 was confined to providing "advisory assistance" to displaced individuals, inasmuch as the acquisition work, along with much of the relocation work (including identification of comparable housing and computation of relocation benefits), had already been completed. (Crabtree Decl., ¶ 14.) This "advisory assistance" consisted to a large degree of Crabtree providing transportation services by driving displaced renters (many of whom lacked vehicles or other means of private transport) to the Section 8 office or to appointments to view replacement housing. (Id., ¶ 16.) Also, a large part of Crabtree's relocation work consisted of "performing inventories of the personal property of displaced renters ... by counting the number of rooms of furniture and looking on the schedule to determine the amount of the relocation benefit." (Id., ¶ 17.) Crabtree concedes, however, that there were tracts for which he identified [*14] comparable housing and calculated replacement housing benefits. (Id., ¶¶ 15, 22.) But even this work was largely routinized, as it consisted of merely compiling and sorting lists of comparable properties by square footage, number of bedrooms, etc. (Id., ¶ 22.) [5] Looking at the "objective characteristics of the properties" on his lists, Crabtree contends, "it was usually obvious" what the most comparable property was, and if it was not, he "would bring the issue to the client's attention and ask the client what to do." (Id., ¶ 25.) Also, Crabtree had no latitude in fixing replacement housing benefits, which were a simple arithmetic calculation of the difference between the appraised value of the acquired property and the listing price of the comparable property. (Id., ¶ 26.) Occasionally, Crabtree would inspect the replacement property selected by the displaced owner to confirm that it was "decent, safe and sanitary" (a so-called "DSS inspection"); however, that process simply involved walking through the property and completing a preprinted form with standards and criteria supplied by the URA and the client. (Id., ¶ 28.) Crabtree also performed required paperwork (called the "relocation [*15] package") for the client's approval after the displaced person bought or leased replacement housing; however, his completion of this paperwork was "micro-managed" by an outside consultant. (Id., ¶¶ 29-30.) According to Crabtree, "[w]henever there was a discretionary decision to be made, I would ask the agency, Volkert's client, what it wanted to do, and I would follow the agency's discretion." (Id., ¶ 38.) Everhardt's account of his job duties and responsibilities was functionally similar to Crabtree's in all material respects. (Everhardt Decl., ¶¶ 11-28, 36.)

**B. Defendant's Compensation Policies and Practices.**[6]

When Volkert hired Everhardt and Crabtree in 2008 and 2010, respectively, Volkert officials completed hiring paperwork showing that each of them would be paid on an hourly basis. (Doc. 28, Exh. A, at 000799; Exh. B, at 001221.) Those same forms reflected that Everhardt would be compensated at an hourly rate of $30.00, and that Crabtree would be compensated at an hourly rate of $28.00. (Id.) [7] Despite these notations on hiring forms, since at least 1994 Volkert has considered Real Estate Specialists to be salaried employees. (Harmening Dep., at 48-50.) In that regard, it is undisputed that Volkert generally paid its Real Estate Specialists and Senior Real Estate Specialists a fixed, predetermined amount of compensation each week, regardless of the number of hours actually

---

[5] For renters (who comprised the bulk of displaced persons whom he assisted), Crabtree would identify comparable properties "simply by conducting a room count and an occupant inventory," and matching up the properties to minimum HUD standards. (Id., ¶ 23.)

[6] Both parties have independently moved for summary judgment on plaintiffs' FLSA claims on the issue of whether Volkert can prove the salary basis of pay prong of the applicable test for the administrative exemption. As a technical matter, this means that, in evaluating each of the cross-motions, the Court must take the evidence [*16] in the light most favorable to the nonmovant. As a practical matter, however, this distinction is of little import here, inasmuch as the record reveals no significant disputed facts pertaining to the salary-basis-of-pay inquiry.

[7] This treatment was similar to that of other Real Estate Specialists and Senior Real Estate Specialists hired by Volkert between 2007 and 2010. (Doc. 28, Exh. H.)

2012 U.S. Dist. LEXIS 173792, *16

worked. It is likewise undisputed that Crabtree and Everhardt worked more than 40 hours in certain (perhaps even numerous) work weeks, and were not compensated for those endeavors with overtime [*17] premium pay of 1.5 times their regular rate.

Although plaintiffs were paid a fixed salary, on four occasions in 2010 and 2011 (August 6, 2010, September 17, 2010, December 10, 2010, and July 22, 2011), Volkert made deductions from Crabtree's paycheck for partial-day absences, or otherwise paid him in increments of fewer than 8 hours per workday. (Doc. 28, Exh. G, at 002665, 002669; Exh. F, at 000827, 000828.) Volkert's Human Resources Supervisor, Holly Gibney, testified that these kinds of partial-day deductions occurred for ostensibly salaried, exempt employees such as Crabtree on more than a dozen occasions between 2008 and 2011. (Gibney Dep., at 57-76.) None of these deductions involved plaintiff Everhardt. (Gibney Aff. (doc. 32, Exh. 12), at 2.) All told, the fraction of paychecks for Real Estate Specialists or Senior Real Estate Specialists during this period of time that included improper partial-day deductions was approximately 1%, with the total dollar amount of those erroneous deductions not exceeding $2,500. (*Id.* at 2-3.) [*18] Accordingly, partial-day deductions from the salaries of Real Estate Specialists and Senior Real Estate Specialists occurred only infrequently during the time period at issue, with minimal financial repercussions for the affected employees.

Notwithstanding the isolated incidence of this kind of event, the fact remains that partial-day deductions for salaried employees constituted a violation of Volkert's written policies. In particular, Volkert's Personnel Practices Manual (doc. 33, Exh. 7) provided at all relevant times that "[n]on-mandated deductions from pay for salaried employees exempt from the overtime requirements of the [FLSA] are prohibited" except in certain enumerated circumstances. (Doc. 28, Exh. J, at 000420.) Two of those exceptions were "[f]or *full-day absences* for personal reasons" or "[f]or *full-day absences* for sickness or disability or intermittent leave under the" FMLA. (*Id.* (emphasis added).) Volkert expected its department managers to enforce the salary-deductions policy, including the prohibition on partial-day deductions for salaried, exempt employees. (Gibney Dep., at 29.) In Crabtree and Everhardt's department, that responsibility rested with Sandy Harmening, [*19] manager of Volkert's Real Estate Services Department (also called the "Right-of-Way Department"). (Harmening Dep., at 25-26, 34.)

The record leaves no doubt that, for some time, Harmening misunderstood and misapplied Volkert's policy forbidding partial-day salary deductions. [8] She was the Volkert manager responsible for approving those deductions for Crabtree and other Real Estate Services employees during the relevant period. (Gibney Dep., at 29.) Human Resources Supervisor Gibney became aware of Harmening's errors in this regard when Crabtree questioned in the summer of 2011 whether he was hourly or salaried. (*Id.* at 29-31.) Gibney "was very surprised to find that [Harmening] did not understand the way that she was supposed to be approving the time card," and spoke with Harmening to convey to her "a better understanding" of Volkert policy on this front. (*Id.* at 30.) [9] As of her May 2012 deposition in this case, Harmening expressed a clear, accurate understanding of Volkert's salary-deduction policy, testifying that "[a] salaried employee is going to get paid 40 hours a week, no matter what," even if the employee has partial-day absences that cause actual hours worked in a given week [*20] to dip below the 40-hour threshold. (Harmening Dep., at 72.) Also, Gibney identified certain additional procedural safeguards (payroll reports, alerts, checklists, new system, etc.) that Volkert implemented in 2011 to prevent these kinds of improper salary deductions from occurring. (Gibney Aff., at 22-27.) There is no record evidence that such safeguards have been ineffectual or that improper deductions continued following implementation of those safeguards; to the contrary, those safeguards caught and prevented at least one Harmening error thereafter.

---

[8] In her deposition, Harmening candidly admitted as much, testifying, "Well, I was — I tried to dock myself a half a day, and I found out I could not do that. So, I did not have a clear understanding. ... I had a misunderstanding of that [prohibition on partial-day deductions for salaried, exempt employees]." (Harmening Dep., at 42.)

[9] Unfortunately, the lesson did not appear to take, as the record shows that Harmening was still attempting to take improper partial-day deductions for salaried, exempt employees as recently as February or March 2012. (Harmening Dep., at 42-44; Gibney Dep., at 30.) Harmening admitted that the first time she [*21] had a "clear understanding" of the rule was two to three months before her May 2012 deposition. (Harmening Dep., at 43-44.)

Case 1:16-cv-01692-SCJ   Document 27-1   Filed 04/20/17   Page 11 of 80

Page 10 of 22
2012 U.S. Dist. LEXIS 173792, *21

Approximately a year after learning of these improper partial-day deductions that Harmening had approved for ostensibly salaried, exempt employees, Volkert reimbursed all affected employees the full amounts of those deductions. (Gibney Aff., at 2 & Exh. A.) In particular, defendant's evidence shows that, on or about June 22, 2012, it sent checks to Kiley Hill in the amount of $1,300.00; to Crabtree in the amount of $448.00; to Thomas Dane in the amount of $466.40; and to Todd Donze in the amount of $138.00, all to compensate them in full for improper partial-day deductions that had occurred between 2008 and 2011. [10]

### C. Plaintiff Crabtree's Protected Activity and Ensuing Termination.[11]

On or about June 30, 2011, Crabtree met with Gibney (the Human Resources Supervisor), and inquired as to whether he was an hourly or a salaried employee. (Gibney Dep., at 35, 42.) Gibney replied that she would have to investigate the matter, but that she understood right-of-way employees to be salaried. (Id. at 37-38.) The following morning, July 1, 2011, Crabtree sent Gibney an e-mail message stating, "I would like to register a formal complaint against Patrick Anthony, my supervisor." (Doc. 37, Exh. O, at P102.) Crabtree went on to explain that, because he was being required to travel from Mobile to New Orleans for work three days per week, and to remain in New Orleans from 8 a.m. until 5 p.m. on those days, Crabtree was working "15 overtime hours per week .... So my estimation was 15 hrs [*23] overtime per week minus 8 hours off on Friday equals +7 hours accumulated per week." (Id.) The email concluded with Crabtree stating, "I can furnish my personal logged overtime hours on request if needed." (Id.)

A series of meetings ensued, with Volkert officials Gibney, Sandy Harmening (Crabtree's department manager), and David Bell (a Volkert vice president) conferring with Crabtree at various times in July and August 2011. (Gibney Dep., at 79, 86.) On or about August 11, Bell notified Crabtree "that he was a salaried employee, that he had been treated as a salaried employee, that [Bell] felt a mistake had been made if he had been termed as hourly." (Id. at 86.) On August 23, 2011, Crabtree sent Gibney another e-mail message, the body of which read as follows: "I have been thinking about our three meetings regarding my overtime worked in New Orleans. I feel not paying my overtime is illegal and I would like to know if this is Volkerts [sic] final answer." (Doc. 37, Exh. O, at 000453.) Gibney shared and discussed Crabtree's August 23 e-mail with Harmening and Bell. (Bell Dep., at 134; Harmening Dep., at 175.) The following day, Harmening sent a memorandum to Crabtree, confirming Volkert's [*24] position that "[y]ou are classified as a Senior Real Estate Specialist and considered a professional employee exempt from overtime." (Doc. 37, Exh. R.)

No more than one week after Crabtree complained in writing that Volkert's refusal to pay him overtime was "illegal," defendant decided to terminate his employment. On August 30, 2011, Harmening authored an internal memorandum identifying Crabtree as one of four employees being let go. (Doc. 37, Exh. T.) The memo explained that Crabtree had been hired for a specific job (the LSU/VA project), that this project "is at a close and based on our work load, staff seniority, and client relationships we have no other choice but to lay Chris [Crabtree] off." (Id.) Harmening's memo concluded that "the LSU/VA project is closing down," that Crabtree had been "hired in 2010 for this project," and that Volkert's "current workload does not justify retaining" him. (Id.)

On September 2, 2011, Bell sent a letter to Crabtree notifying him that Volkert "has not been able to maintain a sufficient backlog of work for the Real Estate Services Department. Due to this lack of work, it is necessary to reduce the work force to accommodate the amount of work available. [*25] Therefore, your last day of employment with Volkert, Inc. will be September 2, 2011." (Doc. 32, Exh. 13.) Crabtree's employment was indeed terminated

---

[10] Interestingly (and perhaps not coincidentally), Volkert mailed out these reimbursement checks on the same day that Crabtree and Everhardt filed their Motion for Summary Judgment, in which they asserted that they did not qualify for the administrative exemption because Volkert did not satisfy the salary basis of pay requirement. A significant component of plaintiffs' argument was that Volkert did not qualify for the so-called "window of correction" [*22] under the FLSA because it had failed to reimburse employees for improper deductions.

[11] Volkert alone has moved for summary judgment on Crabtree's FLSA retaliation cause of action. Accordingly, for summary judgment purposes, all evidence and reasonable inferences relating to that cause of action are construed in Crabtree's favor.

effective September 2, 2011, just 10 days after he sent the e-mail to Volkert officials complaining that "I feel not paying my overtime is illegal."

### III. Summary Judgment Standard.

*HN1*[↑] Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Rule 56(a), Fed.R.Civ.P.* The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991)*. Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986))* [*26] (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 999 (11th Cir. 1992)* (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc., 831 F.2d 1013, 1016 (11th Cir. 1987)* (citation omitted).

Although defendant alone moved for summary judgment as to Crabtree's FLSA retaliation claim and the duties-test portion of plaintiffs' FLSA overtime claim, both sides moved for summary judgment as to the salary-basis-test portion of plaintiffs' FLSA overtime claim. *HN2*[↑] The law is clear that "[t]he applicable *Rule 56* standard is not affected by the filing of cross-motions for summary judgment." *Page v. Winn-Dixie Montgomery, Inc., 702 F. Supp.2d 1334, 1345 (S.D. Ala. 2010)* (citations omitted); *see also Murray v. Holiday Isle, LLC, 620 F. Supp.2d 1302, 1307 (S.D. Ala. 2009)* [*27] (same). The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984)* (citation omitted); *see also Wermager v. Cormorant Tp. Bd., 716 F.2d 1211, 1214 (8th Cir. 1983)* ("the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits"). Nonetheless, "cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts." *Page, 702 F. Supp.2d at 1345* (citations omitted); *see also Murray, 620 F. Supp.2d at 1307*.

### IV. Whether Plaintiffs Were Exempt from the FLSA's Overtime Pay Requirements.

#### A. Legal Test for Administrative Exemption.

*HN3*[↑] As a general rule, the Fair Labor Standards Act requires employers to pay their employees overtime pay of one and one-half times their regular rate for all [*28] hours worked in excess of 40 in a particular workweek. *See 29 U.S.C. § 207(a)(1)*. Here, it is undisputed that Volkert failed to compensate Crabtree and Everhardt at one and one-half times their regular rate for their weekly hours worked in excess of 40. However, the Act also creates certain exemptions from those overtime pay requirements. The exemption invoked by Volkert in this case applies to "any employee employed in a bona fide executive, administrative, or professional capacity" who is compensated on a salary basis. *29 U.S.C. § 213(a)(1)*. Volkert contends that both Crabtree and Everhardt qualified for the administrative exemption, such that it owes them no overtime premium pay for the time period at issue.

*HN4*[↑] "The Department of Labor's (DOL) regulations set forth the requirements for the administrative exemption. Both a 'salary basis' test and a 'duties' test must be satisfied." *Hogan v. Allstate Ins. Co., 361 F.3d 621, 625 (11th Cir. 2004)*; *see also Davis v. City of Hollywood, 120 F.3d 1178, 1179 (11th Cir. 1997)* (to be eligible for the administrative exemption, "an employer must prove that the relevant employees meet two tests: the job duties test and the salary basis test"). In [*29] applying these tests, the Court is cognizant that "[t]he employer carries the

2012 U.S. Dist. LEXIS 173792, *29

burden of proving the exemption, and we narrowly construe the overtime provisions of *Section 207* against the employer." *Hogan, 361 F.3d at 625; Evans v. McClain of Georgia, Inc., 131 F.3d 957, 965 (11th Cir. 1997)* ("Exemptions under the FLSA, however, are to be construed narrowly. ... Indeed, the employer has the burden of showing that it is entitled to the exemption.") (citations omitted).

## B. Duties Test.

*HN5*[⬆] The applicable FLSA duties test contemplates that for an employee whose weekly salary exceeds $455 (as both plaintiffs' did at all relevant times), the administrative exemption applies only if both of the following requirements are satisfied: (i) the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and (ii) the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." *29 C.F.R. § 541.200(a)(2)-(3); see also Rock v. Ray Anthony Int'l, LLC, 380 Fed. Appx. 875, 2010 WL 2089636, *2 (11th Cir. 2010)* (reciting elements of [*30] duties test). The parties disagree as to whether either (much less both) of these elements is satisfied here. To resolve defendant's *Rule 56* Motion as to the duties test, however, the Court looks no further than the "discretion and independent judgment" prong. [12]

*HN7*[⬆] There is no doubt that "[t]o qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance." *29 C.F.R. §*

---

[12] The Court need not (and therefore does not) decide whether Crabtree's and Everhardt's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." *29 C.F.R. § 541.200(a)(2)*. Nonetheless, the Court pauses to observe that plaintiffs' insistence that they were mere "production workers" appears legally threadbare and factually incorrect. Certainly, plaintiffs are right that "the essence of [this] prong's focus on 'general business operations' is to separate production from administration. ... *HN6*[⬆] Production work relates to the goods and services that the business contributes to the marketplace, whereas administration relates to running the business." *Rock, 380 Fed. Appx. 875, 2010 WL 2089636, at *3* (citing Department of Labor guidance dated March 24, 2010). To qualify for this exemption, the employee "must perform work directly related to [*31] assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." *29 C.F.R. § 541.201(a)*. However, the regulations also specify that "[w]ork related to management or general business operations" includes work in functional areas such as "purchasing," "procurement," "public relations, government relations," and "legal and regulatory compliance." *29 C.F.R. § 541.201(b)*. Nor must the focus be on the employer's business; rather, "[a]n employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations *of the employer's customers.*" *29 C.F.R. § 541.201(c)* (emphasis added).

At its core, the primary duty of Real Estate Specialists at Volkert appears to be assisting Volkert clients during the eminent domain process with respect to acquisition of parcels and relocation of property owners. This is not reasonably couched as "production work." Volkert's clients (such as the Lousiana Department of Transportation ("LDOT"), for example) are not in the relocation [*32] business; rather, they are in the business of building roads and other infrastructure projects. To enable it to perform that "production" work, LDOT hires Volkert to provide services in the administrative/ management/ general business operation functions of procurement (of real estate, not office supplies), legal/regulatory compliance, public relations, and so on to ensure that the eminent domain process (which it itself ancillary to the public-works construction that is LDOT's business) complies with federal funding requirements. In other words, Crabtree and Everhardt helped LDOT run its business by making sure that property acquisition and relocation functions were performed in a lawful and proper manner, so that LDOT could go forward with the production work of building roads on the acquired parcels. Viewed in this light, plaintiffs' characterization of Real Estate Specialists such as Crabtree and Everhardt as mere production workers appears unwarranted and inaccurate. *See generally* Opinion Letter Fair Labor Standards Act FLSA2006-23, 2006 WL 2158424 (June 29, 2006) (where the employer "is a land-acquisition service that assists government agencies in the acquisition of property [*33] for public works projects," opining that relocation agents who "assist in property appraisal and provide relocation assistance to the owners and tenants of the property purchased by" their employer's clients are performing work that "is directly related to the general business operations of the employer's clients" because they "work in the functional areas of procurement, government relations, and legal and regulatory compliance, which are management and general business operations functions," such that they satisfy this prong of the duties test for the administrative exemption). Thus, it appears highly unlikely that plaintiffs can prevail at trial in arguing that their primary duties were not work related to management or general business operations of Volkert or its customers.

2012 U.S. Dist. LEXIS 173792, *33

_541.202(a)_. The regulations emphasize that this is a highly fact-bound inquiry. _See 29 C.F.R. § 541.202(b)_ (explaining that "discretion and independent judgment" must be evaluated "in the light [*34] of all the facts involved in the particular employment situation in which the question arises," and reciting lengthy list of relevant factors). Three noteworthy clarifications of the "discretion and independent judgment" concept are (i) that the term "implies that the employee has authority to make an independent choice, free from immediate direction or supervision;" (ii) that the term excludes the performance of "mechanical, repetitive, recurrent or routine work;" and (iii) that the employee's primary duty "must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." _29 C.F.R. § 541.202(c)_, _(e)_.

To hear Crabtree and Everhardt describe it, their primary job duties involved implementation of highly standardized, routinized, even rote tasks that were largely mechanical, repetitive and recurrent, at most involving use of skill in applying well-established standards set forth in the URA and client manuals. Crabtree describes the bulk of his day-to-day activities as transporting displaced renters to various appointments, preparing inventories of personal property, and so on. Crabtree avers that he spent [*35] little time identifying comparable properties and calculating replacement housing benefits, and even then casts those activities as standardized, routine procedures in which he had no latitude or discretion beyond doing what was "obvious." And while Crabtree did perform DSS inspections from time to time, he frames those inspections as consisting of simply walking through a property and filling out a pre-printed checklist to ensure the new housing's compliance with the Uniform Relocation Act and the client's own minimum standards. Whenever Crabtree faced any kind of unusual or non-obvious situation, he avers, he did not decide what to do himself, but instead always went to the client for instructions. Everhardt's description of his duties is much the same. Accepting these descriptions of plaintiffs' job duties as accurate, as the Court must on summary judgment, a reasonable factfinder could readily conclude that plaintiffs' primary duties did not include the exercise of discretion and independent judgment with respect to matters of significance. Plaintiffs' evidence is that they lacked authority to make independent choices, free from immediate direction and supervision; and that the [*36] tasks they performed were standardized, mechanical and routine, at most involving skill in applying specific standards from the URA and client manuals to a particular situation. In the absence of such discretion, of course, plaintiffs would be ineligible for the administrative exemption to FLSA overtime requirements. [13]

The Court's conclusions in this regard were echoed very recently in what appears to be a factually identical case pending in the Northern District of Alabama. Just over two weeks ago, summary judgment was denied in _Brazil v. Volkert, Inc., 2012 U.S. Dist. LEXIS 164601, 2012 WL 5872812 (N.D. Ala. Nov. 19, 2012)_. The _Brazil_ case involves a former colleague of Crabtree's and Everhardt's who worked for Volkert in the same job classification with the

---

[13] The Court understands, of course, that Volkert has a sharply differing view of what Real Estate Specialists such as Crabtree and Everhardt actually do and how much authority they have. For example, Volkert says that Real Estate Specialists perform certain duties (_i.e._, serving as expert witnesses in administrative appeals or litigation, assisting property owner in preparing for property closing) that Crabtree and Everhardt deny was part of their job. Similarly, Volkert insists that it and its clients "rel[y] heavily upon professional judgment of the Real Estate Specialist serving as a relocation agent" (doc. 32, Exh. 21, at #9), but plaintiffs' evidence is otherwise. And Volkert maintains that its Real Estate Specialists have "[g]reat latitude" in the "judgment call" of identifying comparable properties (_id._), which plaintiffs flatly deny. If Volkert's version of the [*37] facts is correct, then the "discretion and independent judgment" prong may well be satisfied; however, plaintiffs' evidence (not defendant's) governs the _Rule 56_ inquiry as to defendant's motion. Summary judgment is neither the time nor the place for courts to resolve credibility disputes and embark on fact-finding expeditions. Likewise, the Court finds unpersuasive defendant's arguments in its reply that various pieces of evidence prove the existence of the requisite discretion and independent judgment. (Doc. 39, at 18.) For example, Volkert maintains that Crabtree admitted to deviating from URA criteria in DSS inspections; however, the cited record testimony is, at best, ambiguous (and, at worst, unsupportive) of that point. Volkert insists that plaintiffs "repeatedly gave their _certified opinions_ regarding the Fair Market Value" of various properties, but ignores plaintiffs' evidence that they simply copied that information from an appraisal and lacked authority to do otherwise. And, contrary to Volkert's suggestion, the fact that Everhardt was assigned a "runner" for some period of time does not automatically imply that his primary duty involved exercise of independent judgment [*38] and discretion in matters of significance; indeed, it seems difficult to imagine how directing a single low-level employee's activities could possibly qualify as a "matter of significance" to the company. (There is no defense presented here that Everhardt was subject to the executive exemption, which at any rate applies only to an employee "[w]ho customarily and regularly directs the work of **two or more other employees**." _29 C.F.R. § 541.100(a)(3)_ (emphasis added).)

Case 1:16-cv-01692-SCJ   Document 27-1   Filed 04/20/17   Page 15 of 80

Page 14 of 22
2012 U.S. Dist. LEXIS 173792, *38

same job title for the same manager in the same time period at issue in this case. [14] Given that our plaintiffs' FLSA overtime claims are apparently in an identical factual and legal posture to Brazil's FLSA overtime claims, the *Brazil* court's analysis of the duties test in Volkert's summary judgment motion concerning **[*39]** the administrative exemption provides helpful guidance to the undersigned in confronting precisely the same issue here. That court concluded as follows: "Because genuine, and hotly contested, issues of material fact exist as to the extent of Mr. Brazil's independent judgment and discretion as a Real Estate Specialist when viewing the evidence in the light most favorable to the nonmovant, the court cannot grant summary judgment for Volkert under the Administrative Exemption." *2012 U.S. Dist. LEXIS 164601, [WL] at \*9*.

For all of the foregoing reasons, the Court finds that there are genuine issues of material fact as to whether plaintiffs' primary duty included the exercise of discretion and independent judgment with respect to matters of significance, as required by *29 C.F.R. § 541.202(a)*. Those factual disputes preclude entry of summary judgment in Volkert's favor on the "duties test" portion of the FLSA's requirements for the administrative exemption. Accordingly, defendant's Motion for Summary Judgment is **denied** on this point.

### C. Salary Basis [*40] Test.

*HN8*[↑] For an employee to qualify for the administrative exemption, "[t]he regulations provide ... that ... an employee must be paid on a salary basis." *Avery v. City of Talladega, Ala., 24 F.3d 1337, 1340 (11th Cir. 1994)*. "An employee is considered 'paid on a salary basis' if 'he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." *Hogan, 361 F.3d at 625* (citations and internal quotation marks omitted); *see also Davis, 120 F.3d at 1179* (similar); *Friedman v. South Florida Psychiatric Associates, Inc., 139 Fed. Appx. 183, 2005 WL 1540129, \*1 (11th Cir. 2005)* ("One of the requirements for exempt status is that the employee be paid on a salary basis, which requires the employee's compensation not be subject to reduction because of variations in the quality or quantity of the work performed.") (citation and internal quotation marks omitted). The salary basis of pay is lacking for employees whose "employers have reduced their salaries because of how much or how well they worked." *Nicholson v. World Business Network, Inc., 105 F.3d 1361, 1365 (11th Cir. 1997)*.

*HN9*[↑] "A **[*41]** deduction for a partial day's absence is not one of the allowable deductions." *Friedman, 139 Fed. Appx. 183, 2005 WL 1540129, at \*2* (where plaintiff's pay was docked for partial-day absences, "the salary basis of pay was violated, and Friedman was rendered a non-exempt employee and was entitled to overtime"). The uncontroverted evidence is that Crabtree and several other Real Estate Specialists incurred deductions from their salary for partial-day absences, with the incidence of such deductions being approximately 17 occasions over a four-year period. Plaintiffs' argument, quite simply, is that those deductions irrevocably destroyed the salary basis of pay for all Real Estate Specialists and Senior Real Estate Specialists reporting to manager Harmening during the entire time period of concern, and foreclose Volkert from relying on the administrative exemption to defeat plaintiffs' FLSA overtime claims. [15] *See 29 C.F.R. § 541.603(a)* ("An employer who makes improper deductions from salary

---

[14] Coincidentally, Mr. Brazil is represented by the same attorneys who represent Messrs. Crabtree and Everhardt here, and Volkert's counsel is likewise identical in both actions.

[15] Although plaintiff Crabtree's pay was reduced on occasion because of partial-day absences, no such **[*42]** deductions were ever made to plaintiff Everhardt's salary. Nonetheless, both case law and regulations confirm that if the salary basis of pay test was not satisfied for Crabtree, then it was likewise not satisfied for his co-workers in the same job classification working for the same manager. *See, e.g., Avery, 24 F.3d at 1342* (rejecting defendant's argument that "our holding that Lt. Jacks is not a salaried employee would not affect the salaried status of the other lieutenants," and instead clarifying that "[w]e hold that the suspension of Lt. Jacks destroyed not only his salaried status but that of the other lieutenants as well"); *29 C.F.R. § 541.603(b)* ("If the facts demonstrate that the employer has an actual practice of making improper deductions, the exemption is lost during the time period in which the improper deductions were made for employees in the same job classification working for the same managers responsible for the actual improper deductions."). Crabtree and Everhardt worked in the same job classification for the same manager. Accordingly, the salary-basis analysis is identical for each plaintiff's FLSA overtime claims, notwithstanding their divergent experiences in **[*43]** terms of actual partial-day deductions from salary.

Case 1:16-cv-01692-SCJ   Document 27-1   Filed 04/20/17   Page 16 of 80

Page 15 of 22
2012 U.S. Dist. LEXIS 173792, *43

shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis.").

In response, Volkert invokes the "window of correction" mechanism established by the regulations. *See, e.g., Davis, 120 F.3d at 1180* (recognizing a regulatory "window of correction" that preserves the salary basis of pay in certain circumstances, such that "the exemption will not be considered to have been lost if the employer reimburses the employee for such deductions and promises to comply in the future"). The "window of correction" regulation was substantially and materially revised by the Department of Labor in 2004. This development is important, because the vast majority of the authorities cited in the parties' briefs pre-dates the 2004 amendments. Rather than parsing the language of case law applying a superseded iteration of the regulation, the Court focuses on the operative regulatory language itself. [16]

Two different subsections of *29 C.F.R. § 541.603* confirm that the salary basis of pay was not destroyed for Crabtree and Everhardt by the infrequent partial-day absence deductions appearing in the record. First, HN10[⚓] *subsection (c)* provides that "[i]mproper deductions that are either isolated or inadvertent will not result in loss of the exemption for any employees subject to such improper deductions, if the employer reimburses the employees for such improper deductions." *29 C.F.R. § 541.603(c)*. The partial-day absence deductions that Harmening approved for approximately 1% of the paychecks issued to Real Estate Specialists and Senior Real Estate Specialists during the 2008-2011 period qualify as "isolated" under any reasonable definition of the term. These kinds of errors were happening roughly four times per year during the relevant time period. (Gibney Aff., at Exh. A.) These undisputed facts reflect that the improper deductions were "isolated" for purposes of *§ 541.603(c)*, and plaintiffs [*45] have advanced no meaningful argument to the contrary. Moreover, the record is clear that Volkert ultimately reimbursed employees for each of those sporadic, isolated improper deductions. [17] For these reasons, the salary basis of pay remains intact for Crabtree and Everhardt, despite the partial-day absence deductions that occurred, pursuant to the plain language of *§ 541.603(c)*.

---

[16] In so doing, the Court recognizes that "[t]he FLSA grants the Secretary broad authority to define and delimit the scope of the exemption for executive, administrative, and professional employees." *Auer v. Robbins, 519 U.S. 452, 456, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)* (citations and internal markings omitted); *see also Avery, 24 F.3d at 1340* [*44] (DOL's interpretive regulations defining scope of FLSA's *§ 213* exemptions "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute") (citation omitted).

[17] Plaintiffs insist that Volkert should not get credit for reimbursing the affected employees because it failed to do so until June 2012, after this lawsuit was filed and, indeed, while summary judgment briefing was underway. The trouble with plaintiffs' argument is that neither *§ 541.603* nor the predecessor regulation established any time frame within which the reimbursement must take place in order for an employer to avail itself of the window of correction. Courts have routinely rejected arguments comparable to plaintiffs' in analogous factual and procedural circumstances involving improper FLSA deductions. *See, e.g., Auer, 519 U.S. at 463-64* (with respect to predecessor regulation, declining to hold that "reimbursement must be made immediately upon the discovery that an improper deduction was made," where [*46] the regulation itself "does not address the timing of reimbursement" and the Secretary indicated via *amicus* brief that "he does not interpret it to require immediate payment"); *Davis, 120 F.3d at 1180* (where employer conducted audit during pendency of FLSA litigation and reimbursed employees found to have been subject to improper deductions, "no question exists that under the facts of this case the City comes within the protection of the window of correction"); *Kelly v. City of New York, 2000 U.S. Dist. LEXIS 11619, 2000 WL 1154062, *27 (S.D.N.Y. Aug. 15, 2000)* (finding that window of correction remained available, even though employer still had not reimbursed plaintiffs for improper deductions at time of summary judgment ruling, where "the language of the regulation does not address the timing of reimbursement and the Secretary of Labor does not interpret the regulation to require immediate payment upon discovery of the improper deduction"); *Johnson v. Chicago Housing Authority, 1997 U.S. Dist. LEXIS 19001, 1997 WL 757737, *5 (N.D. Ill. Nov. 24, 1997)* ("CHA's promise to reimburse plaintiffs upon a final judgment that it can avail itself of the Window of Correction rule satisfies the standard set forth in *Auer*.") (internal marks omitted). [*47] Although these cases were decided under the pre-2004 iteration of the "window of correction" regulation, nothing in the present version (*§ 541.603(c),(d)*) suggests that the DOL intended to impose any kind of deadline on the timing of reimbursement as a prerequisite for an employer to avail itself of the window of correction.

ERIC MAGNUS

Case 1:16-cv-01692-SCJ   Document 27-1   Filed 04/20/17   Page 17 of 80

Page 16 of 22
2012 U.S. Dist. LEXIS 173792, *47

The same conclusion attaches under _subsection (d)_ of the same regulation. That provision reads in part as follows: **HN11**[⬆] "If an employer has a clearly communicated policy that prohibits the improper pay deductions specified in _§ 541.602(a)_ and includes a complaint mechanism, reimburses employees for any improper deductions and makes a good faith commitment to comply in the future, such employer will not lose the exemption for any employees unless the employer willfully violates the policy by continuing to make improper deductions after receiving employee complaints." _29 C.F.R. § 541.603(d)_. Thus, _subsection (d)_ creates a safe harbor when the following five criteria are satisfied: (i) the employer has a clearly communicated policy prohibiting improper deductions; (ii) that policy includes a complaint mechanism; (iii) the employer reimburses employees for any improper deductions; [*48] (iv) the employer makes a good faith commitment to comply in the future; and (v) the employer does not continue to make improper deductions after receiving employee complaints.

All five of those criteria are present here. First, it is undisputed that Volkert's Personnel Practices Manual distributed to all employees prohibited deductions to the salary of exempt employees for partial-day absences. (Doc. 32, Exh. 7, at 000420.) [18] Second, that policy plainly included a complaint mechanism, as it directed any salaried employee "who believes that an improper deduction has been made from his/her pay [to] utilize the 'Problem Solving' procedures in Section II(K) of this Manual to resolve the matter." (_Id._) Third, as discussed _supra_, Volkert fully reimbursed employees for improper deductions. Fourth, the record unambiguously shows that Volkert made "a good faith commitment to comply in the future" in the form of implementing additional procedural safeguards to prevent improper deductions, as well as one-on-one discussions in which Gilbey educated Harmening about Volkert's salary deduction policies and instructed her on the proper application of same. Fifth, the record is devoid of evidence [*49] that Volkert "willfully violate[d] the policy by continuing to make improper deductions after receiving employee complaints." _§ 541.603(d)_. [19] Accordingly, the _subsection (d)_ safe harbor is likewise satisfied here, and the salary basis requirement for FLSA exemption purposes remains intact as to plaintiffs, notwithstanding Volkert's infrequent, improper partial-day deductions from salary.

One other issue concerning the salary basis test is properly addressed at this time. Without citing regulatory language, plaintiffs rely on pre-2004 authorities interpreting the predecessor regulation for the proposition that an employer's intent to pay employees on a salaried basis is a prerequisite to eligibility for the window of correction. [20] **HN12**[⬆] The "intent" concept surfaces in _subsection (a)_ of the current regulation, which provides that "[a]n

[18] According to the regulation, "[t]he best evidence of a clearly communicated policy is a written policy that was distributed to employees prior to the improper pay deductions by, for example, ... publishing the policy in an employee handbook." _29 C.F.R. § 541.603(d)_. That was done here, inasmuch as the deductions policy was included in Volkert's Personnel Practices Manual; therefore, the "clearly communicated policy" requirement is satisfied.

[19] Plaintiffs vigorously pursue this prong of _subsection (d)_, pointing to the July 22, 2011 deduction as proof that "Assistant VP Harmening made at least one improper deduction even after HR Supervisor Gibney informed her she could not do so." (Doc. 38, at 3.) However, plaintiffs' argument glosses over the language in the regulation that continuing to make improper [*50] deductions destroys the safe harbor only if such action occurs "after receiving employee complaints." _§ 541.603(d)_. There is no evidence that any Volkert employee complained prior to July 22, 2011 about improper partial-day deductions. Certainly, Crabtree had expressed concerns about FLSA issues prior to that date; however, his objections were directed generally at hourly versus salaried status and specifically at the scheduled overtime his supervisor was making him work. There is no evidence that he balked at particular deductions for partial-day absences, or that he ever told Volkert he believed those deductions were improper under the FLSA and/or Volkert policy. The record lacking any factual basis to support an inference that Volkert continued to make improper deductions _after receiving employee complaints_ about said deductions, no reasonable factfinder could conclude that this prong of the _subsection (d)_ safe harbor is absent in this case. Plaintiffs' attempt to rewrite the regulation as eliminating access to the window of correction where the employer "continu[es] to make improper deductions _after learning that the deductions were improper_" (doc. 38, at 5 (emphasis added)) is [*51] ill-conceived and unpersuasive. The actual text of the regulation does not hinge window-of-correction status on whether the employer made deductions after "learning that the deductions were improper."

[20] In that regard, plaintiffs urge the Court to follow a Sixth Circuit opinion dating back to 2001 and concluding that, "when read in its entirety, the 'window of correction' regulation allows use of the defense only after an employer has first demonstrated an intention to pay its employees on a salary basis." _Takacs v. Hahn Automotive Corp., 246 F.3d 776, 783 (6th Cir. 2001)_.

employer who makes improper deductions from salary shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis." _29 C.F.R. § 541.603(a)_. Unfortunately, the parties fail to address in any meaningful way (either by discussion or citation to post-2004 authorities) the interplay between _subsection (a)_ (which says the exemption is lost if the employer did not intend to pay its employees on a salary basis) and _subsections (c)_ and _(d)_ (which say the exemption is not lost if certain corrective [*52] actions are taken). Is _subsection (a)_ a prerequisite that must be satisfied before _subsections (c)_ and _(d)_ become available? Or do _subsections (c)_ and _(d)_ effectively restore an exemption that would otherwise be lost by _subsection (a)_? Lacking the benefit of research or legal arguments by the parties on this issue, the Court will not forge ahead _sua sponte_ to construe the interaction among these subsections.

Instead, the Court will assume (without deciding) that _subsection (a)_ is indeed a preliminary hurdle that an employer must overcome before it may unlock the window of correction defense in _subsections (c)_ and _(d)_. HN13[⏏] _Subsection (a)_ states that the intent inquiry turns on whether "an employer has an actual practice of making improper deductions." _§ 541.603(a)_. In determining whether an "actual practice" exists, [*53] courts must consider factors such as (i) the number of improper deductions, relative to the number of infractions; (ii) the time period in which improper deductions were made; (iii) the number and geographic location of employees whose salaries were improperly reduced; (iv) the number and geographic location of managers who took the deductions; and (v) whether the employer has a clearly communicated policy prohibiting improper deductions. _Id._ Applying these factors, and otherwise examining the totality of the circumstances, the Court is convinced that no reasonable factfinder could conclude that Volkert had an "actual practice" of making improper deductions for purposes of _§ 541.603(a)_. In so concluding, the Court observes that Volkert at all times had a clearly communicated written policy prohibiting improper deductions; that the deductions in question were made infrequently by a single manager (Harmening) who by her own admission did not understand the policy; that Volkert officials took prompt steps to educate Harmening, correct her errors, and prevent future errors when they became aware of same; and that only four (4) employees in the entire Volkert organization ever had their [*54] salaries reduced between 2008 and 2011 for partial-day absences. There is no evidence that any other Volkert manager at any time in any location misapplied the salary-deduction policy in the manner that Harmening did, or that any other Volkert employee was subjected to improper deductions at any time. Simply put, the facts do <u>not</u> demonstrate that the "employer had an actual practice of making improper deductions." _29 C.F.R. § 541.603(a)_. As such, by operation of _subsection (a)_, the facts do not "demonstrate that the employer did not intend to pay employees on a salary basis," and Volkert does not lose the exemption. _Id._ [21]

---

[21] In so concluding, the undersigned notes that plaintiffs' briefs shift the focus from Volkert's intent and actual practice to those of Harmening. (_See, e.g._, doc. 28, at 20-21 (discussing "her 'actual practice' of making unlawful deductions") & 22 ("Sandy Harmening's testimony establishes unequivocally that she did not intend to pay employees on a salary basis"); doc. 38, at 4 (referring to "her 'actual practice' of making unlawful deductions"), 6 (arguing that "what matters is ... the intent of the manager who makes the deductions"), & 7 (insisting that Harmening [*55] "had an 'actual practice' of intentionally deducting for partial day absences").) Plaintiffs do not identify any language in _subsection (a)_ or ensuing case law that would make the individual manager (rather than the employer) the proper unit of observation for the "actual practice" inquiry. To the contrary, the plain language of the regulation shows otherwise. _Subsection (a)_ provides that the exemption is lost if "the **employer** did not intend to pay employees on a salary basis," not the manager. _§ 541.603(a)_ (emphasis added). The regulation continues that the proper determination is "whether an **employer** has an actual practice of making improper deductions," not the manager. _Id._ (emphasis added). This unambiguous language is buttressed by _subsection (a)_'s recitation of a proper factor in the inquiry as being "the number and geographic location of managers responsible for taking the improper deductions." _Id._ If, as Crabtree and Everhardt insist, a single manager's misunderstanding is automatically dispositive of the employer's intent for _subsection (a)_ purposes, surely the regulation would not have specified that the number of managers making improper deductions was a relevant factor. [*56] By wording the regulation as it did, the DOL is acknowledging that the outcome of the "actual practice" inquiry differs where a single rogue manager imposes improper deductions, versus where myriad managers are doing so. The latter circumstance would obviously be far more probative of an employer's actual practice of making unlawful deductions than would the former. For all of these reasons, the Court cannot accept plaintiffs' contention that Harmening's "actual practice" is all that matters for the _§ 541.603_ inquiry; rather, the clear language of that regulation specifies that it is the <u>employer's</u> actual practice (not that of a single misinformed, confused, or even malicious/rogue manager) that is relevant. Plaintiffs have not argued — and cannot reasonably argue on this record — that Volkert as a whole ever had an "actual practice" of making the unlawful deductions at issue.

2012 U.S. Dist. LEXIS 173792, *56

For all of the foregoing reasons, the Court concludes that there are no genuine issues of material fact, and that Volkert has satisfied the salary basis test for the administrative exemption for both Crabtree and Everhardt. Although improper deductions were made, when the facts are accepted in the light most favorable [*57] to plaintiffs, Volkert retained the salary basis of pay pursuant to 29 C.F.R. § 541.603(c) and (d) because it had no actual practice of making improper deductions, the improper deductions were isolated, Volkert had a clearly communicated policy prohibiting such deductions and providing for a complaint mechanism, all affected employees were reimbursed for improper deductions, Volkert made a good faith commitment to comply in the future, and Volkert did not continue making improper deductions after receiving employee complaints. With regard to the salary basis test, then, Volkert's Motion for Summary Judgment (doc. 32) is **granted**, and plaintiffs' Motion for Partial Summary Judgment (doc. 28) is **denied**.

**V. Plaintiff Crabtree's FLSA Retaliation Cause of Action.**

*HN14*[⬆] In addition to its provisions requiring payment of overtime compensation and minimum wages to nonexempt employees, the FLSA also prohibits retaliation. In that regard, the Act provides that it is unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3). [*58] Crabtree maintains that he engaged in protected activity under the FLSA when he complained to Volkert on August 23, 2011 that he was being denied overtime compensation to which he claimed entitlement under the FLSA. Crabtree further maintains that his discharge on September 2, 2011 was in retaliation for said protected activity. Defendant moves for summary judgment on this cause of action.

*HN15*[⬆] The legal standard by which claims of FLSA retaliation are evaluated on summary judgment is substantively identical to that employed in the Title VII retaliation context. *See Johnson v. Advertiser Co., 778 F. Supp.2d 1270, 1277 (M.D. Ala. 2011)* ("In the Eleventh Circuit, retaliation claims under the FLSA are analyzed under the burden-shifting framework employed by courts in cases brought under Title VII of the Civil Rights Act."); *Stephenson v. National Alliance Sec. Agency, Inc., 2012 U.S. Dist. LEXIS 53000, 2012 WL 1340073, *7 (N.D. Ala. Apr. 16, 2012)* ("where a plaintiff cannot demonstrate direct evidence of retaliation under the FLSA, she may utilize the *McDonnell Douglas* burden shifting framework"). Thus, a plaintiff establishes a *prima facie* case of FLSA retaliation under § 215(a)(3) by establishing three elements: "(1) [*59] she engaged in activity protected under [the] act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." *Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342-43 (11th Cir. 2000)* (citation omitted). "If a plaintiff demonstrates a *prima facie* case, a defendant has the burden of coming forward with a legitimate non-retaliatory reason for [its] adverse employment action." *Suchite v. Kleppin, 819 F. Supp.2d 1284, 1293 (S.D. Fla. 2011)*. "If the employer asserts a legitimate reason for the adverse action, the plaintiff may attempt to show pretext." *Wolf, 200 F.3d at 1343*.

For purposes of summary judgment, Volkert does not challenge Crabtree's ability to establish a *prima facie* case of FLSA retaliation. (Doc. 33, at 27.) [22] As its legitimate non-retaliatory reason for terminating Crabtree's employment,

---

[22] Defendant's acquiescence on this point is prudent, as the record plainly establishes all elements of plaintiff's *prima facie* case. With respect to protected activity, there can be no reasonable debate that Crabtree's conduct on August 23, 2011 (*i.e.*, complaining internally that Volkert's failure to pay him overtime was unlawful) falls within the scope of activity protected by the FLSA's anti-retaliation provision. *See, e.g., E.E.O.C. v. White and Son Enterprises, 881 F.2d 1006, 1011 (11th Cir. 1989)* ("we conclude that the unofficial complaints expressed by [*61] the women to their employer about unequal pay constitute an assertion of rights protected under" the FLSA, because "[t]he anti-retaliation provision of the FLSA was designed to prevent fear of economic retaliation by an employer against an employee who chose to voice such a grievance"); *Keeler v. Florida Dep't of Health, 324 Fed. Appx. 850, 2009 WL 1111551, *7 (11th Cir. 2009)* ("Informal complaints are sufficient to trigger this anti-retaliation provision."). Involuntary termination of employment is obviously an adverse employment action. And the 10-day interval between Crabtree's protected activity and Volkert's termination of his employment suffices to establish the requisite causal connection for purposes of a *prima facie* case. *See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007)* ("The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action.").

Case 1:16-cv-01692-SCJ   Document 27-1   Filed 04/20/17   Page 20 of 80

Page 19 of 22
2012 U.S. Dist. LEXIS 173792, *61

defendant initially points to a work slowdown. Indeed, during this litigation, defendant's officials have consistently explained that Crabtree was laid off for "lack of work." When asked if Crabtree was terminated for lack of work, David Bell (Volkert vice president involved in the termination decision) [*60] responded, "That is absolutely correct." (Bell Dep., at 100.) Crabtree's supervisor, Sandy Harmening, testified similarly, indicating that Volkert's "upper management had been asking us to cut our resources because of our lack of work. I mean, we had more employees than we had work going on." (Harmening Dep., at 131.) And the "Personnel Termination Form" completed by Volkert for Crabtree recites as the reason for termination "lack of work." (Doc. 28, Exh. A, at 000791.) There appears to be no genuine factual dispute that Volkert was indeed facing a "lack of work" that reasonably called for a reduction in force in September 2011.

To say that Volkert needed to lay off several employees, however, is not to say why Crabtree (as opposed to other Volkert employees) was selected for layoff just a week after he complained of overtime pay violations. On that score, defendant offers [*62] three explanations, to-wit: (i) Crabtree had been rehired by Volkert in July 2010 for the express purpose of working on the LSU/VA project, which was closing down; (ii) Crabtree was not approved by Volkert's client to perform work on its next contract; and (iii) Crabtree was viewed as disloyal. (Doc. 33, at 27-32; doc. 39, at 25.) This articulation of reasons, with supporting record citations, satisfies defendant's modest burden of production in the *McDonnell Douglas* analysis. Plaintiff does not contend otherwise.

*HN16*[↑] "In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." *Chapman v. AI Transport, 229 F.3d 1012, 1037 (11th Cir. 2000)*. To show that the stated reason is pretext for unlawful retaliation, the plaintiff "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Vessels v. Atlanta Independent School System, 408 F.3d 763, 771 (11th Cir. 2005)* (quotation omitted); *see* [*63] *also* *Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1278 (11th Cir. 2008)* ("The plaintiff must demonstrate weaknesses or implausibilities in the employer's proffered legitimate reasons for its action sufficient for a reasonable factfinder to disbelieve the reasons."). Where, as here, a defendant has articulated multiple non-retaliatory justifications for its decision, the plaintiff must rebut each of them to withstand *Rule 56* scrutiny. *See, e.g., Crawford v. City of Fairburn, Ga., 482 F.3d 1305, 1308 (11th Cir. 2007)* ("If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment."). Here, Crabtree has met his burden of casting sufficient doubt on Volkert's stated reasons for selecting him for termination that a reasonable factfinder could deem them unworthy of credence.

First, Volkert contends that Crabtree was chosen in the reduction in force because he was hired for a specific job (the LSU/VA project), and that project was coming to a close. But plaintiff's evidence is rife with admissions by Volkert that it did not rehire Crabtree exclusively to work on the LSU/VA project and no others; [*64] indeed, the record demonstrates that Volkert's intent all along had been to assign Crabtree to work other jobs when the LSU/VA project was completed. In initial hiring paperwork dated July 2, 2010, Harmening explained the decision to hire Crabtree as follows: "We are hiring him back to work on the LSU medical center. His relocation will help on this project *& future projects*." (Doc. 28, Exh. A, at 000799 (emphasis added).) On April 6, 2011, Harmening sent an e-mail to Crabtree stating that, while Volkert had previously been unsure whether "there would be another work assignment for you after the VA/LSU project," it had now been decided that "we are going to work you on the Shreveport project." (Doc. 37, Exh. O, at P0103.) Harmening's testimony is crystal clear that Volkert had intended to assign Crabtree to the Shreveport project when the LSU/VA job was finished. (Harmening Dep., at 132-33.) In light of this evidence, Volkert's suggestion that Crabtree was let go after the LSU/VA job closed down because he was hired solely for the LSU/VA project is of sufficiently dubious validity that a reasonable factfinder could disbelieve it.

Second, Volkert states that it selected Crabtree for [*65] layoff because its client, the Louisiana Department of Transportation ("LDOT"), "would not approve him to work on a major project in Shreveport (Volkert's only ongoing project at the time)." (Doc. 33, at 28.) However, a reasonable factfinder could readily deem this statement to be a half-truth lacking in credibility, thereby qualifying as pretext. *See* *Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1265 (11th Cir. 2010)* (plaintiff may satisfy burden of showing pretext "by showing that [defendant's] proffered reasons are not credible"). It is true enough that LDOT sent letters to Volkert on April 18, 2011 and July

2012 U.S. Dist. LEXIS 173792, *65

18, 2011 stating that Crabtree was "not approved to provide relocation assistance services" on the Shreveport project. (Doc. 32, Exhs. 14 & 17.) It is also true, however, that those same letters included statements by LDOT that "Mr. Brad Joyner is not approved to provide negotiation and acquisition services and improvement control services" and that "Mr. Patrick Anthony is not approved to provide relocation assistance services." (*Id.*) Yet Volkert went to bat for Joyner and Anthony (neither of whom had complained of FLSA violations) in September 2011, successfully [*66] obtaining LDOT approval for them to work on the Shreveport project based solely on the fact that they had previously received panel acceptance letters. (Doc. 37, Exh. V, at P0263, P0265-68.) Crabtree likewise had received just such a panel acceptance letter. (Doc. 37, Exh. U, at P002197.) Yet Volkert did not undertake to gain approval for Crabtree, as it did for the non-complainers, Joyner and Anthony. [23]

More importantly, Volkert candidly acknowledged that it could have obtained the requisite LDOT approval for Crabtree to work on the Shreveport project, just as it did for Joyner and Anthony. Volkert Vice President Bell conceded that Volkert had succeeded in obtaining approval for every Real Estate Specialist or Senior Real Estate Specialist that it had ever wanted to work on an LDOT project. (Bell Dep., at 117-18.) And he admitted, "Would we have ultimately probably been able to get Chris [Crabtree] approved for the project; given his background and relocation, yes." (*Id.* at 118.) Here, then, is the problem: Volkert asks this Court to believe that it had "no other choice" but to fire Crabtree because LDOT had not approved him to work the Shreveport project, and Volkert had no other projects. But the record shows that Volkert could have obtained that approval for Crabtree if it had wished to do so, just as it did for other employees similarly situated to Crabtree who had not engaged in protected activity. This is exactly the sort of implausibility, incoherency or inconsistency that would allow a reasonable factfinder to deem the stated reason unworthy of [*69] credence.

Third, defendant derides Crabtree's "lack of fealty," accuses him of being "disloyal to the company," and asserts that Volkert merely "prioritize[d] the continued employment of those of its workers it viewed as possessing superior qualities of loyalty." (Doc. 33, at 31; doc. 39, at 26.) In this regard, Volkert touts a literary quote that if an employer "pays you wages that supply you your bread and butter, work for him — speak well of him, think well of him, stand by him and stand by the institution he represents." (Doc. 39, at 25 n.6.) A trio of glaring infirmities doom this argument to failure. As an initial matter, Volkert identifies no record evidence in which any decisionmaker ever cited disloyalty as a reason for Volkert laying off Crabtree. [24] Nor is there evidence that Volkert viewed other, retained

---

[23] Defendant ridicules Crabtree's argument as a "Quixotic charge at the windmill" (doc. 39, at 26) and scoffs that, because it did not work to procure approval from LDOT for Joyner and Anthony until mid-September, "it would have been completely illogical for Volkert to have sought such clearance **for an employee it had terminated more than two weeks prior**" (doc. 33, at 31 (emphasis in original)). This argument misses the point. As of September 1, 2011, LDOT approval to work the Shreveport project had not been granted to Joyner, Anthony and Crabtree, all of whom possessed the requisite panel acceptance letters. Volkert chose to fire Crabtree and submit panel acceptance letters for Joyner and Anthony. It could have laid off one of the others in lieu of Crabtree and submitted Crabtree's [*67] letter of approval instead, reaching the same result of approval to work the Shreveport project. The critical question for purposes of the FLSA retaliation claim is why Volkert fired Crabtree rather than the other two, who had been similarly situated to Crabtree inasmuch as they had been repeatedly rejected by LDOT for the Shreveport project just as Crabtree had been. That question has not been adequately answered on summary judgment in a manner that negates a reasonable inference of pretext. Nor does Volkert advance its position on summary judgment by repeatedly pointing to Randy Matheny as an employee who was treated similarly to Crabtree. A Title VII / FLSA plaintiff has no burden on summary judgment to prove that he was treated differently than every other employee who did not engage in protected activity, only that he was treated differently than some other employee who did not engage in protected activity. Properly framed, the issue is not why Matheny was treated the same as Crabtree, but why Crabtree was treated differently than employees like Joyner and Anthony, despite the fact that they, like Crabtree, had not been approved by LDOT to work on the Shreveport project as of [*68] the date of Crabtree's firing.

[24] To be sure, Bell did testify that Crabtree had "left us to go to work for a competitor for a little bit more money in the middle of a job" back in 2006. (Bell Dep., at 146.) But the cited portions of Bell's deposition do not state that fact as a reason for Crabtree's firing in September 2011. Similarly, Harmening did express her opinion that she had "an issue with his loyalty" because "[h]e left us once. I mean, I didn't feel no loyalty to that." (Harmening Dep., at 194.) But she did not expressly state in her deposition that Crabtree's disloyalty was the reason (or even a reason) why she recommended him for layoff. Defendant's counsel appear to be imputing sentiments to Volkert's managers that the witnesses never expressed, drawing connections — between feelings of

2012 U.S. Dist. LEXIS 173792, *68

employees as loyal. Moreover, a reasonable factfinder could deem the "disloyalty" explanation implausible or lacking in credibility for the simple reason that Volkert had rehired Crabtree some 14 months earlier with full knowledge of this purported "disloyalty." If Volkert truly prized loyalty above other virtues, and harbored a grudge that Crabtree was disloyal to the [*70] company based on events that had occurred five years earlier, then why did Volkert rehire him in the first place? Surely a reasonable factfinder could conclude from this factual disconnect that if fears of disloyalty were not sufficient to prevent Volkert from rehiring Crabtree, then they also were not the real reason why Volkert fired him.

Finally, Volkert overlooks the problematic reality that loyalty is a two-edged sword in the retaliation context. Was Crabtree deemed disloyal because he resigned his job to make more money elsewhere in 2006? Or was he deemed disloyal because he complained of overtime violations a week before Volkert showed him the door? The record reasonably supports both inferences. If Volkert really did value employees who would "think well of" it and "stand by the institution," as defendant now insists, then surely a reasonable factfinder could view the "disloyalty" explanation as mere code for Crabtree's protected activity under the FLSA a week before he was fired. After all, what could be more disloyal than accusing the company of "illegal" activity and talking to [*72] other employees about it, as Volkert believed he had done? [25] By defendant's reckoning, it would appear that loyal company men and women do not speak out when the company fails to pay them what it owes, but instead "stand by" the company come what may. If, as it now argues, Volkert wanted employees who stood by it and spoke well of it and never worked against it, and if Volkert truly viewed anything else as disloyalty, then Crabtree's protected complaints of illegal denial of overtime compensation might well have placed him in the "disloyal" category in Volkert's eyes. In that event, of course, his discharge would have constituted unlawful retaliation under the FLSA, with "disloyalty" being a mere euphemism used by the employer to mask retaliatory animus.

For all of the foregoing reasons, the Court finds that Crabtree has successfully rebutted each of Volkert's legitimate non-retaliatory reasons for selecting him (as opposed to other employees) for layoff in September 2011. On this evidentiary record, taking all reasonable inferences in favor of Crabtree, a reasonable factfinder could conclude that Volkert terminated his employment not because he was only hired for a specific project, he had not received LDOT approval, or he had resigned from the company in 2006, but because Crabtree had accused the company of violating the FLSA's overtime pay requirements barely a week earlier. Genuine issues of material fact remain for trial; therefore, defendant's Motion for Summary Judgment is **denied** as to the FLSA retaliation cause of action.

## VI. Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

   1. Plaintiffs' Motion for Partial Summary Judgment (doc. 28) is **denied**;

   2. Defendant's Motion for Summary Judgment (doc. [*74] 32) is **granted in part**, and **denied in part**. The Motion is **granted** with respect to the salary basis test for the FLSA administrative exemption, and the Court concludes as a matter of law that plaintiffs in fact satisfy the salary basis test pursuant to *29 C.F.R. § 541.603*. In all other respects (including whether plaintiffs satisfy the duties test for that exemption, as well as Crabtree's retaliation claim), the Motion is **denied**; and

---

disloyalty and the termination decision — never made by the witnesses' testimony [*71] itself. This is improper. *See Odom v. Southeast Supply Header, LLC, 675 F. Supp. 2d 1105, 1110 n.3 (S.D. Ala. 2009)* (noting impropriety of counsel including in their factual recitations certain "facts" not supported by record citations); *Taylor v. Holiday Isle, LLC, 561 F. Supp.2d 1269, 1275 n.11 (S.D. Ala. 2008)* ("Unadorned representations of counsel in a summary judgment brief are not a substitute for appropriate record evidence.").

[25] In particular, Harmening testified that, after Crabtree raised his FLSA overtime concerns, Volkert "had a meeting with every individual about their status as a Senior Right-of-Way Specialist or a Right-of-Way Specialist" because Crabtree's "talk was going over into other employees; and they were all concerned." (Harmening Dep., at 166-67.) Harmening answered affirmatively when asked if she felt that Crabtree "was spreading his concerns [*73] to other employees." (*Id.* at 167.) This spreading of overtime concerns by Crabtree might reasonably be viewed as the sort of rabble-rousing, trouble-making "lack of fealty" that led to his immediate ouster by the company.

2012 U.S. Dist. LEXIS 173792, *73

3. This matter remains set for Final Pretrial Conference before the undersigned on **January 15, 2013 at 10:00 a.m.**, with trial to follow in the **February 2013** civil term.

DONE and ORDERED this 7th day of December, 2012.

/s/ WILLIAM H. STEELE

CHIEF UNITED STATES DISTRICT JUDGE

---

End of Document

ERIC MAGNUS


Neutral
As of: April 20, 2017 3:11 PM Z

## *Hassinger v. Sun Way Enters.*

United States District Court for the Middle District of Florida, Orlando Division

May 29, 2014, Decided; May 29, 2014, Filed

Case No: 6:12-cv-1052-Orl-28GJK

**Reporter**
2014 U.S. Dist. LEXIS 73325 *

PAUL HASSINGER, Plaintiff, v. SUN WAY ENTERPRISES, INC., and NARENDRA MODHA, Defendants.

**Prior History:** *Hassinger v. Sun Way Enters., 2013 U.S. Dist. LEXIS 166633 (M.D. Fla., Nov. 22, 2013)*

## Core Terms

minimum wage, lodging, reasonable cost, lunch, retaliation, per day, food, employees, damages, facilities, overtime, premises, records, monthly, meals, compensable, visitation, sometimes, gasoline, drove, estimate, regulation, undisputed, days, burden of proof, time period, lawsuit, parties, payroll, presenting evidence

**Counsel:** [*1] For Paul Hassinger, Plaintiff: Mark E. Tietig, LEAD ATTORNEY, Tietig & Tietig, PA, Merritt Island, FL.

For Sun Way Enterprises, Inc., Narendra Modha, Defendants: Adrienne Elise Trent, LEAD ATTORNEY, Adrienne E. Trent, PA, Rockledge, FL.

**Judges:** JOHN ANTOON II, United States District Judge.

**Opinion by:** JOHN ANTOON II

## Opinion

**MEMORANDUM DECISION AND ORDER**

The cynical saying that "no good deed goes unpunished"[1] would be affirmed were Plaintiff, Paul Hassinger, to prevail in this case. He does not. Plaintiff has sued Defendants, Narendra Modha ("Mr. Modha") and Mr. Modha's company, Sun Way Enterprises, Inc., for violation of the Fair Labor Standards Act [2] ("FLSA"), claiming that Defendants failed to pay him the required minimum wage and failed to pay him at an overtime rate for hours he allegedly worked in excess of forty per week. In his Second Amended Complaint (Doc. 16), Plaintiff also claims that Defendants retaliated against him—also in violation of the FLSA—for filing this lawsuit.

The case proceeded to a non-jury trial on January 28 and 29, 2014, during which witnesses testified and Defendants' exhibits [*2] were received in evidence.[3] The parties thereafter submitted proposed findings of fact and conclusions of law. (Docs. 62 & 63). Upon consideration of the evidence and testimony presented, I issue the

---

[1] Most often attributed to American author and political figure Clare Boothe Luce (1903-1987).

[2] *29 U.S.C. §§ 201-219*.

[3] Plaintiff did not submit any exhibits into evidence during the trial.

ERIC MAGNUS

2014 U.S. Dist. LEXIS 73325, *2

following opinion in accordance with _Federal Rule of Civil Procedure 52(a)(1)_. I conclude that Plaintiff did not meet his burden of establishing a minimum wage or overtime violation, nor did he establish that he suffered compensable damages on his retaliation claim.

## I. Trial Testimony and General Findings of Fact

The unlikely path that led to Plaintiff and Mr. Modha meeting began in a Florida prison where Plaintiff was serving a sentence for a felony sexual offense. While in prison, Plaintiff befriended Kishorkumar Modha ("Kishorkumar"), Mr. Modha's brother, who was also serving a sentence for a sex offense. Eventually, Plaintiff completed his sentence and was awaiting release to begin his term of probation, but before he could be released he was required to establish that he had an appropriate place to live. (Trial Tr. Day 1 at 79; Trial Tr. Day 2 at 108, 115-116).[4] This requirement ostensibly was to ensure that he would [*3] not take up residence in proximity to schools, parks, or other places where children were likely to gather; doing so would not be in conformity with the terms of his probation. Upon completion of his sentence, Plaintiff continued to be incarcerated for at least a few weeks because he did not have such a residence available. (Trial Tr. Day 2 at 108-09, 115-16).

To help his friend gain release, Kishorkumar enlisted the assistance of Mr. Modha, who had, a short time earlier, opened a small, family-run gas station/convenience store on U.S. Highway 1 in Mims, Florida, known as A.J.'s. Kishorkumar called Mr. Modha and urged him to permit Plaintiff to live and work at A.J.'s so that Plaintiff could be released from custody. Initially, Mr. Modha declined Kishorkumar's request, but Mr. Modha's resolve weakened as he received pleas from Plaintiff's mother, stepfather, and wife—who was in need of financial assistance to care for their child—all of whom begged [*4] Mr. Modha to allow Plaintiff to live and work at A.J.'s. (Id. at 108-16). Then, Plaintiff's probation officer telephoned Mr. Modha, visited A.J.'s, and determined that the store would be an appropriate place for Plaintiff to live while on probation. (Id. at 109-11, 116). Eventually, Mr. Modha relented and agreed to allow Plaintiff to live and work at A.J.'s, whereupon Plaintiff was released from prison in 2006. (Trial Tr. Day 1 at 80; Trial Tr. Day 2 at 111, 113, & 116).

The day of his release, Plaintiff's parents drove him to A.J.'s, where he and Mr. Modha met for the first time. (Trial Tr. Day 1 at 80; Trial Tr. Day 2 at 116). The two men entered into discussions about the anticipated arrangement. (Trial Tr. Day 2 at 118). Plaintiff is a native of Thailand but was adopted by a United States citizen nearly forty years ago. (Trial Tr. Day 1 at 78-79). Although Plaintiff is intelligent and sophisticated—as evidenced by his American high school diploma and fifteen years of experience working for the United States Armed Forces banking system— he speaks English with a heavy accent. Mr. Modha is from India and had been in the United States approximately two years when he first met Plaintiff; [*5] he has a seventh-grade education and speaks English with difficulty. (Id. at 191-92; Trial Tr. Day 2 at 101-02). Notwithstanding the language barriers, the two men reached an oral agreement that Mr. Modha would provide Plaintiff with work, meals, and a place to live at the store. (Trial Tr. Day 1 at 80-81; Trial Tr. Day 2 at 118-19). Plaintiff told Mr. Modha that in addition to room and board, he required a salary of $600 per month as consideration for helping out at the store. (Trial Tr. Day 1 at 181; Trial Tr. Day 2 at 118-20). Mr. Modha agreed, and Plaintiff immediately moved into A.J.'s, There was no mention of an hourly rate during this discussion or thereafter—until the filing of this lawsuit.

At the time Plaintiff arrived at A.J.'s, Mr. Modha had a part-time employee assisting in the store. That employee was responsible for restocking the cold drinks in the coolers, sweeping, mopping, and cleaning the store each day. (Trial Tr. Day 1 at 186-87). She also was responsible for blowing debris from the parking lot three times a week. (Id. at 187). That employee worked two or three hours a day, seven days a week. (Id.; Trial Tr. Day 2 at 107-08). It was agreed that Plaintiff would [*6] take over that employee's duties. (Trial Tr. Day 1 at 181-82; Trial Tr. Day 2 at 118-19). For approximately two weeks after arriving at A.J.'s, Plaintiff observed the part-time employee execute her duties, after which she was let go and Plaintiff assumed her duties. And, after Plaintiff's employment at A.J.'s ceased in 2013, these responsibilities were performed by a part-time employee who was hired to replace Plaintiff; that employee also worked two to three hours per day. (Trial Tr. Day 2 at 35, 92-93).

---

[4] The transcript of the two-day bench trial is contained in two volumes in the record (Docs. 57 (Day 1) & 58 (Day 2)). References to these transcripts will be indicated by "Trial Tr. Day 1" or "Trial Tr. Day 2" followed by the page number(s).

2014 U.S. Dist. LEXIS 73325, *6

The living accommodations at A.J.'s were undisputedly sparse. Initially, Plaintiff slept on a thin mattress on the floor of the store. At some point, Plaintiff discarded the mattress and replaced it with a mat. Later, he moved into an outbuilding provided by Mr. Modha. At all times, Plaintiff had access to toilet facilities and telephone service.

Conditions of Plaintiff's probation severely restricted his freedom of movement. In addition to being banned from places children were likely to gather, Plaintiff was required to be at A.J.'s from 10:00 p.m. to 6:00 a.m. each day. (Trial Tr. Day 1 at 80). As a result of this curfew, his work, socialization, and recreation for the most part [*7] took place at A.J.'s—he had nowhere else to go. After a couple of months, Plaintiff sought other work at McDonald's and Burger King restaurants, but he was not hired. (Id. at 182). When Plaintiff could not find other work, Mr. Modha increased his salary to $650 per month. (Id. at 188). Additionally, it is undisputed that by July 2009, Mr. Modha had increased Plaintiff's salary to $750 per month and that he increased it to $800 per month in June 2011 and to $900 per month in April 2012.

Plaintiff's counsel describes the relationship that evolved between the parties as one of peonage, but that is a gross mischaracterization. It would be more accurate to say that Plaintiff was treated as a member of the Modha family, which included Mr. Modha's wife, Krupa; their three children; and Minakshi—Kishorkumar's ex-wife—and their two children. (Trial Tr. Day 2 at 4-5). Plaintiff enjoyed privileges not offered to any other employee of the business. He was permitted to eat for free any food offered for sale on the premises, and he indeed partook of that food. Additionally, it was routine for Plaintiff to go to the Modha home for meals. In the afternoon, he would drive to the Modha home for a lunch [*8] meal prepared by Krupa. During these visits he often would also shower and take a nap. (Trial Tr. Day 1 at 114-15). On occasion, he also helped with household chores, and sometimes he played with the Modha children during the lunch breaks. (Trial Tr. Day 2 at 8). He typically spent at least two hours at the Modha home during these lunch outings. (Id.). Additionally, Plaintiff sometimes returned to the Modhas' house for dinner, and if he did not, the Modhas brought dinner to him at A.J.'s. (Trial Tr. Day 1 at 115; Trial Tr. Day 2 at 19-20, 160).

After Plaintiff began living and working at A.J.'s, Mr. Modha converted some of the space at A.J.'s to a takeout Hungry Howie's restaurant. Plaintiff was also allowed to eat at Hungry Howie's, where other employees were instructed that he was to be treated as a member of the Modha family and was not to be charged for his food. (Trial Tr. Day 2 at 121). Eventually, Plaintiff applied for and received food stamps and began purchasing some of his own food, though he was still able to eat for free at the Modhas' house, A.J.'s, and Hungry Howie's. (Trial Tr. Day 1 at 112; Trial Tr. Day 2 at 223-24).

Plaintiff also always enjoyed the use of one [*9] of the Modha family automobiles. In late 2009, Mr. Modha purchased a new Dodge Avenger, which Plaintiff and Minakshi shared, although Mr. Modha paid for maintenance, fuel, and insurance. Plaintiff drove that car to the Modha home—a sixteen-mile round trip—for lunch and sometimes dinner. (Trial Tr. Day 2 at 160). He also used the car to attend out-of-town appointments required by the terms of his probation, including counseling sessions, meetings with his probation officer, and polygraph examinations. (Trial Tr. Day 1 at 138-39; Trial Tr. Day 2 at 156). Additionally, he used the car to visit his son in Daytona Beach, do personal shopping, and travel to the laundromat. (Trial Tr. Day 1 at 139, 154). Plaintiff drove the Avenger 50-60% of the time, and for the most part, Minakshi drove the balance of the time. (Trial Tr. Day 2 at 73, 162-63). By the time of trial, the car had been driven in excess of 100,000 miles. (Id. at 74, 161). The only contribution Plaintiff made to the upkeep of the Avenger was that he would sometimes wash it along with other family cars during his lunch breaks at the Modha home.

While on probation, Plaintiff was monitored to ensure that he was complying with [*10] the terms of the court-imposed curfew. The probation officer periodically telephoned Plaintiff to determine his whereabouts. (Id. at 167-68). When Plaintiff first moved into A.J.'s, he did not have a telephone of his own, and the monitoring was done by calling the store telephone or Mr. Modha's personal line. (Id. at 168). Because calls came in late at night, Mr. Modha eventually purchased a cell phone for Plaintiff. (Id. at 168-69). At no time was Plaintiff charged for the telephone, electricity, or water at A.J.'s. (Id. at 168).

A.J.'s was a family operation. Minakshi worked weekdays from 6:00 a.m. until 3:00 p.m. and weekends from 3:00 p.m. until closing. (Id. at 51-52, 61, & 64). Krupa worked weekdays from 3:00 p.m. until 10:00 p.m. (Id. at 6). Mr.

Case 1:16-cv-01692-SCJ   Document 27-1   Filed 04/20/17   Page 27 of 80

Page 4 of 14
2014 U.S. Dist. LEXIS 73325, *10

Modha did not keep regular hours at A.J.'s, but at the beginning of Plaintiff's employment he typically was present in the store from 2:00 p.m. until 10:00 p.m. (Id. at 110). Other than these Modha family members, the only employees who worked at AJ.'s—as opposed to Hungry Howie's—during the time period involved in this case were Plaintiff and the employees who preceded and replaced him.

Defendants claim that the extent of Plaintiff's [*11] work was no more than that of the employees who preceded and succeeded him at the business, while Plaintiff claims that he worked—or should have been regarded as working—from the time the store opened until it closed. Neither account is correct. In addition to the work done by his predecessor and successor, Plaintiff also locked the doors at night and performed some other, irregular tasks, including: changing the gasoline price signage; accepting deliveries from vendors; assisting elderly and disabled customers with pumping gasoline; and, on extremely rare occasions, emptying the fuel sump pump. (Id. at 204-06).

Plaintiff also did some work in the conversion of some of the space at A.J.'s to a takeout Hungry Howie's restaurant with two walk-up windows. From time to time, Plaintiff assisted his friend, Brian Otte, whom Mr. Modha had hired to do some of the preliminary remodeling work. Plaintiff and Otte, also a convicted felon, had attended therapy classes at the same facility after Plaintiff's release from prison, and they developed a friendship as a result of Otte's visits to A.J.'s during remodeling. (Trial Tr. Day 1 at 41-42). After about forty-five days, Otte's work on the project [*12] ended when a building inspector determined that required permits for the construction had not been issued. (Trial Tr. Day 2 at 142).[5] Once the Hungry Howie's opened in June or July 2011,[6] Plaintiff occasionally assisted the Hungry Howie's employees when they were busy. He also requested and was allowed to deliver pizza, and he was allowed to keep the tips he received for doing so. (Trial Tr. Day 1 at 136-37; Trial Tr. Day 2 at 14, 202). Plaintiff testified that those tips averaged $7-8 per delivery. (Trial Tr. Day 1 at 136-37).

Although Plaintiff testified that he felt that he should be paid from the time A.J.'s opened in the morning until it closed in the evening, he was not working during all of that time. While on the A.J.'s premises, he read, worked puzzles, [*13] talked with customers, took smoke breaks, ate, and meditated three times per day for at least an hour at a time. (Id. at 87 & 142; Trial Tr. Day 2 at 56, 220). Additionally, throughout his time at A.J.'s he took time to travel to his temple in Kissimmee, visit his son in Daytona Beach, make required visits to his probation officer in Cocoa, drive to Rockledge to be take polygraph tests, and drive off premises to do his laundry. (Trial Tr. Day 1 at 138-39, 154; Trial Tr. Day 2 at 156). There is no evidence that he could not leave A.J.'s as he chose.

Not including the time that Plaintiff spent working at Hungry Howie's, Plaintiff completed his assigned duties within a few hours each day. The evidence at trial established that typically, Plaintiff would open the store at either 5:00 a.m. or 6:00 a.m. and operate the cash register for one hour before being relieved by Minakshi. Plaintiff would then return to sleep until 11:00 a.m. or noon, when he would stock the coolers and briefly attend to his other duties before heading to the Modhas' house for a homemade lunch and sometimes to shower and nap. When he eventually returned to A.J.'s in the late afternoon, he would meditate for at least [*14] an hour. He often would return to the Modhas' home for dinner in the evenings, and back at A.J.'s he would work a little more doing stocking and cleaning before locking up the store when it closed for the night.

Much testimony was devoted to describing Plaintiff's visitation with his son, who lived with his mother in Daytona Beach. Because of the nature of his criminal conviction, Plaintiff was entitled to visit with his son only if the visitation was supervised. At first, Plaintiff's ex-wife provided the required supervision, but after they had a disagreement Plaintiff was no longer allowed to go to his ex-wife's residence. (Trial Tr. Day 2 at 158). Plaintiff's parents then agreed to supervise visitation, but that arrangement soon ended as a result of Plaintiff's difficulty in getting along with his parents. (Id. at 159). At that point, the Modhas agreed to facilitate visitation by driving to Daytona Beach with Plaintiff so one of the Modhas could supervise the visitation. (Id. at 15). At times on the way back to Mims they would stop at the Daytona Sam's Club to pick up supplies for the store, (id. at 159), and Plaintiff unfairly discounts

---

[5] Otte testified that he worked on the construction project for much longer than forty-five days, (see Trial Tr. Day 1 at 22-23), but I did not find Otte's testimony credible on that point or in general.

[6] As earlier noted, Plaintiff's salary increased from $750 to $800 per month in June 2011. He also was paid an extra $100 on June 5, 2011, for helping lay sod at the Hungry Howie's. (Trial Tr. Day 1 at 119; Defs.' Trial Ex. 4 at 19).

Case 1:16-cv-01692-SCJ   Document 27-1   Filed 04/20/17   Page 28 of 80

Page 5 of 14
2014 U.S. Dist. LEXIS 73325, *14

the Modhas' visitation assistance on this basis. [*15] Toward the end of Plaintiff's time at A.J.'s, his son turned eighteen and visitation no longer required supervision.

By May 2012, Mr. Modha owned three gas stations including A.J.'s, and with the growing number of employees at these businesses, payroll issues became difficult to manage. (Id. at 127). Consequently, early in 2012 Mr. Modha decided to hire a payroll company, and by the summer of that year he had engaged one. (Id. at 128-29). By August 2013, the payroll company had streamlined and automated payroll at Mr. Modha's businesses, including A.J.'s. After the payroll company took over, time records were required for all employees. This was the first time that records of hours worked were kept for Plaintiff, and up until that point he had been paid monthly, in cash. From then on, Plaintiff was paid by check every other week at an hourly rate. (Id. at 132).

Krupa kept track of the employees' hours on a form provided by the payroll company. (Id. at 21-22). Under the new system, employees filled out the form indicating what time work commenced and what time it ended. (Id. at 22). Each day, Krupa had the employees initial the form showing the hours they had worked. (Id. at 21-22). On [*16] August 2, 2012, shortly after this system was implemented, Plaintiff indicated that he had stopped work at 11:00, but in fact he had finished working an hour earlier. (Id. at 22). Having seen Plaintiff cease work at 10:00, Krupa crossed out the entry of 11:00 and asked Plaintiff why he had included an extra hour. (Id.). In response, Plaintiff yelled that Krupa did not have the right to question the number of hours he included on the form and that he should get paid for all hours that A.J.'s was open. (Id. at 22-23). He then said in a loud and threatening manner, "Wait and watch what [I can] do for you next month." (Id. at 23). Shortly thereafter, the Modhas learned of the Complaint that Plaintiff had filed in this case on July 9, 2012. (Id. at 23-24).

When Mr. Modha received a letter from lawyers in Tampa advising him that his company had been sued and advertising their services, Mr. Modha asked Plaintiff why he was suing him. (Id. at 137). Plaintiff explained to Mr. Modha that he was fifty-one years old and wished to retire; his son was no longer a minor and he wished to live with him; and he needed money for a place to live, a car, and insurance. (Id. at 139). Thereafter, Plaintiff [*17] continued to live and work at A.J.'s, eat at Hungry Howie's, and drive the Modha family car. (Id. at 132). On May 30, 2013, he delivered written notice that he was resigning effective June 13, 2013. (Id. at 32-34; Defs.' Trial Ex. 11).

In spite of the fact that Plaintiff continued to live and work at A.J.'s until the effective date of his resignation, he claims that Mr. Modha retaliated against him because he filed this lawsuit. In his Second Amended Complaint, Plaintiff raised a number of bases for his claim of retaliation, nearly all of which were found insufficient in the Order (Doc. 33) granting in part and denying in part Defendants' Motion for Summary Judgment. The ruling did, however, leave viable Plaintiff's claim that a reduction in the number of hours that he worked constituted retaliation.

Notwithstanding the ruling limiting his claim of retaliation, Plaintiff testified that Mr. Modha tried to evict him from A.J.'s. Mr. Modha admitted that after receiving notice of the lawsuit he told Plaintiff that if he did not like living and working at A.J.'s he could find another place to live and work. (Trial Tr. Day 2 at 188). This sentiment had been communicated to Plaintiff in the [*18] past as well; over the term of the parties' relationship, Mr. Modha had encouraged Plaintiff to find a nicer place to live. (Id. at 180, 182). Plaintiff admitted that he had looked for another place to live and found an apartment for rent at $800 per month, but he stated that it would not likely have been approved by his probation officer and he probably would need to rent a house. (Trial Tr. Day 1 at 163-64). He also admitted that he again considered looking for another job about a year before he filed the Complaint in this case, but he came to the conclusion that no one would hire him. (Id. at 164). Mr. Modha made no effort to evict Plaintiff from A.J.'s; ultimately, Plaintiff voluntarily relocated to live with his son, and his employment by Defendants ended.

## II. Legal Application, Conclusions of Law, and Additional Findings of Fact

### A. Counts I and II—Wages

The FLSA requires that employers pay their employees a minimum hourly wage, 29 U.S.C. § 206, and it also requires employers to pay employees overtime wages—at a rate at least one and a half times the employee's regular rate—for work performed in excess of forty hours per week, id. § 207. Contending that Defendants failed to comply [*19] with both of these provisions, Plaintiff brings a minimum wage claim in Count I and an overtime claim

in Count II of the Second Amended Complaint. However, at trial he did not establish a violation of either § 206 or § 207.

*1. Time Period at Issue*

A cause of action for unpaid minimum wages, unpaid overtime, or liquidated damages under the FLSA must be "commenced within two years after the cause of action accrued, . . . except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). "To establish that [a] violation of the Act was willful in order to extend the limitations period, the employee must prove by a preponderance of the evidence that his employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was [prohibited]." Perez v. Sanford-Orlando Kennel Club, Inc., 515 F.3d 1150, 1162-63 (11th Cir. 2008).

Plaintiff filed this case on July 9, 2012, and thus the earliest date for which Plaintiff can potentially seek unpaid minimum wages and overtime in this case is July 9, 2009, if the violation was willful; otherwise, Plaintiff can seek unpaid **[*20]** wages going back only to July 9, 2010. Moreover, it is undisputed that from August 2012 forward, Defendants paid Plaintiff minimum wage and Plaintiff did not work overtime. Hence, the time period at issue with regard to Counts I and II runs from either July 9, 2009, or July 9, 2010, through July 31, 2012.

*2. Burden of Proof*

"An employee who brings suit under [the FLSA] for unpaid minimum wages or unpaid overtime compensation . . . has the burden of proving that he performed work for which he was not properly compensated." Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686-87, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946). The FLSA imposes on employers an obligation to keep records of employees' hours, 29 U.S.C. § 211(c), and where the employer fails to do so, it can be difficult for an employee to establish with precision the number of uncompensated hours that he worked. In such situations, "an employee [carries out] his burden [of proof] if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Mt. Clemens Pottery, 328 U.S. at 687. If the employee produces such **[*21]** evidence, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." Id. at 687-88; accord Lamonica v. Safe Hurricane Shutters, Inc., 711 F.3d 1299, 1315 (11th Cir. 2013) (describing Plaintiff's "relaxed" burden where time records are not kept by employer). It is undisputed that in this case, Defendants did not keep records of the hours that Plaintiff worked during the time period at issue.

*3. Hours Worked*

In the Second Amended Complaint and in the Joint Final Pretrial Statement, Plaintiff claimed that from July 2009 to July 2012 he worked fifty-seven hours per week for Defendants. (Doc. 16 ¶ 8; Doc. 36 at 3). Notwithstanding those assertions, at trial and in his post-trial brief Plaintiff claimed that he had worked seventy-seven hours per week during that time period. Defendants, on the other hand, assert that Plaintiff worked only a few hours per day, though it is undisputed that Plaintiff **[*22]** worked seven days per week. (See Trial Tr. Day 1 at 82 (Test. of Plaintiff); id. at 183 (Test. of Narendra Modha)). Based on the testimony presented at trial, I conclude that Plaintiff typically worked, on average, four and a half hours per day, seven days per week, for a total of thirty-one and a half hours per week, and that Plaintiff failed to establish that he worked more than forty hours in any single week.

During the time period at issue, Plaintiff was on the A.J.'s premises all evening and much of the day, but he was not required by Defendants to be there all of that time, and not all of the time Plaintiff was on the premises was compensable time. As explained in an FLSA regulation, "[a]n employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises." 29 C.F.R. § 785.23. This regulation specifically recognizes that an employee living on his employer's premises "[o]rdinarily . . . may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining,

and other periods of complete freedom from all duties when he may leave the premises for purposes [*23] of his own." Id. The regulation further recognizes that where an employee lives on the employer's premises, "[i]t is . . . difficult to determine the exact hours worked . . . and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted" for purposes of calculating the number of hours worked. Id.

Although at trial Plaintiff maintained that he worked eleven hours per day and denied that he and Mr. Modha reached an agreement as to how many hours he was to work, the evidence at trial established that the parties agreed that Plaintiff could live at the store and work at the store doing cleanup and stocking tasks that previously had been done by an employee who worked two to three hours per day. It was contemplated by Plaintiff and Mr. Modha at the outset that Plaintiff would, like the part-time employee whose duties he assumed, work approximately two to three hours per day. However, the evidence at trial also established that despite that initial agreement, in actuality Plaintiff worked more than three hours per day, and additional FLSA principles must be examined to determine the extent of Plaintiff's compensable time.

The FLSA defines [*24] "employ" as "to suffer or permit to work," 29 U.S.C. § 203(g), and where an "employer knows or has reason to believe that [an employee] is continuing to work . . . , the time is working time" even where the employee is working more than his scheduled time, 29 C.F.R. § 785.11; accord Allen v. Bd. of Pub. Educ. for Bibb Cnty., 495 F.3d 1306, 1314 (11th Cir. 2007). If the employer does not want that work performed, management must "exercise its control and see that the work is not performed . . . . It cannot sit back and accept the benefits without compensating for them." 29 C.F.R. § 785.13. The testimony at trial established that Plaintiff did, with Defendants' knowledge, typically work more than three hours per day. He worked one hour in the morning before Minakshi Modha arrived at the store, whereupon he went back to sleep until late morning. He then woke up and did some stocking and cleaning before going the Modhas' house for lunch in the afternoon. Upon returning to the store in the late afternoon, he meditated for at least an hour, and he sometimes returned to the Modhas' home for dinner. Later in the evening he did some more cleaning and stocking before closing the store. And, [*25] as noted earlier, from time to time Plaintiff did other tasks such as assisting elderly customers and accepting deliveries, though that work was irregular and lasted only a few minutes at a time when it did occur.

Plaintiff also at times did work at Hungry Howie's, including delivering pizzas, and sometimes he sought out this work. When Plaintiff delivered pizzas, he was paid for that work in the form of tips, which were typically $7-8 per delivery and which he was allowed to keep. (Trial Tr. Day 1 at 136-37). I find that through those tips, Plaintiff has already been adequately compensated under the law for the time he spent delivering pizzas. The other work that Plaintiff did at Hungry Howie's was irregular and sporadic, depending on when Hungry Howie's employees asked him or allowed him to help at the restaurant when it was busy. Plaintiff did not work at Hungry Howie's every day. (Id. at 70). Sometimes when Plaintiff sought to work at Hungry Howie's, no help was needed and he would then "sit down and read the paper." (Id. at 112 (Test. of Plaintiff)). I have included occasional, unpaid Hungry Howie's work in my assessment that Plaintiff's hours averaged four and a half per day and [*26] thirty-one and a half per week.

No evidence was presented that Plaintiff was required to be on the premises when he was not working, and Plaintiff did not establish entitlement to pay for any time other than when he was actually working. At one point in the trial, Plaintiff testified that if he was at the store during business hours and was not asleep, then he should have been paid for that time. (Id. at 156). He also testified that he should be paid for the time he lunched and showered at the Modhas' house. (Id. at 152-53).[7] Plaintiff felt that if Mr. Modha did not tell him he had a whole day off, then he should have been regarded as working the entire day. (Id. at 153).

Plaintiff's position regarding being owed wages for non-working time at the store is not well-founded. As Plaintiff well knew, he lived at the store not for Defendants' benefit but for his own—he had no other place to live and could not be released from prison until he found a suitable place [*27] to report as his residence. Mr. Modha allowed Plaintiff to live at the store after being repeatedly asked to do so by his own brother and by several members of

---

[7] After the Court took a brief recess, Plaintiff retreated from this position and agreed he should not be paid for the time he spent lunching, showering, or doing personal errands away from the store. (See Trial Tr. Day 1 at 155-56).

2014 U.S. Dist. LEXIS 73325, *27

Plaintiff's family. The fact that Plaintiff was on the premises did not inure to the benefit of Defendants except when Plaintiff was working, and he was only owed wages for working time.

There was also testimony presented at trial regarding Plaintiff sometimes being interrupted—for example, during meditation—to make a delivery for Hungry Howie's. (Id. at 56). In this vein, FLSA principles regarding "waiting time" are instructive. "Whether waiting time is time worked under the Act depends upon particular circumstances." 29 C.F.R. § 785.14. "Facts may show that the employee was engaged to wait, or they may show that he waited to be engaged." Skidmore v. Swift, 323 U.S. 134, 137, 65 S. Ct. 161, 89 L. Ed. 124 (1944). Plaintiff was due to be paid for time worked, but I do not find that Plaintiff's otherwise personal time is compensable just because he was occasionally interrupted and asked to work. The evidence presented at trial established that Plaintiff was not "on call" or "engaged to wait" for work by Defendants; instead, when Plaintiff sometimes was at the [*28] premises in the hopes of being given a Hungry Howie's delivery or other task, he was "waiting to be engaged" and only his actual work time is compensable time.

In sum, I conclude from the evidence presented at trial that Plaintiff typically worked an average of four and a half hours per day, seven days per week, for a total of thirty-one and a half hours per week. He did not establish that he worked more than forty hours in any single work week. The latter finding disposes of Plaintiff's overtime claim in Count II of the Second Amended Complaint. Determination of whether Plaintiff was paid minimum wage for the thirty-one and a half hours he worked each week, however, requires further analysis.

### 4. Wages Owed and Wages Paid

It is undisputed that Plaintiff was paid $750 to $900 in cash monthly during the time period at issue in this case. Defendants claim entitlement to credit for room, board, and other items that they provided to Plaintiff in addition to the cash he was paid. Before turning to the issue of the value of the non-cash compensation, it first must be determined whether the cash Plaintiff was paid met or exceeded the required minimum wage on its own; if it did, it is not necessary [*29] to determine the value of non-monetary compensation.

Because Plaintiff was paid monthly, his monthly earnings must be converted to an hourly rate and then compared to the hourly minimum wage. The parties agree that from July 2009 to May 2011, Plaintiff was paid $750 in cash each month; that from June 2011 through March 2012, Plaintiff was paid $800 in cash each month; and that from April 2012 through July 2012, Plaintiff was paid $900 in cash each month. Additionally, the parties agree that the federal minimum wage—not the Florida minimum wage—should be applied in this case. (See Order, Doc. 33, at 6). It is undisputed that from July 9, 2009, to July 23, 2009, the federal minimum wage was $6.55 per hour and that from July 24, 2009, to June 13, 2013, the federal minimum wage was $7.25 per hour.

At $750 per month, Plaintiff's hourly wage for a 31.5-hour workweek amounts to $5.49—less than minimum wage.[8] At $800 per month, Plaintiffs hourly rate for a 31.5-hour workweek is $5.86,[9] and at $900 per month, it is $6.59 [10]— both of which are also below minimum wage. Stated conversely, thirty-one and a half hours per week at minimum wage of $7.25 per hour works out to a monthly total of $989.65.[11] [*30] Thus, Plaintiff was not paid minimum wage if only the monthly cash payments he received are considered; for the months in which he was paid $750 there was a shortfall of just under $240; for those in which he was paid $800 there was a shortfall of just under $190; and for the months in which he was paid $900 there was a shortfall of just under $90. However, these shortfalls do not end the minimum wage analysis; additional FLSA principles regarding what constitutes a "wage" must be examined in order to determine whether a minimum wage violation has been established in this case.

---

[8] ($750/month x 12 months/year) ÷ 52 weeks/year = $173.08/week. $173.08/week ÷ 31.5 hours/week = $5.49/hour.

[9] ($800/month x 12 months/year) ÷ 52 weeks/year = $184.62/week. $184.62/week ÷ 31.5 hours/week = $5.86/hour.

[10] ($900/month x 12 months/year) ÷ 52 weeks/year = $207.69/week. $207.69/week ÷ 31.5 hours/week = $6.59/hour.

[11] 31.5 hours/week x $7.25/hour = $228.38/week. $228.38/week x 52 weeks/year = $11,875.76/year $11,875.76/year ÷ 12 months/year = $989.65/month.

2014 U.S. Dist. LEXIS 73325, *30

Under the FLSA, "wage" is defined as including "the [*31] reasonable cost ... to the employer of furnishing [the] employee with board, lodging, or other facilities." *29 U.S.C. § 203(m)*. As explained in a regulation promulgated under the FLSA, "in determining whether he has met the minimum wage and overtime requirements of the Act, the employer may credit himself with the reasonable cost to himself of [such] board, lodging, or other facilities." *29 C.F.R. § 531.27(b)*. Defendants rely on this regulation in arguing that the total compensation Plaintiff received exceeded the minimum wage.

As used in *29 U.S.C. § 203(m)*, "reasonable cost" is "not more than the actual cost to the employer of the board, lodging, or other facilities," *29 C.F.R. § 531.3(a)*, and "[r]easonable cost does not include a profit to the employer or to any affiliated person," *id. § 531.3(b)*; accord *Donovan v. New Floridian Hotel, Inc., 676 F.2d 468, 474 (11th Cir. 1982)* (citing these regulations); *Davis Bros., Inc. v. Donovan, 700 F.2d 1368, 1371 (11th Cir. 1983)* ("The credit is not for the retail value of the meals, but is limited to the reasonable cost to the employer of providing the meals."). Additionally, FLSA regulations require employers to keep records of the cost of [*32] furnishing these items. *29 C.F.R. § 516.27*. "[T]he burden of proving the 'reasonable cost' of providing board, lodging, or other facilities [is] on the employer." *New Floridian Hotel, 676 F.2d at 474*.

In *New Floridian Hotel*, the appellate court affirmed the district court's determination that the employer failed to establish the reasonable cost of meals. The court noted that the appellants did not keep the records required by *29 C.F.R. § 516.27*, and the evidence that the appellants presented in the absence of such records was not sufficient to meet their burden. One piece of evidence was testimony that estimated the cost of lunch at $1.00 and the cost of dinner at $2.00; the court held that "an employer's unsubstantiated estimate of his cost, where the employer has failed to comply with the recordkeeping provisions of the FLSA, . . . does not satisfy the employer's burden of proving reasonable cost." *New Floridian Hotel, 676 F.2d at 475*. The court also noted that "[t]he district court was entitled to discount [the witness's] unsubstantiated estimate of cost on credibility grounds." *Id.* Other evidence presented included profit within it, and the court noted that "the district court would [*33] have had to speculate in order to segregate reasonable cost from total cost plus profit." *Id. at 476*. Thus, "the district court correctly denied appellants credit for meals and lodging." *Id.*

Decisions in this circuit since *New Floridian Hotel* have been consistent in application of these principles. For example, in *Washington v. Miller, 721 F.2d 797, 803 (11th Cir. 1983)*, the court explained:

> It is not possible from the records introduced by [the employer] as to the expenses of operating the labor camp to determine what was the reasonable cost of the facilities provided.
>
> This is not to say that the facilities furnished had no value. However, to separate the reasonable cost of these facilities from the total cost plus profit would require the Court to speculate on the basis of an inadequate and inaccurate record. Under these circumstances, the New Floridian case requires that the Defendant be denied credit for the meals, wine, lodging, and other facilities.

See also *Caro-Galvan v. Curtis Richardson, Inc., 993 F.2d 1500, 1514 (11th Cir. 1993)* (reiterating that the employer bears the burden of proving reasonable cost and that the "employer's unsubstantiated estimate of his cost" does not meet [*34] that burden, and finding that the district court "erroneously placed the burden of proof on" the employees); *Leonard v. Carmichael Props. & Mgmt. Co., 614 F. Supp. 1182, 1187-88 (S.D. Fla. 1985)* (finding that the employer did not meet burden of establishing entitlement to credit under *29 U.S.C. § 203(m)* where "[it] [wa]s impossible for the court to determine what was the reasonable cost of the apartment because defendant . . . failed to proffer any evidence as to the expenses of providing it for plaintiff" and "insist[ed] that the retail value, rather than cost, [wa]s the appropriate measure"); *Mendoza v. Uptown Buffet, Inc., No. 09-22799-CIV, 2010 U.S. Dist. LEXIS 96898, 2010 WL 3768052, at *4 (S.D. Fla. Sept. 16, 2010)* (denying meal and lodging credits to employer where employer did not introduce evidence of reasonable cost); *Maldonado v. Alta Healthcare Grp., Inc., No. 6:12-cv-1552-Orl-36DAB, 2014 U.S. Dist. LEXIS 60153, 2014 WL 1661265, at *8 (M.D. Fla. Mar. 26, 2014)* (finding that the defendants did not substantiate reasonable cost of facilities provided where they presented only "a one-page, bare-bones document" ostensibly breaking down "implicit values" of room, food, and other items without explanation, and the supporting witness [*35] testified in his deposition "that the values had nothing to do with the actual cost of the benefits provided" to the employee).

ERIC MAGNUS

Case 1:16-cv-01692-SCJ   Document 27-1   Filed 04/20/17   Page 33 of 80

Page 10 of 14
2014 U.S. Dist. LEXIS 73325, *35

Defendants claim credit for three items provided to Plaintiff: lodging, food, and gasoline/use of the Modhas' car. Defendants' evidence in support of these claimed credits was, for the most part, insufficient as a matter of law to meet their burden, but they did present competent evidence supporting some credit.

### a. Lodging

It is undisputed that Plaintiff lived at A.J.'s from 2006 until June 13, 2013; indeed, the reason that Plaintiff went to A.J.'s at all was because he needed a probation-approved place to live so that he could be released from prison. However, Defendants did not present evidence of the reasonable cost of providing lodging to Plaintiff, and thus no lodging credit can be awarded to them. Mr. Modha testified that he estimated the value of the lodging that he provided to Plaintiff at $100-$125/week. (Trial Tr. Day 2 at 169). However, no basis was provided for Mr. Modha's estimate, and in any event it is not the *value* of the lodging but the *cost to the employer of providing the lodging* that is determinative in this FLSA context.[12] See, e.g., _Washington, 721 F.2d at 803_. [*36] Defendants' request for lodging credit therefore must be denied.[13]

### b. Board

It is undisputed that Defendants provided meals to Plaintiff every day and allowed him to eat whatever he wanted at A.J.'s and at Hungry Howie's. There was testimony that Plaintiff typically ate a honey bun or granola bar from A.J.'s for breakfast, and Plaintiff [*37] admittedly ate lunch at the Modhas' home daily. He also was provided with dinner either at the Modhas' home or at A.J.'s.

However, Defendants did not present evidence of the cost of meals. They admittedly did not keep records regarding the food that was provided to Plaintiff, and Krupa Modha, who prepared the lunches, did not know how much those meals cost. (Trial Tr. Day 1 at 176-77, 179).[14] Later in the trial, Mr. Modha was able—rather impressively—to recite the prices of many items on the Hungry Howie's menu, (Trial Tr. Day 2 at 151), but that testimony does not establish the cost to Defendants of providing food to Plaintiff; retail costs include profit, which are not allowable, and Plaintiff largely prepared his own pizza and other food at Hungry Howie's in any event, (id. at 152). And, despite testimony regarding Plaintiff having a granola bar or honey bun and coffee each morning for breakfast, (id. at 53), no evidence or testimony was introduced regarding the cost of these items, and I am not free to speculate on such cost. Moreover, Mr. Modha's testimony that the food Plaintiff ate cost an average of $25-$30 per day, (id. at 154-55), is the type of "employer's unsubstantiated [*38] estimate of cost" that has been rejected in New Floridian Hotel and subsequent cases.

As to one food-related item, however, I find that competent testimony was presented to support a food credit to Defendants. Mr. Modha provided unrebutted testimony that Plaintiff drank bottled water at A.J.'s—a minimum of four bottles per day—and that these bottles cost (not sold for) sixty or seventy cents each. (Id. at 153). As the owner of the store, Mr. Modha is competent to testify as to costs of items sold there, and thus Defendants have

---

[12] For this reason, Plaintiff's estimate that an apartment elsewhere would have cost him $800 per month is also not useful in this analysis.

[13] An FLSA regulation provides that "[f]acilities furnished in violation of any Federal, State, or local law, ordinance or prohibition will not be considered facilities 'customarily' furnished" within the meaning of 29 U.S.C. § 203(m). 29 C.F.R. § 531.31. There was testimony that A.J.'s was not zoned for residential use, and thus arguably Defendants could not claim credit for the lodging provided there. However, due to the unique circumstances of this case—the reason that Plaintiff was living at A.J.'s and the unavailability of alternative lodging—it is questionable whether this regulation should be given effect here. Of course, Defendants' failure to present evidence of the cost of providing lodging moots this issue.

[14] At one point during trial, Krupa testified that "[m]aybe $20" was the value of the food provided to Plaintiff at lunch. (Trial Tr. Day 1 at 176). However, she was then impeached with her deposition testimony that she did not know the cost of a typical lunch that she prepared. (Id. at 177). In any event, the Court rejects $20 as the cost of a typical Plaintiff lunch, and no competent evidence of lunch cost was presented.

Case 1:16-cv-01692-SCJ   Document 27-1   Filed 04/20/17   Page 34 of 80

Page 11 of 14
2014 U.S. Dist. LEXIS 73325, *38

established entitlement to a credit of $73 per month [15] for water consumed by Plaintiff. In all other respects, however, Defendants did not meet their burden of proving the reasonable cost of providing food or beverages to Plaintiff.

**c. Gasoline/Vehicle Use**

Finally, Defendants claim credit for allowing Plaintiff to use one of the Modhas' vehicles for personal purposes and for providing gasoline for that use. Such transportation and fuel costs are within the meaning of "other facilities" under 29 U.S.C. § 203(m). See 29 C.F.R. § 531.32(a). Defendants did establish entitlement to some credit for providing a car and gasoline to Plaintiff.

It is undisputed that Plaintiff was allowed to drive a Modha car for personal use, including to probation appointments, to counseling appointments, to visit his son in Daytona Beach, and to the Modhas' house for lunch each day—eight miles each way. He also used the car to make pizza deliveries for Hungry Howie's, and that enabled him to earn extra money in the form of tips.

Mr. Modha testified that the average cost of gasoline over the period at issue was $3.50 per gallon, (Trial Tr. Day 2 at 164), and that the car that Plaintiff primarily drove—the Dodge Avenger—averages twenty miles to the gallon, (id. at 163). Minakshi Modha also drove the Avenger; estimates at trial were that Plaintiff drove it 50-60% [*40] of the time and Minakshi drove it 40-50% of the time. (Id. at 73 (50/50) (Test. of Minakshi Modha); id. at 162 (60/40) (Test. of Narendra Modha)). Mr. Modha acknowledged that he sometimes, but not often, drove the Avenger and that his son and Minakshi's son occasionally drove it. (Id. at 192-94).

Mr. Modha testified that he purchased the Avenger at the end of October 2009 and that at the time of trial in late January 2014 the car had 107,000 miles on it. (Id. at 161). Based on the Avenger's mileage and Plaintiffs historical use of the car from October 2009 to June 2013, Mr. Modha estimated that Plaintiff drove the car 1,000-1,300 miles per month. (Id. at 161, 163).

In light of the testimony from Mr. Modha, Minakshi Modha, and Plaintiff himself regarding Plaintiff's use of Mr. Modha's vehicles for his personal benefit throughout his employment, I find that 1,000 miles per month is a reasonable assessment of that use. And, as the owner of several gas stations, Mr. Modha is competent to testify as to the cost of gasoline, and I credit his testimony as to a $3.50 per gallon average cost during the time period at issue. At twenty miles per gallon, Plaintiff used fifty gallons of gasoline [*41] per month, for a gasoline cost of $175 per month.[16] Defendants have established entitlement to a monthly credit in this amount for gasoline.

Mr. Modha also testified regarding costs involved in maintaining and using the Avenger. He testified that he paid for insurance on the Avenger and alluded to the vehicle's periodic need for new tires; but, no testimony or other evidence as to the cost of these items was presented and no credit for them can be given. However, Mr. Modha also testified that he had the oil changed on the Avenger every 3,000 miles and that service cost "twenty, thirty bucks." (Trial Tr. Day 2 at 155, 164). Allotting one-third (1,000/3,000) of the oil change cost to Plaintiff yields a monthly credit of $6.67.[17] Defendants are entitled to a credit in this amount for maintenance of the Avenger, for a total vehicle-use credit of $181.67.

**d. Conclusion as to Wages Paid and Wages Owed**

In sum, Defendants failed to prove at trial the reasonable cost of providing lodging to Plaintiff, and thus they are not entitled to any lodging credit. On the other hand, they [*42] did establish $73 in monthly bottled water cost and $181.67 in monthly vehicle-use cost, for total credit under 29 C.F.R. § 531.27(b) of $254.67 per month. Thus, the

---

[15] 60 cents/bottle [*39] x 4 bottles/day x 365 days/year = $876/year. $876/year ÷ 12 months/year = $73/month.

[16] 1000 miles/month ÷ 20 miles/gallon = 50 gallons/month. 50 gallons/month x $3.50/gallon = $175/month.

[17] $20/3 = $6.67.

2014 U.S. Dist. LEXIS 73325, *39

total compensation that Plaintiff received monthly from July 2009 to May 2011 was $1,004.67 [18]; from June 2011 through March 2012, $1,054.67 [19]; and from April 2012 through July 2012, $1,154.67.[20] None of these amounts is less than minimum wage—calculated earlier as a monthly rate of $989.65.[21] Thus, when Defendants are given credit for the board and "facilities" as to which they presented competent evidence at trial, no minimum wage violation has been established in this case, and Plaintiff does not prevail on Count I.

## B. Count III—Retaliation

The FLSA makes it "unlawful for any person ... to discharge or in any other manner discriminate against any employee because [*43] such employee has filed any complaint or instituted or caused to be instituted any proceeding under" the FLSA. 29 U.S.C. § 215(a)(3). Plaintiff alleges that Defendants retaliated against him after they found out about this lawsuit in the summer of 2012. He asserted several forms of retaliation in his Second Amended Complaint, but prior to trial I ruled that the only means of retaliation that remained viable for trial was the reduction of Plaintiff's hours in August 2012. (See Order, Doc. 33, at 7-10).

Plaintiff contends that after Defendants learned of this lawsuit and that Plaintiff was accusing them of minimum wage and overtime violations, Defendants retaliated against him by cutting his hours. The record evidence does support the contention that Plaintiff worked fewer hours beginning in August 2012. Defendants began keeping records of Plaintiff's hours during August, when a payroll company was brought in to handle the growing number of employees at Mr. Modha's three businesses and insisted that records of hours worked be kept for every employee, including Plaintiff. Plaintiff was paid in cash from the A.J.'s cash register for August 1-12, 2012—$378.67 for 49.5 hours of work—hours [*44] that were recorded on a daily time log and ranged from three to five hours per day, with four hours per day being the most common number of hours worked during that period. (Defs.' Trial Ex. 7 at 8 (receipt showing cash payout of $378.67); Defs.' Trial Ex. 9 at 1-2 (time log showing hours worked for August 1 through August 12, 2012); Defs.' Trial Ex. 10 at 1 (same)). From August 13 on, however, Plaintiff typically worked only 2.5 hours per day, and he worked three hours or more in a single day only three times during the rest of his tenure at A.J.'s, which ended with his resignation on June 13, 2013. (See Defs.' Trial Exs. 9 and 10 (showing fewer than three hours worked for every day except April 26, 2013 (3.25 hours), May 14, 2013 (3.02 hours) and May 21, 2013 (3.00 hours))). Although I reject Plaintiff's suggestion that Defendants began using the payroll company in order to cut Plaintiff's hours rather than due to needs of the growing businesses, I do find that Plaintiff's hours were reduced after Defendants found out about the lawsuit sometime in early August 2012. Defendants have offered no explanation for the cutting of Plaintiff's hours,[22] and I conclude that his hours were reduced [*45] as a consequence of Plaintiff's filing of this lawsuit.

However, Plaintiff has not established a basis for an award of damages on this claim. In the Joint Final Pretrial Statement, in which parties claiming damages are required to list "a statement of the elements of each [claim for damages] and the amount being sought with respect to each such element," M.D. Fla. Local Rule 3.06(c)(7), Plaintiff requested "[e]motional distress for retaliation $100,000.00," (Doc. 36 at 4).[23] He did not list any other type

---

[18] $750 + $254.67 = $1,004.67.

[19] $800 + $254.67 = $1,054.67.

[20] $900 + $254.67 = $1,154.67.

[21] Stated differently, when converted to hourly rates, $1,004.67 per month for a 31.5-hour workweek equates to $7.36/hour; $1,054.67 per month equates to $7.73/hour; and $1,154.67 per month equates to $8.46/hour. Each of these hourly rates exceeds the $7.25 federal minimum wage.

[22] Additionally, Defendants have not argued that Plaintiff did not engage in "protected activity" under the FLSA, which requires in part that Plaintiff had an objectively reasonable, good faith belief that Defendants had violated the FLSA's minimum wage or overtime provisions. See, e.g., Perez v. Brands Mart Serv. Corp., No. 10-61203-CIV, 2011 U.S. Dist. LEXIS 82708, 2011 WL 3236022, at *10 (S.D. Fla. July 28, 2011). I will therefore not address that issue.

[23] Similarly, in the Second Amended Complaint Plaintiff alleged that "[a]s a result of the retaliation, [Plaintiff] has suffered damages, including emotional distress and pain and suffering." (Doc. 16 ¶ 39).

Case 1:16-cv-01692-SCJ   Document 27-1   Filed 04/20/17   Page 36 of 80

Page 13 of 14
2014 U.S. Dist. LEXIS 73325, *45

of damages for this claim.[24] And, in his Amended Post-Trial Brief, Plaintiff makes no attempt to explain what damages he seeks on this claim—or a basis for any such damages—other than proposing that judgment be entered "regarding [Plaintiff's] claim of retaliation, [*46] jointly and severally against [b]oth Defendants, in the amount of $100,000." (Doc. 63 at 34). This request for $100,000 is consistent with the request in the Joint Final Pretrial Statement in that amount.

The law in this circuit is not settled regarding whether emotional distress damages are recoverable for FLSA retaliation. The FLSA provides that "[a]ny employer who violates the provisions of *section 215(a)(3)* of this title [the anti-retaliation provision] shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of *section 215(a)(3)* of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages." *29 U.S.C. § 216(b)*. [*47] Although several other circuits have held that emotional distress damages are recoverable under this section of the FLSA,[25] the Court of Appeals for the Eleventh Circuit has not squarely addressed this question, and district court decisions have reached differing conclusions. Compare, e.g., *Vaccaro v. Custom Sounds, Inc., No. 3:08-cv-776-J-32JRK, 2010 U.S. Dist. LEXIS 28188, 2010 WL 1223907, at *5 (M.D. Fla. Mar. 4, 2010)* (discussing history of the issue and predicting "that the Eleventh Circuit would conclude that compensatory damages for emotional distress can be awarded in FLSA cases"), and *Bogacki v. Buccaneers Ltd. P'ship, 370 F. Supp. 2d 1201, 1205-06 (M.D. Fla. 2005)* (allowing claim for emotional distress damages for FLSA retaliation to proceed), with *Bolick v. Brevard Cnty. Sheriff's Dep't, 937 F. Supp. 1560, 1567 (M.D. Fla. 1996)* (concluding that "emotional . . . damages are unavailable under the FLSA").

In any event, even assuming that the Eleventh Circuit would allow emotional distress damages in FLSA retaliation cases, Plaintiff did not present evidence supporting an award of emotional distress damages in this case. No testimony or other evidence of compensable emotional distress was adduced at trial, and in his post-trial brief Plaintiff makes no argument or explanation for such an award; as noted earlier, he merely sets forth a proposed judgment amount of $100,000. Accordingly, Plaintiff has not established that he suffered compensable damages on this claim, and it fails for this reason.

## III. Conclusion

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:
  1. As set forth herein, Plaintiff does not prevail on any of his claims in this case.
  2. Defendants' ore tenus "motion for judgment as a matter of law"[26] (Doc. 47) is deemed moot.

---

[24] In contrast, Plaintiff did, in the Joint Final Pretrial Statement, make detailed calculations of damage amounts—in the form of lost wages—for his minimum wage and overtime claims. (Doc. 36 at 3-4).

[25] See, e.g., *Moore v. Freeman, 355 F.3d 558, 563-64 (6th Cir. 2004)*; *Travis v. Gary Cmty. Mental Health Ctr., Inc., 921 F.2d 108, 111-12 (7th Cir. 1990)*; see also *Adams v. Cedar Hill Indep. Sch. Dist., Civ. Action No. 3:13-CV-2598-D, 2014 U.S. Dist. LEXIS 2070, 2014 WL 66488, at *6 (N.D. Tex. Jan. 8, 2014)* (discussing lack of consensus [*48] among district courts in the Fifth Circuit and noting decisions from other circuits).

[26] Defendants made their motion at the close of Plaintiff's evidence as a "Rule 50 motion." (Trial Tr. [*49] Day 1 at 198). *Federal Rule of Civil Procedure 50*, however, pertains to "judgment as a matter of law in a jury trial." This case was tried to the Court, not a jury, and the analogous rule is *Federal Rule of Civil Procedure 52(c)*, which provides:

> Judgment on Partial Findings. If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. . . .

In this case, the Court reserved ruling on Defendants' motion, (see Trial Tr. Day 1 at 199), and thereby "decline[d] to render any judgment until the close of the evidence" as stated in *Rule 52(c)*. The Court has instead, in this Order, made the findings and conclusions contemplated by *Federal Rule of Civil Procedure 52(a)*.

2014 U.S. Dist. LEXIS 73325, *49

3. The Clerk is directed to enter a judgment providing that Plaintiff shall take nothing from Defendants on any of his claims. Thereafter, the Clerk shall close this case.

**DONE** and **ORDERED** in Orlando, Florida, on May 29, 2014.

/s/ John Antoon II

JOHN ANTOON II

United States District Judge

---

End of Document

Caution
As of: April 20, 2017 3:12 PM Z

## *Perez v. Brands Mart Serv. Corp.*

United States District Court for the Southern District of Florida

July 28, 2011, Decided; July 28, 2011, Entered on Docket

Case No.10-61203-CIV-O'SULLIVAN [CONSENT]

**Reporter**
2011 U.S. Dist. LEXIS 82708 *

ANGEL PEREZ and others similarly situated, Plaintiffs, v. BRANDS MART SERVICE CORP., Defendant.

## Core Terms

minimum wage, Installation, termination, summary judgment, complaints, protected activity, commissions, hours worked, waiting, spent, retaliation claim, retaliation, objectively reasonable, pretext, duties, tasks, non-moving, assigned, fired, prima facie case, material fact, anti-retaliation, argues, final judgment, abandonment, party's, hourly, notice, rights, badge

**Counsel:** [*1] For Angel Perez, on his own behalf and others similarly situated, Plaintiff: G Ware Cornell, Jr., Cornell & Associates, Weston, FL.

For Brands Mart Service Corp., a Florida Corporation, Defendant: Tamatha Suzanne Alvarez, LEAD ATTORNEY, Martin, Lister & Alvarez, PLC, Weston, FL; Robert L. Duston, Saul Ewing, LLP, Washington, DC; Robert C. Nagle, Saul Ewing LLP, Philadelphia, PA.

**Judges:** JOHN J. O'SULLIVAN, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** JOHN J. O'SULLIVAN

## Opinion

### ORDER

THIS MATTER is before the Court on the Defendant's Motion for Summary Judgment (DE# 39, 5/4/11). Having reviewed the motion, response and reply as well as the parties' respective statements of material facts and exhibits, including declarations and transcripts of depositions, and applicable law, it is

ORDERED AND ADJUDGED that the Defendant's Motion for Summary Judgment (DE# 39, 5/4/11) is GRANTED for the reasons set forth below.

### INTRODUCTION

The plaintiff filed his Complaint seeking compensation for unpaid minimum wage compensation pursuant to the Fair Labor Standards Act, *29 U.S.C. §§ 201-219* (the "FLSA") as well as a claim for retaliatory discharge under the FLSA, *29 U.S.C. § 215(a)(2), (3)*. Complaint (DE# 1, 7/13/10). The plaintiff alleges [*2] that the defendant violated the FLSA by failing to pay him the federal minimum wage for the hours he spent in the stores under the Same Day Installation Program ("Program"). In the Fall of 2009, BrandMart instituted a new program for same day installation ("Same Day Installation Program" or "Program"). This Program was intended to counter the adverse effects of the

ERIC MAGNUS

recession on home installations, and to either increase or stop the decrease in the number of jobs for the Installation Teams.

The defendant contends that it did not violate the FLSA because the FLSA permits employees to be paid on a commission rather than hourly basis. The defendant paid the plaintiff in excess of the federal minimum wage due to its arrangement to pay the plaintiff 100% commission that covered all hours worked on both the productive work that generates compensation and the other non-productive hours (e.g. waiting time, meetings, training). The plaintiff claims that the defendant failed to pay him minimum wage ($7.25/hour) for hours spent in or at retail stores as part of the Program. The plaintiff contends that the defendant did not have the right under the FLSA to add hours or duties to his job (i.e. the [*3] Program requiring in-store time and tasks) without additional compensation beyond his commissions. Additionally, the plaintiff claims that his objections to the Program and his request for more money was an assertion of rights under the FLSA, and that he was fired in retaliation for that protected activity.

Additionally, the plaintiff alleges that the defendant violated the anti-retaliation provision of the FLSA by terminating his employment after he complained that he was not paid for the additional work assigned under the Program. Although an issue exists as to whether the plaintiff quit or was fired, the defendant maintains that it is entitled to summary judgment because the plaintiff cannot establish a prima facie case of retaliation and the plaintiff failed to carry his burden of proof on pretext. That is, the plaintiff failed to rebut the defendant's record evidence that the termination, if any, was based on a non-retaliatory ground, i.e. the plaintiff's abandonment of his job based on his refusal to perform the assigned work under the Program.

## FACTS[1]

The plaintiff filed his Complaint seeking compensation for unpaid minimum wage compensation pursuant to the Fair Labor Standards Act, _29 U.S.C. §§ 201-219_ (the "FLSA") as well as a claim for retaliatory discharge under the FLSA, _29 U.S.C. § 215(a)(2), (3)_. Complaint (DE# 1, 7/13/10).

### Minimum Wage

The plaintiff was hired as an installer's helper for the defendant, BrandsMart Service Corp. His job duties were to assist an installer that installed electronics purchased from the defendant. The defendant paid the plaintiff on a commission basis. The plaintiff's commission included attending meetings, picking up parts at the warehouse or stores, driving time between jobs, time spent waiting between jobs, and keeping the truck clean.

Installers were treated as full-time employees, working at least 30 hours per week, and thus, eligible for fringe benefits including major medical, vision and dental insurance, paid vacation and sick leave, and a 401(k) plan with a 2% Company match.

In the Spring of 2009, Gary Carlisle, a manager at BrandsMart, implemented a pilot program of same day [*5] installation to try to generate more installation jobs and the Program was formally initiated in September 2009. At no time during the Program, did Perez work more than 40 hours in a workweek, including all hours in the stores. The plaintiff did not go into a store every week.

The defendant guaranteed that all employees who were paid on commission, including the Installation Teams, received at least minimum wage for all hours worked up to 40 in a workweek. If an employee's commissions failed to meet the minimum wage, BrandsMart supplemented their compensation with "draw pay." During the plaintiff's employment, none of the electronics installation employees were ever paid draw pay, because their compensation far exceeded minimum wage. Assuming a forty hour week, the plaintiff's effective rate of pay was over $16 per hour, or more than twice the minimum wage (i.e. $6.55 between 5/08-7/25/09; $7.25 thereafter).

---

[1] The facts of the case are set forth with a view toward the evidence and the factual inferences therefrom in the light most favorable [*4] to the plaintiff, the non-moving party. _Key West Harbour Dev. Corp. v. Key West, 987 F.2d 723, 726 (11th Cir. 1993)._

2011 U.S. Dist. LEXIS 82708, *4

Objections to the Same Day Installation Program/Retaliation

When the Program began in the Fall of 2009, the plaintiff says that when they went to the store he and the Installer, Charlie Freeman, would walk in and "If there's nothing, we can hang out outside, stay in the truck. Just [*6] waiting for who knows?" (Perez Depo. p. 39) The plaintiff's perception was that he did not need to stay in the T.V. Department and that only his Installer had anything to do with the salespeople. (Id. at p. 39-40).

Perez' perception was that the Program changed sometime in 2010. His primary source of information was the Installer with whom he worked. The plaintiff originally claimed that the Installer told him that they would need to do merchandising and other tasks in the T.V. Department, but later changed his description of what the Installer told him, stating that they were required to be inside the store, in the T.V. Department, working with the salespeople.

Perez claims that he did not have any objection to being required to go inside the stores, waiting around the T.V. Department and talking to the salesmen or customers, even if he did not receive additional compensation, because that was what he was doing for most of the Program. (Id. at p.125-27) He objected to the Program because it would require him to work in the store without getting paid. (Id. at p. 44, 126-27). The plaintiff never performed any tasks in the store. (Id. at pp. 47-49). The plaintiff said he "didn't give a  [*7] chance until they pay me for it." (Id. at p. 49).

In March 2010, the plaintiff spent one day waiting in the truck, refusing to accompany the installer into the Deerfield Beach store. In subsequent discussions with his supervisors, the plaintiff made it clear that he would not do what he was being asked, or even go into the stores to wait for jobs, unless he was given more money. (Id. at pp. 51-54, 57-58, 64-65)

The plaintiff objected to the Program in the following ways: 1) his initial note of 5 hours at a store on 2/26/10 for which he asked to be paid $100 ($20/hour), then notes of "free" on subsequent submissions; his two discussions with Gary Carlisle; his call to Human Resources on April 8, 2010; and his meeting with Messrs. Adamo, Carlisle and Pena on April 9, 2010. The plaintiff did not mention the FLSA in any of these discussions.

On April 9, 2010, the plaintiff, and Cosmo Adamo, Vice President of Service at BrandsMart, Gary Carlisle, a manager at BrandsMart, and Edmundo ("Mundy") Pena, the General Manager of Service, participated in a meeting at the Service Center in Mr. Adamo's office, which lasted approximately 30-45 minutes. Mr. Adamo did most of the talking during the meeting.  [*8] (Id. at pp. 66-67; Carlisle Depo. at pp. 54-56, 59; Adamo Depo. at pp. 9-10; Pena Decl. ¶ 5). The plaintiff explained that "he did not want to go into the store, he didn't think it was fair. He didn't think it was fair that he wasn't getting paid for going into the store." (Perez Depo. at p. 9)

Mr. Adamo said, "[I]t doesn't seem like you're understanding or that you are going to do what we are discussing here today. [Mr. Perez] says I am not going to the store, I am not going to work for free." (Adamo Depo. at pp. 10-11).

Gary Carlisle testified "[a]t the end of the meeting, Adamo told Perez if he was unwilling to go into the store that he could leave his badge and go." Carlisle Decl. ¶ 27 (DE# 39-9, 5/4/11).

There was no discussion of what assignments or tasks, if any, he would be expected to perform while in the stores, other than Adamo mentioning the use of stickers to promote Installation services. The understanding of Adamo, Carlisle and Pena was that the plaintiff was refusing to go in the store at all, just as he had done on April 2, without additional pay. (Adamo Decl. ¶¶ 19-21; Carlisle Depo. at pp. 57-60; Carlisle Decl. ¶ 26 ; Pena Decl. ¶ 5; Perez Depo. at 68-69).

Mr. Adamo  [*9] stated that "I said I need you to please go back to work, please follow your schedule and please follow your tasks as Gary [Carlisle] assigned to you. [Mr. Perez] said I am not going into the store and he approached the doorway in the room." (Id.) "As he approaches the door, I said if you are leaving us, we need for you to leave us your badge. [Mr. Perez] says I am not leave you my badge. He says I am going to go across the street to HR. I said okay, if that is what you want to do, you can do that, too. And he walked out the door, my office door." (Id. at pp. 11-12).

2011 U.S. Dist. LEXIS 82708, *9

Mr. Carlisle's recollection is that Mr. Adamo told the plaintiff "if you are not going to participate in the program, then you can leave your badge and go" and the plaintiff responded "I can't do that or I refuse to do that" or something to that effect. (Carlisle Depo. at p. 59).

In response to the plaintiff's statement that "I don't work unless you pay me," the plaintiff states that Mr. Adamo replied "it's clear you don't want to do what we ask you to do. So from now on, you're no longer working for us, please return your badge, and good luck." (Perez Depo. at p. 71).

All three managers present were surprised when Mr. Perez **[*10]** walked out, and did not know whether Mr. Perez was going to HR to complain or to quit. (Adamo Depo. at p. 12; Adamo Decl. ¶¶ 22,24; Carlisle Decl. ¶ 27; Pena Decl. ¶¶ 7-8). Mr. Pena went after Mr. Perez and told him to "think about what you're doing," i.e. whether he really wanted to quit, and if the plaintiff was actually going to leave, then he would need to return his uniforms. The plaintiff responded "I understand." (Pena Decl. ¶ 8).

On April 23, 2010, HR processed the plaintiff's termination for job abandonment after he did not return to work. The first time the Vice President of HR was aware that the plaintiff was claiming he had been fired was at the appeal of his denial of unemployment compensation. (Witczak Decl. ¶ 23; Adamo Decl. ¶¶ 23-24; Carlisle Decl. ¶ 26).

The plaintiff did not mention the FLSA when he communicated his objections to the Program and his refusals to work for free with Messrs. Carlisle and Adamo as well as HR representatives. Defendant's Statement of Material Facts ¶¶ 25-26, 28-29, 30-31. (DE# 39-1, 5/4/11)

## LEGAL ANALYSIS

## I. STANDARD OF REVIEW

The court, in reviewing a motion for summary judgment, is guided by the standard set forth in *Federal Rule of Civil Procedure 56*( **[*11]** c), which states, in relevant part, as follows:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

*Fed. R. Civ. P. 56(c)*. The moving party bears the burden of meeting this exacting standard. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)*. That is, "[t]he moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *U.S. v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991)* (quoting *Celotex, 477 U.S. at 323*). In assessing whether the moving party has satisfied this burden, the court is required to view the evidence and all factual inferences arising therefrom in the light most favorable to the **[*12]** non-moving party. *Batey v. Stone, 24 F.3d 1330, 1333 (11th Cir. 1994)*; *Sheckells v. Agv-Usa Corp., 987 F.2d 1532, 1534 (11th Cir. 1993)*; *Browning v. Peyton, 918 F.2d 1516, 1520 (11th Cir. 1990)*; *Clemons v. Dougherty County, Ga., 684 F.2d 1365, 1368 (11th Cir. 1982)*; *Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)*(per curiam). Summary judgment is appropriate when there is no dispute as to any material fact and only questions of law remain. *Reich v. John Alden Life Ins. Co., 126 F.3d 1 (1st Cir. 1997)*. If the record presents factual issues, the court must deny the motion and proceed to trial. *Adickes, 398 U.S. at 157*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

Despite these presumptions in favor of the non-moving party, the court must be mindful of the purpose of *Rule 56* which is to eliminate the needless delay and expense to the parties and to the court occasioned by an unnecessary trial. *Celotex, 477 U.S. at 322-323*. Consequently, the non-moving party cannot merely rest upon his bare assertions, conclusory allegations, surmises or conjectures. *Id.* As the Supreme Court noted in *Celotex*,

Case 1:16-cv-01692-SCJ    Document 27-1    Filed 04/20/17    Page 42 of 80

Page 5 of 11
2011 U.S. Dist. LEXIS 82708, *12

[T]he plain language of *Rule 56*( c) **[\*13]** mandates the entry of summary judgment . . . against the party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Id. at 322-323.* Thus, the mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient. There must be evidence on which the jury could reasonably find for the non-movant. *Anderson, 477 U.S. at 251; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).*

## II. DISCUSSION

### A. Mimimum Wage

Plaintiff seeks recovery of minimum wage compensation under the FLSA in Count I. The plaintiff acknowledges that "Plaintiff's employment as an outside installer with the Defendant provided for compensation on a commission basis" and claims that the defendant failed to pay the plaintiff for all hours worked in the store. (Complaint at ¶ 8-9).

The plaintiff understood that he was paid "a hundred **[\*14]** percent on commission" and that part of his job requirements, which were covered by his commissions, included attending meetings, picking up parts at the warehouse or stores, driving time between jobs, time spent waiting between jobs, and keeping the truck clean. (SMF ¶ 6, Perez Depo. at pp. 32-33).

When the Program began in September 2009, the plaintiff did not mind hanging around the stores. In February or March of 2010, when the plaintiff perceived that the Program was changing, the plaintiff complained that he wanted more money to go into the stores, and objected that he should not have to "work for free." (SMF ¶¶ 21-22). Despite repeated efforts by others to explain the nature of commission compensation, the plaintiff maintained that he was not willing to participate in the Program, and in particular objected to "physically working" in the stores without additional pay.

1. The Plaintiff Was Paid Well-Above Minimum Wage for all Hours Worked, Including the Time He Spent in Stores, under a Lawful Commission Arrangment.

The FLSA minimum wage provision requires employers to pay employees a minimum wage of not less than $7.25 an hour. [2] *29 U.S.C. §206(a)(1)(C).* The federal minimum wage **[\*15]** provision is not violated

so long as the total weekly wage paid by an employer meets the minimum weekly requirements of the statute, such minimum weekly requirement being equal to the number of hours actually worked that week multiplied by the minimum hourly statutory requirement.

*United States v. Klinghoffer Bros. Realty Corp., 285 F.2d 487, 490 (2d Cir. 1960)*; see *Klinedinst v. Swift Investments, Inc., 260 F.3d 1251, 1256 (11th Cir. 2001)*(analyzing the commission exemption for overtime compensation and explaining that the regular rate of pay is calculated by dividing all of the employer's total compensation for the workweek by the number of hours worked); see also *Walters v. American Coach Lines of Miami, Inc., 569 F. Supp. 2d 1270, 1300 (S.D. Fla. 2008)* ("[I]t is the workweek as a whole rather than each individual hour within a workweek that is the relevant unit for determining compliance with the minimum wage requirement.") (citations omitted); *29 C.F.R. §§ 778.117 et seq.* ("Commissions (whether based on a percentage of total sales or of sales in excess of a specified amount, or on some other formula) are payments for hours worked and must be included in the regular rate....")

---

[2] The **[\*16]** applicable federal minimum wage during the plaintiff's employment increased from $6.55 per hour from May 2008 until July 25, 2009, to $7.25 per hour for the duration of the plaintiff's employment.

2011 U.S. Dist. LEXIS 82708, *16

The defendant acknowledges that the plaintiff was entitled to minimum wage for all hours worked (other than breaks) from the time he started at the warehouse, store or customer's home for his first job or to pick up parts, any hours spent in the stores under the Program regardless of whether he was hanging around or performing tasks and until he finished his last job. Memorandum of Law in Support Defendant's Motion for Summary Judgment (DE# 39-2 at 6; 5/4/11) Travel time between jobs, waiting for customers, and hours spent in the stores under the Program were included.

There is no dispute that the plaintiff was paid a commission. There is no claim for overtime pay and the plaintiff does not assert that the time he spent in the stores caused him to work more than 40 hours. The plaintiff averaged 35 hours or less and never more than 40 hours per week. (Carlisle Decl. ¶¶ 12, 16-17) During his entire employment, the plaintiff's compensation always exceeded the minimum wage. During the 10 pay periods [*17] when he was in the stores during the Program, his average weekly commissions were $1,345, which is an effective hourly rate of over $16.00, more than twice the minimum wage. (SMF ¶ 20, Witczak Decl. ¶¶ 17-19 and Ex. B)

The plaintiff has not and cannot show that he was paid less than minimum wage for the hours he was required to work by the defendant because the plaintiff never earned less than minimum wage. His lowest pay from the defendant was nearly twice minimum wage (i.e. $16.00 per hour).

In *Caci v. Wiz of Lake Grove, Inc., 267 F. Supp. 2d 297 (E.D.N.Y. 2003),* the district court granted summary judgment in the employers' favor on the plaintiff's minimum wage and retaliation claims. The plaintiff was a sales associate who claimed that his employer did not pay him minimum wage for all of his hours. Caci was paid by commissions and an hourly draw. Caci complained that he was not being paid for the hours he worked cleaning and maintaining his work area after the store closed because he was unable to earn any commission during that time. *Id. at 298.* Caci refused to work after the store closed and was terminated. *Id. at 298-99.* The district court determined that "[d]espite Caci's contention [*18] that he was not paid for the hours he worked after the store closed because he was unable to make any sales and, therefore, to earn any commissions during those hours, the undisputed facts demonstrate that Caci was paid at least the required minimum wage for every hour worked, that is, Caci's weekly pay divided by the total hours he worked - including hours he worked after the store closed - yielded an hourly rate exceeding the required minimum wage...." *Id. at 300* (citations omitted).

The plaintiff seems to contend that the defendant had no right to ever increase or change the duties or hours covered by his commissions. Plaintiff cites no case law for this proposition; does not address any of the relevant DOL regulations; and does not discuss or distinguish the *Caci* case. "The Act does not preclude an employer from lowering an employee's hourly rate, provided the rate paid is at least the minimum wage, or from reducing the number of hours the employee is scheduled to work." See DOL Wage and Hour Division, *Fact Sheet #70: Frequently Asked Questions Regarding Furloughs and Other Reductions in Pay and Hours Worked Issues* (Nov. 2009).

Like the plaintiff in *Caci,* the plaintiff in the present [*19] case was paid at least the required minimum wage for every hour worked, including those in-store under the Program. "As a general rule, an employee cannot succeed on a claim under the FLSA if his average wage for a period in which he works no overtime exceeds minimum wage." *Bolick v. Brevard County Sheriff's Dept., 937 F. Supp. 1560, 1568 (M.D. Fla. 1996)*(citations omitted). "Letter opinions issued by the U.S. Department of Labor's Wage and Hour Division support this general rule." *Id. at 1568-69.* The plaintiff has failed to show that he was not paid the required minimum wage for all hours worked. Moreover, it is undisputed that the plaintiff never performed the work under the Program for which he now claims he was entitled to additional compensation. The defendant is entitled to judgment as a matter of law on Count I (minimum wage) of the plaintiff's Complaint.

## B. Retaliation

With respect to the retaliation claim, the plaintiff alleges that "[o]n April 3, 2010, shortly after complaining to his supervisor about the Defendant's failure to pay minimum wage for each hour worked, Plaintiff was terminated from employment." Complaint ¶ 18 (DE# 1, 7/13/10). The defendant argues that it is entitled [*20] to summary final

2011 U.S. Dist. LEXIS 82708, *20

judgment on the retaliation claim on three separate grounds: the plaintiff's inability to establish two of the elements of his *prima facie* case (protected activity and adverse action) and his ultimate burden of proving pretext. See Defendant's Motion for Summary Judgment at 2 (DE# 39, 5/4/11); Memorandum of Law in Support of Defendant's Motion for Summary Judgment (DE# 39-2, 5/4/11); and Reply Memorandum of Law in Support of Defendant's Motion for Summary Judgment (DE# 44, 6/7/11) .

Section 215(a)(3) of the FLSA prohibits employers from

discharg[ing] or in any other manner discriminat[ing] against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3). Where the plaintiff does not present any direct evidence of retaliatory discharge, circumstantial evidence may be evaluated under the burden shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); See Raspanti v. Four Amigos Travel, Inc., 266 Fed. Appx. 820, 822 (11th Cir. 2008).

Under [*21] this framework, the plaintiff must first establish a prima facie case of retaliation. McDonnell Douglas Corp., 411 U.S. at 802. "A prima facie case of FLSA retaliation requires a demonstration by the plaintiff of the following: '(1) [he] engaged in activity protected under [the] act; (2) [he] subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action.'" Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342-43 (11th Cir. 2000) (citing Richmond v. ONEOK, Inc., 120 F.3d 205, 208-09 (10th Cir.1997)). The employer must then articulate a legitimate non-retaliatory reason for the adverse employment action. Raspanti, 266 Fed. Appx. at 822. "[T]he defendant's burden of rebuttal is exceedingly light." Perryman v. Johnson Products Co., 698 F.2d 1138, 1142 (11th Cir. 1983). "If the employer asserts a legitimate reason for the adverse action, the plaintiff may attempt to show pretext." Wolf, 200 F.3d at 1343. "In demonstrating causation, the plaintiff must prove that the adverse action would not have been taken 'but for' the assertion of FLSA rights." Id. (citation omitted).

**a. Protected Activity**

1. Notice

The defendant argues [*22] that it is entitled to summary final judgment on the plaintiff's retaliation claim because the plaintiff has not shown that he engaged in a protected activity. See Def.'s Motion (DE# 39, 5/4/11). Protected activity within the meaning of the FLSA includes filing a complaint alleging FLSA violations, instituting a FLSA proceeding, or providing (or about to provide) testimony in a FLSA proceeding. See 29 U.S.C. § 215(a)(3). The defendant argues that the plaintiff's complaints do not rise to the level of protected activity and that he did not have an objectively reasonable, good faith belief that BrandsMart was violating the law. The Court agrees.

The Eleventh Circuit has held that informal complaints to a private employer can constitute an assertion of rights protected under the anti-retaliation provision of the FLSA. E.E.O.C. v. White and Son Enterprises, 881 F.2d 1006, 1011 (11th Cir. 1989)(concluding that "the unofficial complaints expressed by the women to their employer about unequal pay constitute an assertion of rights protected under the statute"); contra, Kasten v. Saint-Gobain Performance Plastics Corp., 131 S. Ct. 1325, 1337, 179 L. Ed. 2d 379 (2011) (Scalia, J., dissenting) ("The plain meaning [*23] of the critical phrase ['filed any complaint'] and the context in which [it] appears make clear that the retaliation provision contemplates an official grievance filed with a court or an agency, not oral complaints - or even formal, written complaints - from an employee to an employer.").

In Kasten v. Saint-Gobain Performance Plastics Corp., 131 S. Ct. 1325, 1335, 179 L. Ed. 2d 379 (2011), the Supreme Court concluded, consistent with White and Son, that the term "filed any complaint" did not require a writing, and could include oral complaints. The Supreme Court did not address the issue of whether the anti-retaliation provision only applies to complaints made to the government that is, not to a private employer. The

2011 U.S. Dist. LEXIS 82708, *23

Supreme Court was sensitive to the argument that an employer must have fair notice that the employee is making a complaint about a violation of the FLSA and stated:

> the phrase "filed any complaint" contemplates some degree of formality, certainly to the point where the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns.

Id. at 1334. In Kasten, the Supreme Court explained,

> [t]o fall within [*24] the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both the content and context, as an assertion of rights protected by the statute and a call for their protection.

Id. In Kasten, the Supreme Court held that "[t]his standard can be met, however, by oral complaints, as well as by written ones." Id. The Supreme Court did not entertain Saint-Gobain's alternative argument that the anti-retaliation provision applies only to complaints filed with the government, not the employer. Id. at 1336; contra, Kasten, 131 S. Ct. at 1337 (Scalia, J., dissenting) (criticizing the majority's refusal to entertain the issue and determining that "'complaint' in the FLSA refers to an official filing with a governmental body"). In Kasten, the Supreme Court found that "the Seventh Circuit erred in determining that oral complaints cannot fall with the scope of the phrase 'filed any complaint' in the Act's antiretaliation provision" and left it to the "lower courts to decide whether Kasten will be able to satisfy the Act's notice requirement." Kasten, 131 S. Ct. at 1336.

The defendant argues that "[g]iven the context, [*25] Perez' complaints do not meet the degree of specificity required by [Kasten]. An employee who is making twice minimum wage who demands more money for a perceived change in his duties does not put a reasonable employer on notice that he is asserting rights or a violation of the FLSA." Def.'s Memo. (DE# 39-2 at 17-18; 5/4/11). The defendant concedes that "Perez' complaints did have some degree of formality when he went to Human Resources," but argues that "his complaints were not 'sufficiently clear and detailed' for BrandsMart to understand, in light of both the content and context, that he was asserting rights under the FLSA." Id. at 17.

The defendant acknowledges that the plaintiff's repeated remarks that he would not "work for free" might seem, in the abstract, like a complaint that he was entitled to minimum wage if he was going to be asked to start doing tasks in the store. However, in context, the plaintiff was paid commissions that covered tasks beyond simple installation of equipment, including non-productive time such as a waiting time. The plaintiff's managers knew that BrandsMart guaranteed the plaintiff minimum wage for all compensable hours worked. Additionally, they knew [*26] that the plaintiff was making more than minimum wage in commissions. The plaintiff did not mention the FLSA and did not specifically ask to be paid minimum wage. The plaintiff's managers understood that the plaintiff was complaining about his compensation, wanted more money for waiting in the stores (e.g. once asking for $20/hour), and that the plaintiff did not agree that his commissions should cover those additional duties. Demands for more compensation are not protected activity. Alvarado v. I.G.W.T. Delivery Systems, Inc., 410 F. Supp. 2d 1272 (S.D. Fla. 2006).

In Alvarado, this Court granted summary judgment for the defendants on the plaintiffs' retaliation claim because the plaintiffs could not show they were engaged in a protected activity. In that case, the plaintiffs' retaliation claim was based, in part, on letters signed by the plaintiffs in February 2005 "requesting, among other things, an increase in salary, reorganization of delivery routes, the cessation of discriminatory comments on the job, and increased courtesy and respect in company memorandums." Id. at 1278. This Court concluded that the February 2005 letters "fail[ed] to meet the elements required for a prima facie [*27] case [of retaliation]" because "[t]he letters themselves d[id] not appear to clearly assert rights under the [FLSA] in that they make no specific mention of overtime pay or invoke the FLSA." Id. at 1279.

Nowhere in the plaintiff's statements to management does the plaintiff assert his rights under the FLSA or mention minimum wage. See Alvarado, 410 F. Supp. 2d at 1279; Etienne v. Muvico Theaters, Inc., No. 01-6265-CIV, 2003 U.S. Dist. LEXIS 14036, 2003 WL 21184268, * 18 (S.D. Fla. Mar. 11, 2003) (plaintiff failed to make prima facie retaliation claim under FLSA where plaintiff did not present evidence "that he threatened to report labor-law

violations, or file a complaint about business practices at the theater."). Thus, the plaintiff has failed to establish that he was engaged in a protected activity and the defendant is entitled to summary final judgment on this claim.

2. Objectively Reasonable, Good Faith Belief

Even if the plaintiff satisfied the notice requirement under *Kasten*, the commissions paid by the defendant exceeded the minimum wage for each hour the plaintiff worked, including in-store hours. Complaints of legal activity can still be protected if the employee has an objectively reasonable, good faith [*28] belief that the employer's conduct is unlawful. This standard has two requirements: 1) the employee must show that he subjectively, that is in good faith, believed that his employer was violating the law. *Little v. United Techs. Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997)* (decided under Title VII anti-retaliation provision). The employee's complaint does not constitute protected activity unless the belief is both objectively reasonable and in good faith. Id.; *Burnette v. Northside Hospital, 342 F. Supp. 2d 1128, 1134 (N.D. Ga. 2004)*(citing *Little*, id., and *Standard v. ABEL Servs., Inc., 161 F.3d 1318, 1328-29 (11th Cir. 1998)*). The record is devoid of evidence that the plaintiff claimed that he believed in good faith that he was not getting paid for waiting time, and that he was entitled to at least minimum wage for going into the store or performing any duties in the store.

Even if he did meet the subjective good faith belief that he was entitled by law to more compensation, the plaintiff cannot meet the second part of the standard, that he had an "objectively reasonable belief that his employer was engaged in unlawful practices." *Padilla v. The North Broward Hosp. Dist., 270 Fed. Appx. 966 (11th Cir. 2008)* [*29] (Title VII). The plaintiff's belief must have been "objectively reasonable in light of the facts and the record presented." *Little, 103 F.3d at 960*. "[I]t is presumed that the employee has substantive knowledge of the law" when applying the objective test. *Padilla, 270 Fed. Appx. at 966*; accord *Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1388 n.2 (11th Cir. 1998)* ("If plaintiffs are free to disclaim knowledge of the substantive law, the reasonableness inquiry becomes no more than speculation regarding their subjective knowledge.").

The defendant relies on *Burnette v. Northside Hospital, 342 F. Supp. 2d 1128 (N.D. Ga. 2004)*. In *Burnette*, the plaintiff complained about a change in his employer's on-call program that resulted in his loss of on-call pay. *Burnette, 342 F. Supp. 2d at 1134-35*. Burnette was told that his only obligation once he was home was to answer the phone if his supervisor called; he could then choose whether to come in or not. Id. The applicable law is that on-call time is only compensable when the employee's on-call duties severely restrict the employee's use of free time. *Id. at 1135*. (citation omitted). In *Burnette*, the district court held that the employee's [*30] subjective belief was not objectively reasonable despite his honest belief that the employer was acting unlawfully, and that his complaint was not protected activity. *Id. at 1135-36*.

Likewise, the plaintiff in the present case cannot satisfy the objectively reasonable requirement. Even if the plaintiff did not know that BrandsMart guaranteed him minimum wage for all hours worked, it is an undisputed fact. The applicable law allows commission payments to cover any hours spent for the benefit of the employer, regardless of how those hours are spent. The FLSA does not prohibit an employer from changing or increasing job duties, hours or assignments, as long as the employee receives at least minimum wage for all compensable hours. The plaintiff's complaints were not objectively reasonable and thus, cannot constitute protected activity.

b. Pretext

Even assuming the plaintiff can establish a prima facie case for retaliation, the defendant would still be entitled to summary final judgment as a matter of law because the defendant has shown that the plaintiff was terminated for a legitimate reason and the plaintiff has failed to show that the defendant's reason is pretextual. See *Alvarado, 410 F. Supp. 2d at 1279* [*31] (on summary judgment motion noting that even though a causal connection appeared to exist, "Defendants ha[d] provided a valid reason for their termination and the Plaintiffs ha[d] not met the burden of persuasion that this proffered reason [wa]s pretextual in nature."). The defendant has shown that it terminated the plaintiff for a legitimate reason - job abandonment based on the plaintiff's refusal to perform assigned tasks under the Program. See Def.'s Memo. (DE# 39-2 at 16, 5/4/11)(citing Statement of Material Facts ¶¶ 31-35)(DE# 39-1, 5/4/11).

Case 1:16-cv-01692-SCJ   Document 27-1   Filed 04/20/17   Page 47 of 80

Page 10 of 11
2011 U.S. Dist. LEXIS 82708, *31

Where, as here, the defendant proffers some legitimate, non-discriminatory basis for terminating the plaintiff, the plaintiff must show pretext. To show pretext, the plaintiff must reveal "'such weaknesses, implausibilities, inconsistencies, incoherences or contradictions' in the employer's reasons for its actions that a reasonable fact finder could find them unworthy of credence.'" *Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997)* (quoting *Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1072 (3d Cir. 1996)*(other citations omitted)).

In his opposition, the plaintiff "claims that he was discharged after meeting with [*32] Cosmo Adamo, Gary Carlisle and one other manager on April 9, 2009 [sic]." Additionally, the plaintiff maintains that the words used by Adamo left no doubt as to what happened: "Indeed, Carlisle's Declaration leaves little to the imagination when [Carlisle] says, 'At the end of the meeting, Adamo told Perez that if he was unwilling to go into the store that he could leave his badge and go.'" Pl.'s Opposition (DE# 43 at 12 n. 2, 5/31/11) (quoting Carlisle Decl. ¶ 27).

Although the plaintiff acknowledges the burden-shifting required by *McDonnell Douglas*, the plaintiff fails to address pretext and submits no evidence to rebut the defendant's legitimate ground for termination. The plaintiff's reliance on Mr. Carlisle's testimony fails to rebut the defendant's legitimate ground, i.e. job abandonment based on refusal to perform assigned work.

The plaintiff challenges BrandsMart's decision to implement the Program without first obtaining "advice of counsel." Id. at 8. Without citing any legal authority, the plaintiff argues that a jury can find the existence of a good faith belief on the following grounds: 1) the Human Resources department needed to research his objections; 2) the employer unilaterally [*33] imposed the additional duties after the plaintiff commenced employment; and 3) the plaintiff repeatedly complained and noted "free labor" on his time sheet and met with HR and Gary Carlisle. Id. at 9-11.

The plaintiff contends that a jury question exists because the defendant has asserted inconsistent positions. The plaintiff argues that "[t]he Defendant cannot claim on the one hand that it never fired the Plaintiff and assert on the other that it was justified in firing him." Id. at 11. The plaintiff concedes that if he quit, he loses his retaliation claim. Pl.'s Opposition at 11 (DE# 43, 5/31/11) The defendant is within its rights to assert alternative defenses.

Although there is an issue as to whether the plaintiff quit or was fired, it does not preclude summary judgment. The defendant denies that it fired the plaintiff at the April 9, 2010 meeting, but admits that it terminated the plaintiff several weeks later for job abandonment. The defendant has proffered a legitimate reason for his termination that the plaintiff has failed to rebut. "[A] plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, [*34] so long as the reason is one that might motivate a reasonable employer." *Clark v. Alabama, 141 Fed. Appx. 777, 788 (11th Cir. 2005)*. "Indeed, '[f]ederal courts do not sit to second-guess the business judgment of employers.'" Id. (citing *Combs, 106 F.3d at 1543*).

In the instant case, the defendant has proffered a valid reason for terminating the plaintiff, job abandonment due to refusing to perform assigned work, and the plaintiff has not shown pretext. The facts surrounding the plaintiff's departure on April 9, 2010 following the meeting with his managers contain discrepancies between the parties and within the plaintiff's own testimony (deposition and declaration). However, taking the facts in the light most favorable to the non-movant plaintiff, the evidence supports the defendant's position that the plaintiff's employment was dependent on his willingness to go into the store. Whether the plaintiff quit or whether BrandsMart fired him, the plaintiff has failed to put forth any evidence of pretext. Accordingly, the defendant is entitled to summary final judgment on the retaliation claim.

## CONCLUSION

Based on the foregoing, the Court finds that the defendant is entitled to summary final [*35] judgment on the plaintiffs minimum wage claim and his retaliation claim. The plaintiff was properly paid in excess of minimum wage for all hours worked. Addtionally, the plaintiff has not shown as a matter of law that he was engaged in a protected activity or that there was a causal connection between his complaints and his alleged termination. Even if the plaintiff can show a prima facie case for retaliation, the defendant has provided a valid reason for the plaintiffs termination. Accordingly, it is

2011 U.S. Dist. LEXIS 82708, *35

ORDERED AND ADJUDGED that the Defendant's Motion for Summary Judgment (DE# 39, 5/4/11) is GRANTED.

DONE AND ORDERED in Chambers at Miami, Florida this **28th** day of July, 2011.

/s/ John J. O'Sullivan

JOHN J. O'SULLIVAN

UNITED STATES MAGISTRATE JUDGE

---

End of Document

ERIC MAGNUS

Ⓐ Neutral
As of: April 20, 2017 3:13 PM Z

## *Garcia v. Nachon Enters.*

United States District Court for the Southern District of Florida

November 23, 2016, Decided; November 23, 2016, Entered on Docket

Case No. 15-cv-23416-GAYLES

**Reporter**
2016 U.S. Dist. LEXIS 162540 *; 167 Lab. Cas. (CCH) P36,491

ERVIN GARCIA, Plaintiff, v. NACHON ENTERPRISES, INC.; CARLOS NACHON; and ACE HARDWARE CORP. (DELAWARE), Defendants.NACHON ENTERPRISES, INC., Counter-Plaintiff, v. ERVIN GARCIA, Counter-Defendant.

**Prior History:** *Garcia v. Nachon Enters., 2016 U.S. Dist. LEXIS 35366 (S.D. Fla., Mar. 18, 2016)*

## Core Terms

employees, exempt, duties, recommended, primary duty, managerial, performing, vendors, hire, nonexempt, inventory, monitored, overtime, merchandise, supervised, customer, set-up, operational, spent, summary judgment, wages, summary judgment motion, protected activity, state law claim, manual labor, contractors, retaliation, remodeling, managed, planned

**Counsel:** [*1] For Ervin Garcia, Plaintiff, Counter Defendants: Brody Max Shulman, Jason Saul Remer, Peter Michael Hoogerwoerd, LEAD ATTORNEYS, Waynice Amoii Green, Remer & Georges-Pierre, PLLC, Miami, FL.

For Nachon Enterprises, Inc., Carlos Nachon, Defendants, Counter Claimants: Leslie W. Langbein, Langbein & Langbein, Miami Lakes, FL.

**Judges:** DARRIN P. GAYLES, UNITED STATES DISTRICT JUDGE.

**Opinion by:** DARRIN P. GAYLES

## Opinion

### ORDER

**THIS CAUSE** comes before the Court on Defendant Nachon Enterprises, Inc.'s ("NEI") Motion for Summary Judgment [ECF No. 70], filed on behalf of itself and Defendant Carlos Nachon, deceased.[1] Plaintiff Ervin Garcia brings claims against the Defendants alleging unpaid wages and retaliation, in violation of the *Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.*, as well as supplemental state law claims alleging breach of agreement,

---

[1] *Federal Rule of Civil Procedure 25(a)* provides: "If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." *Fed. R. Civ. P. 25(a)(1).* On April 22, 2016, NEI filed a Suggestion of Death, notifying the Court that Carlos Nachon died on March 16, 2016 [ECF No. 51]. Because there has been no motion for substitution and more than ninety days have passed, the action shall be dismissed as against Carlos Nachon.

ERIC MAGNUS

Case 1:16-cv-01692-SCJ   Document 27-1   Filed 04/20/17   Page 50 of 80

Page 2 of 11
2016 U.S. Dist. LEXIS 162540, *1

quantum meruit, and unjust enrichment.[2] These claims arise from the Defendants' alleged failure to pay overtime wages throughout Garcia's employment with the Defendants in 2014 and 2015. The Court has carefully considered the parties' briefs, the record in this case, and the applicable law, and is otherwise fully advised in the premises. For the reasons that follow, NEI's motion for summary judgment [*2] shall be granted.

## I. BACKGROUND

### A. *Factual History*

### 1. NEI's Operational Structure and Garcia's Hiring

NEI is a company that sells hardware and building construction materials from its location in Hialeah, Florida. NEI had two operational divisions: Carlos Nachon managed the Building and Construction Materials Division until his death in March 2016; his daughter, Vice President Priscilla Nachon managed the Millwork [*3] Division. The Millwork Division and Ms. Nachon's office were located in a separate building (the "Millwork Building") across the street from NEI's principal building (the "Main Building").

In 2014, NEI purchased a membership in the Ace Hardware Stores network ("AHS"). NEI planned to operate a new Ace Hardware Store (the "Ace Store" or the "Store") in the Main Building, which necessitated a remodeling of the Main Building. AHS assigned District Manager Ramon Mayorquin to guide NEI and Ms. Nachon through the set-up process. Mayorquin and Ms. Nachon agreed that NEI should hire a General Manager for the new Ace Store at the outset. Mayorquin suggested Plaintiff Ervin Garcia as a candidate, as he had previous experience working for an AHS subcontractor. When Garcia and Ms. Nachon met to discuss the General Manager position, Ms. Nachon explained that NEI was seeking someone with significant retail and management experience to be responsible for all aspects of the set-up, start-up, and operation of the Ace Store, including budget, personnel, finances, banking, marketing, purchasing, inventory, and vendor and consumer relations. Moreover, she explained that the General Manager would be responsible [*4] for formulating new ideas for the Store. Garcia presented Ms. Nachon with a resume that listed his past managerial positions in retail operations. He also represented that he was familiar with AHS's proprietary operational software systems and previously had worked with AHS's district staff (including Mayorquin), and he represented that he possessed managerial skills and experience and leadership capability. Ms. Nachon offered Garcia a starting salary of $49,000, and he accepted. Garcia admitted that he never would have accepted the position of General Manager if he thought he did not have the managerial and leadership skills to perform it. He testified that the "brought to the table" his experience in "supervision, store set up, managerial experience, and leadership" skills. Pl.'s Dep. 69:24-70:6.

### 2. Garcia's Duties Prior to the Opening of the Ace Store

Garcia began working for the Defendants on or about July 7, 2014. His first project as General Manager was to prepare a transition plan to rid NEI's existing hardware inventory and store fixtures, gut and remodel the Main Building, and furnish it as the Ace Store. Garcia was given a budget to accomplish these tasks. He planned the new [*5] layout, appearance, and furnishing of the interior of the Store. He suggested painting the outside of the Main Building, installing new signage and creating a logo to give it a younger, fresher appearance. Garcia selected a sign contractor and ordered a new sign for the front of the Store.

Garcia and Ms. Nachon discussed moving NEI's door sales department from the Millwork Building into the Main Building as part of the remodel. Garcia's layout also apportioned space next to the new Store to relocate Ms. Nachon's office and a work area for her sales staff.

Garcia recommended that an auction be held to quickly sell NEI's existing inventory and store fixtures in order to advance the remodeling. Ms. Nachon agreed. Garcia suggested names of potential auctioneers to Ms. Nachon, who ultimately selected the auctioneer to hire. The two worked together to plan the auction.

---

[2] All claims against the remaining Defendant, Ace Hardware Corp. (Delaware), were dismissed upon joint motion of the parties on January 27, 2016 [ECF No. 38].

Case 1:16-cv-01692-SCJ   Document 27-1   Filed 04/20/17   Page 51 of 80

Page 3 of 11
2016 U.S. Dist. LEXIS 162540, *5

Garcia suggested that NEI lease, set up, and use a trailer as a temporary store to handle ongoing business during the remodeling phase, and Ms. Nachon agreed. Garcia obtained quotes and recommended a vendor to use, and Ms. Nachon again agreed. Garcia managed this temporary store and supervised the employees who worked there while [*6] he helped remove the old store fixtures.

Garcia canvassed and took bids from local contractors for the remodeling of the Main Building. He made recommendations to Ms. Nachon regarding which vendors to hire, and Ms. Nachon hired those vendors. Ms. Nachon also agreed with Garcia's suggestion that NEI's construction budget could be conserved if NEI employees helped perform some of the demolition work. As part of this demolition work. Garcia recommended dumpster vendors that would hold and haul away debris and Ms. Nachon agreed. Garcia was NEI's liaison to contractors. He oversaw work performed by NEI's employees and outside contractors to ensure that that work was of sufficient quality.

During this period of time, Garcia continued to work with AHS regarding the set-up and start-up of the Ace Store. He was in constant communication with Mayorquin and Ms. Nachon discussing products, fixturing, layout, promotions, and AHS's programs. Garcia and Ms. Nachon met daily to discuss implementation of Mayorquin's directives for set-up and start-up, as well as other operational issues. They also met weekly to discuss the remodeling and status of the budget. Ms. Nachon continued to operate the Millwork [*7] Division from the Millwork Building and Mr. Nachon continued to manage the Building Construction Materials Division.

Garcia and Ms. Nachon believed that certain items in AHS's core inventory would not sell well. Garcia suggested carrying other types of merchandise in the Ace Store, such as colored mulch. Ms. Nachon agreed and the two discussed these ideas with Mayorquin. Garcia contracted with a new vendor to carry its mulch products and, in the process, negotiated for NEI to be provided free bags of mulch for the Store's grand opening. Garcia comparison-shopped competitors to determine pricing for non-AHS merchandise the Store would carry. He and Ms. Nachon discussed and determined mark-ups. Garcia communicated with and met with existing NEI vendors to consider new lines of merchandise to carry in the Store. He also contracted and interviewed potential new vendors, like Yeti Cooler and a tankless water heater company. Garcia recommended NEI contract with the new vendors and carry new merchandise from established vendors in the Store. Ms. Nachon agreed. Garcia then communicated with those vendors and set up credit accounts.

Garcia oversaw the set-up of the Ace Store by AHS's subcontractor [*8] to ensure everything went as planned. Garcia recommended the Ace Store's hours of operation and how many employees to hire. Ms. Nachon agreed with both recommendations. Garcia suggested using Work Force, a state employment agency, to find employees. He called applicants and interviewed them, and Ms. Nachon sat in on some of these interviews. Garcia recommended to Ms. Nachon the best candidates to hire and Ms. Nachon agreed. Garcia then trained the new Ace Store employees on AHS's software and sales systems.

Setting up the Ace Store involved manual labor, as well. Garcia asserts that between July and November 2014, he spent the majority of his working hours performing manual labor, doing construction and renovation work including pulling up flooring, replastering, and painting.

### 3. Grand Opening of the Ace Store

The Ace Store's grand opening was planned for November 15, 2014. As the date grew closer, Garcia met with Ms. Nachon to discuss publicity of the grand opening and activities and opening day specials the Ace Store should offer. Garcia recommended the distribution of flyers, placement of ads in Spanish language newspapers, and hiring of a Latin radio station to be present on opening [*9] day. He also told Ms. Nachon that it was common practice for Ace Hardware Stores to conduct drawings or giveaways on opening day. With the exception of hiring a radio station, Ms. Nachon agreed with these suggestions.

### 4. Garcia's Duties after the Opening of the Ace Store

2016 U.S. Dist. LEXIS 162540, *9

After the grand opening, Garcia performed substantially less manual labor. He continued to handle marketing for the Store, and his marketing plan had an overall positive effect on drawing customers to the Store. Garcia suggested and NEI purchased a hot dog stand to attract customers away from NEI's chief competitor, Shell Lumber, and as a convenience for customers.

Garcia directly supervised the Store's employees, assigned their hours, and coordinated his schedule with theirs. He gave the employees instructions, such as to stock and straighten the shelves, place merchandise and displays, and run errands. He delegated responsibilities, including opening and closing the Store and making bank deposits. Garcia ensured that the employees delivered high levels of customer service, since that is what set the Store apart from big box retailers like Home Depot. He monitored the employees' compliance with AHS's customer service [*10] standards. He also handled customer relations and dealt with customer orders, requests, and complaints. His personal cell phone number was listed on his business card, and Store customers could contact him directly. He approved or disapproved the acceptance of returned merchandise. Garcia sometimes oversaw all of NEI's employees, including those in the Millwork Division and Rebar Department if neither Mr. Nachon nor Ms. Nachon was present, and on these occasions he supervised as many as twenty employees. Garcia enforced all employment policies and procedures. He recommended use of an employee handbook and created a new hire packet. He recommended that NEI post FLSA and OSHA posters. He kept track of his subordinates' work hours. At the end of each pay period, he reviewed their timecards and calculated their hours. Garcia, unlike his subordinates, never clocked in and out, and he understood that his position did not require him to punch in.

Garcia had access to the Ace Store's security video on his cell phone. He physically walked the Store to monitor its orderliness and cleanliness and looked for hazards to the safety of employees or customers. As General Manager, Garcia was in charge [*11] of inventory and monitored it on a daily basis. He personally handled re-orders of stock in the Ace Store and he also delegated that task. He had the ability to override AHS's suggested levels of inventory and he did so. He also had the discretion not to order core inventory items. He simply presented inventory orders to Ms. Nachon for her signature.

Garcia prepared reports that tracked sales, revenue, profits and losses, and accounts payable. He received and reviewed invoices from vendors and determined when they would be paid, while being mindful of cash flow. He instituted policies and procedures to monitor and control shrinkage. In one month he improved sales by $200,000.

**5. Garcia Resigns from His Employment with NEI**

Garcia took issue with the way Mr. Nachon ran his business. He contends that Mr. Nachon was aggressive and hostile toward employees, including Garcia, and called Garcia derogatory names at work. Furthermore, Mr. Nachon kept a gun on his desk at the office, and, on one occasion, pulled his gun out in front of Garcia when Garcia complained to him about his paying employees under the table and treating employees poorly. Garcia resigned from his employment via text message [*12] sent to Ms. Nachon on July 18, 2015.

**B. *Procedural History***

The Defendants removed this case from the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, on September 10, 2015 [ECF No. 1], and Garcia amended his Complaint on October 2, 2015 [ECF No. 9]. In the Amended Complaint, Garcia brings claims to recover alleged unpaid overtime and minimum wage compensation from the Defendants pursuant to the FLSA. *Id.* He also brings claims for retaliation under the FLSA, as well as state law claims for breach of contract, quantum meruit, and unjust enrichment. *Id.* On November 4, 2015, NEI counterclaimed against Garcia, alleging breach of fiduciary duty and conversion. Garcia moved to dismiss the counterclaims, but the Court denied that motion on March 18, 2016 [ECF No. 18]. NEI filed the instant motion for summary judgment on August 12, 2016. The motion has been fully briefed and is ripe for determination.

**II. LEGAL STANDARD**

Summary judgment, pursuant to *Federal Rule of Civil Procedure 56(a)*, "is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v.*

2016 U.S. Dist. LEXIS 162540, *12

_Cotton, 572 U.S.    , 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014)_ (per curiam) (quoting _Fed. R. Civ. P. 56(a)_) (internal quotation marks omitted); [*13] _see also Alabama v. North Carolina, 560 U.S. 330, 344, 130 S. Ct. 2295, 176 L. Ed. 2d 1070 (2010)_. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no _genuine_ issue of _material_ fact." _Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)_.

An issue is "genuine" when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the nonmoving party in light of his burden of proof. _Harrison v. Culliver, 746 F.3d 1288, 1298 (11th Cir. 2014)_. And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." _Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259-60 (11th Cir. 2004)_ (citations and internal quotation marks omitted). "Where the material facts are undisputed and all that remains are questions of law, summary judgment may be granted." _Eternal Word Television Network, Inc. v. Sec'y of U.S. Dep't of Health & Human Servs., 818 F.3d 1122, 1138 (11th Cir. 2016)_.

The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. _SEC v. Monterosso, 756 F.3d 1326, 1333 (11th Cir. 2014)_. However, to prevail on a motion for summary judgment, "the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." _Urquilla-Diaz v. Kaplan Univ., 780 F.3d 1039, 1050 (11th Cir. 2015)_.

### III. DISCUSSION

#### A. _FLSA Overtime Claim_

The FLSA provides that [*14] employers must pay employees at a rate of one-and-one-half times their regular rate of pay for each hour worked in excess of forty hours per week. _29 U.S.C. § 207(a)_. However, the FLSA contains exemptions to this overtime requirement. For present purposes, the overtime requirement does not apply to executive or administrative employees. _29 U.S.C. § 213(a)(1)_. NEI argues that Garcia falls under either of these exemptions.

An employer asserting that such an exemption applies bears the burden to establish it by clear and affirmative evidence, _Calvo v. B & R Supermarket, Inc., 63 F. Supp. 3d 1369, 1378-79 (S.D. Fla. 2014)_, and courts are instructed to narrowly construe the exemptions, _Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995)_ (per curiam). An employee working in an executive capacity means an employee
   (1) Compensated on a salary basis at a rate of not less than $455 per week . . . ;
   (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
   (3) Who customarily and regularly directs the work of two or more other employees; and
   (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

_29 C.F.R. § 541.100(a)_. In [*15] his opposition to NEI's motion, Garcia disputes only whether his "primary duty" was management of the enterprise; the Court therefore presumes that he does not dispute that NEI has satisfied the other three elements and will focus only on the second element of this test.

Garcia was employed by NEI has the General Manager of the Ace Store; that said, "title is not dispositive of his primary duty." _Byers v. Petro Servs., Inc., 110 F. Supp. 3d 1277, 1281 (S.D. Fla. 2015)_. "Instead, the Court must examine the surrounding facts to determine whether [Garcia's] 'most critical duties to the enterprise were his exempt managerial duties.'" _Id._ (quoting _Rutenberg v. Boynton Carolina Ale House, LLC, No. 09-80409, 2010 U.S. Dist. LEXIS 1520, 2010 WL 135100, at *3 (S.D. Fla. Jan. 8, 2010)_). "An employee's 'primary duty' is determined based on all of the facts in a particular case, with emphasis placed upon the character of the employee's job as a

whole." *Calvo, 63 F. Supp. 3d at 1381* (quoting *Langley v. Gymboree Operations, Inc., 530 F. Supp. 2d 1297, 1300 (S.D. Fla. 2008)).* Department of Labor regulations guide the Court's examination into whether an employee's "primary duty" is management:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity [*16] and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

*29 C.F.R. § 541.102.* The regulations also provide a list of factors to consider when determining whether the employee's "primary duty" was management:

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. . . .

> The amount of time spent performing exempt work can be a useful guide in determining whether [*17] exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion. . . .
> Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

*Id. § 541.700.* And moreover:

> Concurrent performance of exempt and nonexempt [*18] work does not disqualify an employee from the executive exemption if the requirements of *§ 541.100* are other-wise met. Whether an employee meets the requirements of *§ 541.100* when the employee performs concurrent duties is determined on a case-by-case basis and based on the factors set forth in *§ 541.700.* Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work. In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods. An employee whose primary duty is ordinary production work or routine, recurrent or repetitive tasks cannot qualify for exemption as an executive. . . .

*Id. § 541.106(a).*

Upon consideration of these factors, as well as the undisputed facts of this case, the Court finds that Garcia's primary duty while employed at NEI was unquestionably managerial in nature. "[N]umerous courts have held that when considering the question concerning whether management was an employee's 'primary duty,' a more useful question is whether or not the employee's managerial duties constituted [*19] the primary value the employer

ERIC MAGNUS

placed upon the employee." *Calvo, 63 F. Supp. 3d at 1381* (quoting *Brillas v. Bennett Auto Supply, Inc., 675 F. Supp. 2d 1164, 1168 (S.D. Fla. 2009))*. It is clear to the Court that Garcia's managerial duties constituted the primary value that Ms. Nachon—and accordingly NEI—placed upon Garcia.

Prior to the opening of the Ace Store, Garcia managed a budget. He planned the new layout, appearance, and furnishing of the Store. He provided recommendations to Ms. Nachon regarding contractors and vendors, which she relied on, and he sometimes hired vendors on his own. He liaised between NEI and AHS regarding the set-up and start-up of the Store. He suggested carrying new and different types of merchandise in the Store. He, along with Ms. Nachon, determined price mark-ups. He oversaw the set-up of the Store by AHS's contractor. He recommended using an employment agency to find employees. He called and interviewed applicants, sometimes without Ms. Nachon present. He recommended applicants to hire. He trained new employees.

After the opening of the Store, he directly supervised the Store employees (and sometimes employees in other departments when Mr. Nachon or Ms. Nachon were away). He set employee hours. He gave employees instructions on assignments to do throughout the day. [*20] He delegated responsibilities, including opening and closing the Store and making bank deposits. He monitored the employees' compliance with AHS customer service standards. He enforced employment policies and procedures. He kept track of and calculated hours, and reviewed employee time cards. He monitored the order and cleanliness of the store. He was in charge of inventory and monitored it daily. He often overrode inventory levels suggested by AHS. He had the discretion to decline to order core inventory items. He drew up inventory orders on his own to provide to Ms. Nachon for her sign-off. He tracked sales, profits, losses, and accounts payable.

Reviewing these duties, the Court finds it obvious that Garcia's "most critical duties to the enterprise" of NEI were his managerial duties. *Byers, 110 F. Supp. 3d at 1281* (citation omitted).

Garcia argues that he does not fall under this exemption because during periods of his employment—mostly prior to the Store's opening—he spent as much as eighty-five percent of his time performing non-managerial work, including demolition, reconstruction, flooring, and stocking shelves. He contends, therefore, the amount of time he spent performing work is a genuine issue of material [*21] fact that precludes summary judgment.

The Court disagrees. At the outset, the fact that Garcia performed a significant amount of non-exempt tasks at all is not alone dispositive. *See Posely v. Eckerd Corp., 433 F. Supp. 2d 1287, 1302-03 (S.D. Fla. 2006)* ("The case law is replete with decisions holding managers of retail estab-lishments to be exempt, notwithstanding the fact that they spent non-exempt tasks or their need to obey corporate policies and/or follow the orders of their corporate supervisors."). And again, the Court emphasizes that "the analysis for the 'primary duty' test should not focus on whether [a p]laintiff spent most of his time on managerial duties; the test should focus on whether [the p]laintiff's managerial duties constituted the *primary value* [the d]efendants placed on [the p]laintiff." *Altman v. Sterling Caterers, Inc., 879 F. Supp. 2d 1375, 1383 (S.D. Fla. 2012)* (emphasis added); *see also Moore v. Tractor Supply Co., 352 F. Supp. 2d 1268, 1272-79 (S.D. Fla. 2004)* (finding an employee exempt even though he spent ninety percent of his time on nonexempt work), *aff'd, 140 F. App'x 168 (11th Cir. 2005)* (per curiam).

Garcia testified that the performed this manual work because he was "in charge of things" ("things" meaning the set-up of the Ace Store prior to the grand opening). The Department of Labor regulations contemplate that an exempt employee will concurrently perform exempt and nonexempt work, explaining that [*22] "exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work." *29 C.F.R. § 541.106(a)*. Because Garcia was "in charge" of the set-up of the Store, he exercised his discretion to engage in the manual labor, yet at the same time he remained responsible for the set-up of the Store as the General Manager. Garcia makes much of his engaging in manual labor, but he admitted that he performed significantly less manual labor after the opening of the store in November 2014, so the large majority of any manual labor he performed is confined to the pre—grand opening period of time (July through November 2014). But during this time, he was concurrently performing all of the exempt, managerial tasks the Court outlined above. "[W]here [p]laintiffs down-play and minimize the importance of their positions, testifying that they spent most of their time performing routine non-managerial jobs, the courts have tended to reject such post-hoc efforts to minimize the relative importance of

Case 1:16-cv-01692-SCJ   Document 27-1   Filed 04/20/17   Page 56 of 80

Page 8 of 11
2016 U.S. Dist. LEXIS 162540, *22

managerial duties." _Jackson v. Advance Auto Parts, Inc., 362 F. Supp. 2d 1323, 1334 (N.D. Ga. 2005)_ (citations, internal quotation marks, and alterations omitted). This Court will similarly **[*23]** reject Garcia's post-hoc efforts to characterize himself as a mere construction worker or stock-boy in light of the litany of managerial duties he himself has admitted to performing.

Garcia also argues that he did not possess "discretionary powers" because while he had input into certain decisions, NEI had the final say. Pl.'s Opp'n at 6. But the record shows that he, for example, independently researched vendors and contractors and independently interviewed potential employees. He brought his recommendations to Ms. Nachon, who nearly unfailingly adopted those recommendations. The fact that NEI, as the employer, had so-called "final say" in these decisions does not render Garcia discretion-less in his managerial duties. Garcia has provided no authority to the contrary, nor could he, lest no manager employed by, for example, a retail corporate entity could ever be found to be exempt. Cf, e.g., _Posely, 433 F. Supp. 2d at 1298-1309_ (finding that plaintiffs, who were managers employed by a retail pharmacy chain that operated drug stores in twenty-three states, were bona fide executive employees).

Finally, Garcia argues that he did not have a "relative freedom from direct supervision" (one of the factors to consider in determining **[*24]** whether his primary duty was management), _29 C.F.R. § 541.700_, because he "was monitored by Defendants twenty-four (24) hours a day and seven (7) days a week." Pl.'s Opp'n at 8. As an initial matter, unless Garcia was a permanent resident of the Ace Store, this is an absurd assertion. Furthermore, the assertion has no basis in the record. He bases this assertion in his brief on the following exchange in his deposition:

    Q. Was [sic] there video cameras in the store, security?
    A. There was [sic] video cameras, yes.
    Q. Okay, and was—were you able to monitor that on your telephone?
    A. That's correct.
    Q. So would it be possible that Priscilla was monitoring your attendance by using the security system on, looking at on her phone [sic]?
    A. Correct . . . .

Pl.'s Dep. at 168:15-23. In this passage, Garcia describes the Store's security system (to which he also had access to view via cell phone). Yet in his brief, he attempts to turn the **_possibility_** that Ms. Nachon could view **the security cameras at the Store** at any time from her cell phone into the **certainty** that she monitored Garcia's every movement, "twenty-four (24) hours a day and seven (7) days a week." Pl.'s Opp'n at 8. This dubious claim is insufficient to withstand **[*25]** summary judgment, and regardless, only addresses one factor out of an extensive list that the Court must consider. The record reflects that Garcia was the highest-ranking manager at the Store during his employment. The only NEI employees who outranked him (Ms. Nachon and Mr. Nachon) managed other divisions in different buildings. He was not required to punch in or out, unlike the other Store employees, and he set his own schedule, also unlike the other Store employees.

Based on the foregoing, the Court finds that Garcia's primary duty was management of the enterprise. Given that Garcia does not dispute any of the other elements of this test, the Court concludes that Garcia was "employed in a bona fide executive . . . capacity" within the meaning of the FLSA and is thus an employee exempt from the overtime provisions of the FLSA. Accordingly, NEI's motion for summary judgment on the Plaintiff's FLSA overtime claims is granted.[3]

**B. _State Law Claims_**

"As a matter of law, [a] plaintiff cannot circumvent the exclusive **[*26]** remedy prescribed by Congress in asserting equivalent state law claims in addition to the FLSA claim." _Morrow v. Green Tree Serv'g, L.L.C., 360 F. Supp. 2d 1246, 1252 (M.D. Ala. 2005)_ (quoting _Tombrello v. USX Corp., 763 F. Supp. 541, 545 (N.D. Ala. 1991)_). Specifically, where a plaintiff's state law claims are merely the FLSA claims recast in state law terms, those state

---

[3] Because the Court has found that Garcia is exempt under the executive/managerial exemption, it need not address NEI's argument that he also falls under the administrative exemption.

2016 U.S. Dist. LEXIS 162540, *26

law claims are preempted by the FLSA and summary judgment may therefore be granted. *Alexander v. Vesta Ins. Grp., Inc., 147 F. Supp. 2d 1223, 1240-41 (N.D. Ala. 2001)*. Garcia's state law claims for breach of agreement, unjust enrichment, and quantum meruit are each phrased as state-law versions of his FLSA overtime claims. *See, e.g.*, Am. Compl. ¶ 23 (breach of agreement) ("Defendant . . . fail[ed] to pay the amount due to Plaintiff for services provided and performed under their agreement, and [did] not properly pay[] Plaintiff for all hours worked . . . ."); *id.* ¶ 29 (quantum meruit) ("Defendants retain an inequitable benefit from Plaintiff by not properly paying Plaintiff for all hours worked . . . ."); *id.* ¶ 35 (unjust enrichment) ("Defendants unjustly benefit from the services performed and provided by Plaintiff by not properly paying Plaintiff for all hours worked . . . ."). Thus, NEI's motion for summary judgment is granted.

## C. *FLSA Retaliation Claim*

The FLSA makes it unlawful for any person

to discharge or in any other manner discriminate [*27] against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act, or has testified or is about to testify in any such proceeding or has served or is about to serve on an industry committee.

*29 U.S.C. § 215(a)(3)*. To prevail on a claim for retaliation under the FLSA, a plaintiff must first establish a prima facie case, which requires a showing that "(1) []he engaged in activity protected under [the] act; (2) []he subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." *Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342-43 (11th Cir. 2000)*. If the plaintiff succeeds in stating this prima facie case, the employer must then articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Raspanti v. Four Amigos Travel, Inc., 266 F. App'x 820, 822 (11th Cir. 2008)*. Then, if the employer meets this burden of production, "the plaintiff may attempt to show pretext." *Wolf, 200 F.3d at 1343*.

A plaintiff engages in statutorily protected activity when he or she protests an employer's conduct that is unlawful. *See Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1388 (11th Cir. 1998)*. In addition, a plaintiff engages in statutorily protected activity when he or she protests "an employer's conduct which is actually *lawful*, so long as he or she demonstrates 'a [*28] good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" *Id.* (emphasis added) (quoting *Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997))*. A plaintiff "must not only show that he subjectively . . . believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable." *Little, 103 F.3d at 960*.

In his Amended Complaint, Garcia's allegations supporting his retaliation claim read as follows:

17. Throughout Plaintiff's employment, Plaintiff regularly and repeatedly complained to Defendants, including but not limited to Carlos Nachon, and/or objected [to] the Defendants' failure to properly pay overtime wages.
18. The last time Plaintiff complained about his wages was when Defendants terminated him in July of 2015.
19. Defendants, including Carlos Nachon, knew or should have known that Plaintiff's complaints regarding improper payment of wages was protected activity under the FLSA.
20. Defendant, Carlos Nachon, who had operational control of the Defendant's business, made the ultimate decision to terminate Plaintiff.

Am. Compl. ¶¶ 17-20. However, when questioned about his retaliation claim at his deposition, Garcia testified as follows:

Q. Okay, so what are you claiming is [*29] the retaliation in this case?
A. Retaliation comes into effect of the whistleblowing [sic], and to the fact that I believe that [Mr. Nachon]—
Q. The whistleblowing of—
A. Yes, because I had confronted him about paying people, such as Fermin and others, under the table, and the fact that I confronted him in regards to the fact of him being very vulgar with the employees [sic].
Q. Okay, so your—so your claim is that what statute was violated?
A. Whistleblowing.

Case 1:16-cv-01692-SCJ   Document 27-1   Filed 04/20/17   Page 58 of 80

Page 10 of 11
2016 U.S. Dist. LEXIS 162540, *29

Q. Yeah, under the whistleblower statute, you have to name a statute that has been violated.
A. I leave that to my lawyer.
Q. Well, you haven't pled it in your complaint, so I guess now is the time for me to find that out.

Pl.'s Dep. at 324:14-325:8. At that point, counsel for both parties discussed Garcia's proposed motion to amend the complaint to add claims for civil RICO, whistleblower, unfair trade practice, and retaliation claims against the Defendants. Garcia filed such a motion on May 25, 2016 [ECF No. 60], but the Court, following a hearing on the motion, denied the motion on May 31, 2016, finding that (1) Garcia had not shown good cause as to why the Complaint should be amended beyond the deadline provided in the Scheduling [*30] Order and (2) the Defendants would be unduly prejudiced by the amendment [ECF No. 62].

It is axiomatic that "[w]hen a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must 'go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., Inc., 103 F. Supp. 3d 1343, 1349-50 (S.D. Fla. 2015)* (quoting *Celotex Corp. v. Catrett, 477 U.S. 317, 324-25, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986))*. And Garcia himself states that "[t]he plaintiff bears the ultimate burden of proving retaliation by a preponderance of the evidence and that the reason provided by the employer is a pretext for prohibited retaliatory conduct." Pl.'s Opp'n at 11 (citing *Goldsmith v. Bagby Elev. Co., 513 F.3d 1261, 1272-74 (11th Cir. 2008))*. Yet Garcia argues that he "routinely complained about Defendants' conduct, and the last straw was when Defendants failed to pay Plaintiff for the hours he worked by docking his pay. This resulted in Defendants constructively discharging Plaintiff." *Id.* at 11-12. But because Garcia has proffered no evidence that he, as he alleges in the Amended Complaint, "regularly and repeatedly complained to Defendants . . . and/or objected [to] the Defendants' [*31] failure to properly pay overtime wages," he may not rely on this allegation as support for his retaliation claim. Thus, the only evidence Garcia *has* proffered in support of the position that he engaged in protected activity is a generalized statement that he "routinely complained about Defendants' conduct," *id.* at 11 (although he does not state what exactly this "conduct" consists of), and testimony that he confronted Mr. Nachon about "paying people, such as Fermin and others, under the table" and about "being very vulgar with the employees," Pl.'s Dep. at 324:20-24.

First, "[g]eneral work grievances do not give rise to FLSA anti-retaliation actions," *Barquin v. Monty's Sunset, L.L.C., 975 F. Supp. 2d 1309, 1313 (S.D. Fla. 2013)*, so Garcia's "routine complaints," or his specific complaint about Mr. Nachon's vulgarity do not establish that he engaged in protected activity *under the FLSA*. And second, even assuming *arguendo* that Garcia subjectively believed that NEI paying certain employees in cash was unlawful, he has provided no evidence to show that that belief was *objectively* reasonable. The objective reasonableness of a plaintiff's belief that an employer's action is unlawful is "measured against existing substantive law." *Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999)*. "In applying this 'objective reasonableness' test, [*32] the Eleventh Circuit has held that, where courts have concluded that an employer's conduct is lawful, a plaintiff's belief that his employer engaged in an unlawful employment practice was not 'objectively reasonable,' and the plaintiff's complaints therefore did not qualify as 'protected activity.'" *Baker v. Supreme Beverage Co., No. 13-0222, 2014 U.S. Dist. LEXIS 172833, 2014 WL 7146790, at *7 (N.D. Ala. Dec. 15, 2014)*. Payment in cash for work is unquestionably a lawful activity, *see 29 C.F.R. § 501.3* (defining "[w]ages" as "[a]ll forms of cash remuneration to a worker by an employer in payment for personal services"); *see also id. § 531.27* (explaining, in section titled *"Payment in cash or its equivalent required,"* that *"sections 6* and *7* of the [FLSA] require payments of the prescribed wages, including overtime compensation, *in cash or negotiable instrument payable at par"* and that *section 3(m) of the FLSA* "permits and governs the payment of wages *in other than cash"* (emphases added)). Given that, Garcia's belief that NEI's activity was unlawful—based on his limited testimony that NEI was paying some employees in cash—without more is objectively unreasonable. He therefore has failed to establish that he engaged in statutorily protected activity, which necessarily means that he cannot establish a prima facie case of retaliation under the FLSA. Accordingly, NEI's motion [*33] for summary judgment on this claim is granted.

**IV. CONCLUSION**

Based on the foregoing, it is **ORDERED AND ADJUDGED** as follows:

ERIC MAGNUS

2016 U.S. Dist. LEXIS 162540, *33

(1) all claims against Defendant Carlos Nachon are **DISMISSED**; and

(2) Defendant Nachon Enterprises, Inc.'s Motion for Summary Judgment [ECF No. 70] is **GRANTED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 23rd day of November, 2016.

/s/ Darrin P. Gayles

DARRIN P. GAYLES

UNITED STATES DISTRICT JUDGE

End of Document

◈ Positive
As of: April 20, 2017 3:13 PM Z

## *Baker v. Supreme Bev. Co.*

United States District Court for the Northern District of Alabama, Southern Division

December 15, 2014, Decided; December 15, 2014, Filed

Civil Action Number 2:13-cv-00222-AKK

**Reporter**
2014 U.S. Dist. LEXIS 172833 *; 2014 WL 7146790

GRADY L. BAKER, Plaintiff, v. SUPREME BEVERAGE COMPANY, INC., Defendant.

## Core Terms

stops, suppliers, pallets, driver, overtime, warehouse, motor carriers, customers, summary judgment, transportation, deliveries, kegs, exemption, out-of-state, harassment, products, empty, interstate commerce, distributor, discharged, truck, terminated, articulated, retaliation, employees, returning, parties, beer, hostile work environment claim, purportedly

**Counsel:** [*1] For Grady L Baker, Plaintiff: Thomas F Talty, THOMAS TALTY & ASSOCIATES, Birmingham, AL.

For Supreme Beverage Company Inc, Defendant: N Dewayne Pope, LEAD ATTORNEY, DEWAYNE POPE LLC, Birmingham, AL; Brice Martin Johnston, JOHNSTON LAW FIRM, PC, Birmingham, AL.

**Judges:** ABDUL K. KALLON, UNITED STATES DISTRICT JUDGE.

**Opinion by:** ABDUL K. KALLON

## Opinion

### MEMORANDUM OPINION

Grady Baker, an African-American, pursues this lawsuit against his former employer, Supreme Beverage Company, Inc. ("SBC"). Doc. 1. Grady alleges that during his employment, SBC denied him overtime pay, subjected him to a racially hostile work environment, and subsequently discharged him in retaliation for his complaints about overtime and/or because of his race. *Id.* Accordingly, Baker pursues claims for alleged violations of the Fair Labor Standards Act ("FLSA"), *29 U.S.C. §§ 201, et seq.*, and *42 U.S.C. § 1981*. Before the court is SBC's Motion for Summary Judgment, doc. 36, which, for the reasons stated below, is due to be granted.[1] At this juncture, however, the court notes that Baker's strongest claims is the hostile work environment claim. According to Baker, he was subjected repeatedly to racially offensive language by one of his co-workers and a supervisor. Doc. 38-1 at 81, 89, 91-92. [*2] Unfortunately for Baker, because he never complained about the alleged conduct, despite receiving SBC's anti-harassment policy, doc. 38-1 at 90, 91, 157, 167; doc. 38-3 at 12, there is no relief available to him against SBC for the alleged conduct, *see Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1366 (11th Cir. 1999)*. While Baker may think this is a harsh result, as the Eleventh Circuit has noted regarding workplace harassment:

---

[1] Also before the court is SBC's motion to strike portions of Baker's affidavit that are allegedly inconsistent with his deposition testimony. Doc. 56. Except for paragraphs 24 through 26 and 28 of the affidavit, doc. 51-1 at 5-6, which Baker concedes are due to be stricken, and are **STRICKEN**, the court **DENIES** the motion because the remaining paragraphs in contention ultimately have no impact on the court's summary judgment decision.

ERIC MAGNUS

Case 1:16-cv-01692-SCJ   Document 27-1   Filed 04/20/17   Page 61 of 80

Page 2 of 10
2014 U.S. Dist. LEXIS 172833, *2

We are not unmindful of the enormous difficulties involved in lodging complaints about discrimination in the workplace, including complaints of . . . harassment. We also recognize the great psychological burden it places on one who is already the victim of harassment to require that person to complicate further his or her life with the ramifications, both legal and otherwise, of making a complaint. Federal law has now attempted to correct the problem of workplace discrimination, but it cannot be done without the cooperation of the victims, notwithstanding that it may be difficult for them to make such efforts. When an employer has taken steps, such as promulgating a considered [anti-]harassment policy, to prevent . . . harassment in the workplace, an employee must provide adequate notice that the employer's directives have [*3] been breached so that the employer has the opportunity to correct the problem.

*Id*. Therefore, despite evidence of clear severe and pervasive racial harassment in this case, as explained more fully below, the hostile work environment claim also fails due to Baker's failure to utilize SBC's complaint procedure.

# I. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Under *Rule 56(a) of the Federal Rules of Civil Procedure*, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To support a summary judgment motion, the parties must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory [*4] answers, or other materials." *Fed. R. Civ. P. 56(c)*. Moreover, "*Rule 56(c)* mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id. at 323*. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id. at 324* (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)*; *see also Anderson, 477 U.S. at 255* (all justifiable inferences must be drawn in the non-moving party's favor). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005)* (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver, 863 F.2d 1560, 1563 (11th Cir. 1989)*). Furthermore, "[a] mere 'scintilla' [*5] of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990)* (citing *Anderson, 477 U.S. at 252*).

# II. FACTUAL BACKGROUND

This action arises from Baker's employment as a delivery truck driver for SBC. Below are the relevant facts for summary judgment purposes with all reasonable doubts resolved in favor of Baker, organized as they relate to (a) the alleged unpaid wages and retaliatory discharge and (b) the alleged discrimination and harassment.

## A. Baker's employment and discharge

From May 6, 2010 until June 18, 2012, Baker worked as a delivery truck driver for SBC, a wholesale beverage distributor that sells and delivers primarily beer and energy drinks to restaurants and retail outlets in Alabama. Doc. 38-30 at 1; doc. 38-31 at 2. Baker describes that, on a regular workday, his position required that he arrive at SBC's warehouse at 5:30 a.m., obtain an invoice that details the items on his truck (shrink-wrapped pallets of beverages), count the items (which SBC's warehouse personnel would load onto the truck the preceding workday), confirm that the items in the truck match those on the invoice, and deliver the items [*6] on the truck to the appropriate "customer stops." Doc. 38-1 at 16. Once he completed his stops for the day, Baker would return to the warehouse

and "check in" to account for payment or returned product. *Id.* at 24. If a driver could not complete his stops,[2] SBC's policy required that he "let management know," get a forklift driver to unload the truck, wait until "someone in management comes over and checks [to make] sure all the beer is there, and then the driver . . . takes the pink ticket copy [of the invoice] upstairs in the warehouse to the check up lady." Doc. 51-1 at 6. The "check up lady" would then call management in the warehouse "to be sure the pallet of product is actually there," "the pallet is then re-keyed to produce another invoice with changed route and date," and the undelivered order typically gets "[rolled] over to the next day." *Id.* Baker performed these duties generally until June 18, 2012, when SBC discharged Baker for purportedly failing to complete his deliveries on the prior workday, June 15, 2012. Doc. 38-1 at 2. Baker, on the other hand, claims that retaliatory animus motivated his discharge—specifically that his supervisors "were out to get [him]" because he demanded [*7] overtime wages on June 15, 2012 and on multiple previous occasions. Doc. 38-1 at 117; doc. 51-1 at 3.

Turning to the events of June 15, 2012, when Baker arrived at work at 5:30 a.m., he realized that he had "two customer stops more than usual" and believed that he would not have time to deliver the last two stops unless he worked for twelve to thirteen hours. Doc. 38-1 at 64; doc. 51-1 at 4. According to Baker, he "was not feeling well" that day, and his supervisors knew that he was undergoing treatment for diverticulitis. Doc. 38-1 at 64; doc. 51-1 at 7. Throughout the day, Baker purportedly notified warehouse managers Josh Lankford and Buster Tate[3] that he could not complete the last two stops because he was not feeling well, and he told Lankford that completing the last two stops would take until "6:00 or 7:00 [p.m.], [when] he got there at 5:30 [a.m.]." Doc. 38-1 at 64-66. Purportedly, Lankford told Baker that "he didn't have nobody [else]" to complete [*8] the stops, and Tate told Baker, "Do what you can do."[4] *Id.* at 65, 66. At 5:30 p.m., after "working twelve hours . . . [when he] was not feeling well," Baker decided to return the undelivered pallets remaining on his truck because he believed completing the deliveries would require an additional three hours of work. Doc. 51-1 at 5. In doing so, Baker claims he followed the proper procedure for returning the stops. *Id.* at 6. Specifically, a forklift driver unloaded the undelivered pallets and "set [the pallets] on the floor for them [to] take a picture of [the pallets]," another warehouse worker "signed that [the ] beer [was] back in [the] warehouse," and Baker "[went] up and [checked] up" with the "check up lady."[5] *Id.* Additionally, earlier that day, because company "protocol" required that he inform the salesman for the undelivered product, Baker claims he notified the appropriate salesman, Charles Rose, that he could not complete the stops. Doc. 38-1 at 65. According to Baker, he "could not check up and go home until the check up lady and [his] paperwork matched," and he "made sure" to follow this procedure because, otherwise, "he would have to pay for [the undelivered items]." Doc. 51-1 at 6-7.

The next workday, June 18, 2012, warehouse supervisor Alan Creel notified Baker that his employment was terminated as a result of the events that took place on June 15, 2012.[6] *Id.* at 2. Because Baker maintains that he followed the proper procedure [*10] for returning the undelivered pallets, he describes another set of events, which he believes truly motivated the decision to terminate his employment. Specifically, Baker claims that he "got on [his supervisors'] nerves" in "asking so much" and complaining about unpaid overtime wages. Doc. 38-1 at 117. Baker

---

[2] Typical reasons for returning a stop include situations where a customer refused the order or canceled part of the order, or where the driver did not deliver items at a previously designated delivery time. Doc. 38-1 at 24; doc. 38-26 at 8.

[3] Tate claims [*9] that he never spoke with Baker that day, doc. 38-26 at 10, and Lankford denies that Baker stated he was not feeling well, doc. 38-18 at 11. While Lankford maintains that Baker "never gave a reason why" he would be returning the stops, *id.*, Alan Creel, another warehouse manager, testified that Lankford told him on June 18, 2012 that Baker did not complete his stops because he "had something to do," doc. 38-16 at 18.

[4] Lankford claims he told Baker that failing to complete his deliveries would be "unacceptable." Doc. 38-18 at 11.

[5] The "check up lady" at this point apparently contacted Alan Creel, who was seemingly the only warehouse manager present in the warehouse at that time, and informed him that Baker did not complete the last stops. Doc. 38-16 at 17. While Creel claims he was not aware that Baker would be returning any stops, *id.*, Lankford testified that he informed Creel earlier that day that Baker "wasn't going to be making the stops," doc. 38-18 at 11.

[6] Creel claims Baker stated on June 18, 2012 that he returned the stops because "he was trying to get to a graduation for a family member." Doc. 38-16 at 21.

2014 U.S. Dist. LEXIS 172833, *9

purportedly complained about overtime "for two years" on "more than ten" occasions, and he recounts three specific incidences when he complained about overtime to three different supervisors, including Lankford and Creel. *Id.* at 110, 112, 118. One of these incidences took place on Baker's last workday: when Baker realized that morning that he would not be able to complete his without working an additional two to three hours, he told Lankford, "Y'all don't want to pay me no overtime . . . I'm not going to be able to do them other stops." Doc. 38-1 at 111. On the same day, Baker's coworker, Alan Lowe, purportedly overheard Lankford speaking with Marshall Nichols (SBC's Director of Operations) about discharging Baker, prompting Lowe to opine that "they were out to get [Baker]." Doc. 51-1 at 1-2. Lowe also told Baker that in May 2012, he overheard Lankford telling Creel that Baker "was getting to be a [*11] nuisance about talking about overtime in front of other employees." *Id.* at 2.

## B. Discrimination and harassment

To support his claims of discrimination and harassment, Baker relies in part on his coworker Lowe, who purportedly overheard Creel, Lankford, and warehouse worker Mike DeArman "discussing how Buster Tate, African-American warehouse manager, would allow [Lowe] to help [Baker] make deliveries . . . and [how] them 'n*****s' must be [in] cahoots." Doc. 51-1 at 4. Baker also maintains that he heard "the word 'n*****' used at [work] all the time." *Id.*

## III. ANALYSIS

The court has considered Baker's claims and the parties' respective contentions and agrees with SBC that it is entitled to summary judgment on all of Baker's claims. The court addresses the FLSA unpaid overtime and retaliation claims first, and the *Section 1981* disparate treatment and hostile work environment claims second.

### 1. FLSA unpaid overtime and retaliation claims

SBC raises two arguments with respect to Baker's FLSA claims: (a) that the FLSA's overtime requirement does not apply to Baker [*12] pursuant to the motor carrier exemption; and (b) that Baker cannot establish a prima facie case of retaliation. The court agrees with both arguments and addresses each in turn.

#### a. Unpaid overtime and the motor carrier exemption

While the FLSA requires employers to pay employees at an overtime rate if they work more than forty hours during the workweek, *29 U.S.C. § 207(a)(1)*, it also provides a number of exemptions to the overtime provision, *see 29 U.S.C. § 213(b)(1)-(30)*. Relevant here is the motor carrier exemption, which exempts from the overtime pay requirement "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of *section 31502* of Title 49 [the Motor Carrier Act ("MCA")]." *29 U.S.C. §213(b)(1)*. *Section 31502* of the MCA authorizes the Secretary of Transportation to "prescribe requirements for . . . qualifications and maximum hours of service of employees of" a motor carrier or a private motor carrier. *49 U.S.C. § 31502(b)(1)-(2)*. This provision applies to "transportation . . . described in" *49 U.S.C. § 13501*. *49 U.S.C. § 31502(a)(1)*. In turn, *Section 13501* confers jurisdiction on the Secretary of Transportation over transportation by a motor carrier "on a public highway," to the extent passengers, property, or both are transported by motor carrier "between [*13] a place in . . . a State and a place in another State" or "a State and another place in the same State through another State." *49 U.S.C. § 13501(1)(A)-(B)*.

In this Circuit, to establish that the motor carrier exemption applies, the employer must first show that it is (1) a common carrier by motor vehicle, (2) engaged in interstate commerce, and (3) whose activities directly affect the safety of operations of such motor vehicles. *Walters v. Am. Coach Lines of Miami, Inc., 575 F.3d 1221, 1226 (11th Cir. 2009)*. Next, because the applicability of the exemption also depends on the "class of work involved in the employee's job," *id. at 1227*, "the employee's business-related activities must directly affect . . . the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the [MCA]," *id. at 1226*.

Baker concedes that SBC is a "motor carrier," doc. 51 at 13, "that the DOT is authorized to regulate the safety of [SBC's] . . . operation," and seemingly concedes that SBC's activities directly affect the safety of operations of

motor vehicles.[7] *See id.* at 24. Therefore, the only points of contention are: whether SBC engages in interstate commerce, and whether the class of work involved in Baker's job directly affects the [*14] safety of operation of motor vehicles. *See id.* at 12, 24.

(i) Engaging in interstate commerce

The parties agree that SBC receives its canned and bottled product and kegs from various in-state and out-of-state suppliers on shrink-wrapped pallets. Doc. 38-30 at 2-4. The evidence is undisputed that SBC receives products from more than 200 suppliers, which it orders based on a "forecasting system that includes past [seasonal] sales data," and at least 75% of its sales are of products it receives from out-of-state suppliers. *Id.* at 2, 4. Once it receives the pallets from a supplier, SBC unpacks and sorts some pallets for further distribution to restaurants and retail outlets in Alabama, and maintains some shrink-wrapped pallets in their original form for [*15] delivery directly to the customer. *Id.* at 2-3. The pallets stay in SBC's warehouse as inventory for an indeterminate amount of time (but typically no more than 30 days) until a customer places an order requesting the particular product, at which point SBC's drivers deliver them to various restaurants and retail outlets. Doc. 38-19 at 19. Upon delivering the products, the drivers collect the empty pallets and return them to the warehouse, and, according to SBC, in some situations where the empty pallets are "identifiable as from a specific supplier"—for example, where the pallets are marked with a particular supplier's logo—SBC will ship the pallets back to the supplier "once it has collected a sufficient number of pallets."[8] Doc. 38-30 at 3. The driver also collects empty kegs from customers and returns them to the warehouse, and once SBC collects enough empty kegs to be refilled by a specific supplier, SBC sends the empty kegs to that supplier, and the supplier ships the refilled kegs back to SBC. *Id.* The majority of the pallets and kegs that SBC collects are sent to out-of-state suppliers. *Id.*

SBC, while conceding that it ships products to customers only within the state of Alabama, claims that its business operations are a part of a "practical continuity of movement" across state lines because it distributes out-of-state products within Alabama, or, alternatively, that SBC meets the interstate commerce requirement because it collects and exports empty pallets and kegs out-of-state. Doc. 37 at 20-25. SBC is correct that "transportation within a single state may remain 'interstate' in character when it forms a part of a 'practical continuity of movement' across state lines from the point of origin to the point of destination." *Walling v. Jacksonville Paper Co., 317 U.S. 564, 568, 63 S. Ct. 332, 87 L. Ed. 460 (1943).* Critically, the characterization of such transportation depends upon the "essential character" of the shipment, *Texas N. O. R. Co. v. Sabine Tram Co., 227 U.S. 111, 122, 33 S. Ct. 229, 57 L. Ed. 442 (1913),* and the crucial factor in determining the essential character of a shipment is "the shipper's fixed and persisting intent at the time of shipment" based on a totality of the facts and circumstances of each case, *Cent. Freight Lines v. I.C.C., 899 F.2d 413, 419 (5th Cir. 1990)* (citing *Texas v. United States, 866 F.2d 1546, 1556 (5th Cir.1989)*). *See also* 29 C.F.R. § 782.7(b)(2) (intrastate transportation can satisfy the interstate commerce requirement of the MCA if the shipper has a "fixed and persisting transportation intent beyond [*17] the terminal storage point at the time of shipment").[9] However, in the case at hand, the court does not need to reach a

---

[7] Baker failed to offer any response on this issue and instead asserts only that "the parties dispute whether . . . [SBC] was engaged in interstate commerce," and "the second prong necessary for [the] MCA exemption was also not met." Doc. 51 at 15, 24. Accordingly, the court concludes that Baker has waived this issue. *McCain v. Imery's Carbonates LLC, No. 1:11-CV-25-VEH, 2013 U.S. Dist. LEXIS 16911, 2013 WL 535541, at *5 (N.D. Ala. Feb. 7, 2013)* (plaintiff waived an issue in failing to respond to defendant's arguments at summary judgment phase).

[8] Baker disputes that the pallets are sent back to suppliers and contends that SBC and its customers [*16] "retain the pallets for their own use." Doc. 51 at 2.

[9] In determining whether a shipper has the relevant "fixed and persistent intent," courts have applied a three-prong test. *See Foxworthy v. Hiland Dairy Co., 997 F.2d 670, 672 (10th Cir. 1993); California Trucking Ass'n v. I.C.C., 893 F.2d 1338 (9th Cir. 1989); Baird v. Wagoner Trans. Co., 425 F.2d 407 (6th Cir.1970),* cert. denied, *400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 59 (1970); Ashby v. Nat'l Freight, Inc., No. 807-CV-898-T-30MSS, 2008 U.S. Dist. LEXIS 66815, 2008 WL 3981422, at *5 (M.D. Fla. Aug. 22, 2008). See also Determination of Jurisdiction over Transportation of Petroleum and Petroleum Products by Motor Carriers Within a Single State, 71 M.C.C. 17, 29 (1957).* Under this test, the major factors that could preclude single-state transportation

conclusion regarding the "fixed and persistent intent" issue SBC's regular practice of shipping kegs to its out-of-state suppliers meets the interstate requirement.[10] As courts have held, the "regular pick up of empty containers destined for out-of-state bottling facilities . . . place[s] employees in interstate commerce and exempt[s] them from the overtime provisions of the FLSA under the motor carrier exemption." *Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1025 (10th Cir. 1992). See also Baez v. Wells Fargo Armored Serv. Corp., 938 F.2d 180, 181 (11th Cir. 1991)* (citing *Opelika Royal Crown Bottling Co. v. Goldberg, 299 F.2d 37, 40 (5th Cir. 1962)* (return of empty bottles to supplier creates a "sufficient channel of interstate commerce" where the return of bottles is "an integral part of the [employer's]" business)). While the parties seemingly disagree regarding whether SBC returns empty pallets to out-of-state suppliers as a regular or integral aspect of its operations, the record is undisputed with respect to the regularity with which SBC ships kegs to out-of-state suppliers. Specifically, Baker admits that he collected "three or four" empty kegs a week and offers no evidence to dispute testimony from SBC's Chief Financial Officer, James Hall, that SBC "accumulates [the kegs] into truckload quantities [*18] and send[s] them back to the supplier," that keg sales constitute a "significant" percentage of SBC's sales, and that over 75% of SBC's total sales are of products from its out-of-state suppliers. Doc. 38-19 at 25. Significantly, Baker testified that he has no knowledge of where SBC sends the kegs that its drivers collect, doc. 38-1 at 23, and the record is undisputed that SBC ships "the majority of the [empty] kegs" to out-of-state suppliers. Doc. 38-30 at 3. Accordingly, the court concludes that SBC meets the interstate commerce requirement of the motor carrier exemption in light of its regular export of empty kegs to out-of-state suppliers.

(ii) Class of work involved in Baker's job

Next, Baker contends that SBC does not satisfy the second prong of the motor carrier exemption because SBC "did not require its drivers to complete Department of Transportation ("DOT") logs recording the time they spent driving." [*21] Doc. 51 at 24. However, Baker provides no support for the proposition that an employer's failure to log its drivers' time necessarily means that those drivers' business-related activities do not directly affect "the safety of operation of motor vehicles." Baker merely cites to a case where the Tenth Circuit found that the truck drivers' duties in that case "affected the safety of operations" because the employer "complied with DOT regulations concerning preemployment physicals, log books, . . . driving tests and drug testing," which subjected the drivers "to the power of the Secretary of Transportation." *Thomas, 968 F.2d at 1026*. Baker's reading of the *Thomas* case overlooks that the court did not indicate that the employer's compliance specifically with regulations concerning log books was alone determinative or central to the court's decision. *See id*. In any event, the court notes that the

---

from being considered interstate in nature are (1) that there is no specific order destined for a specific destination at the time of shipment (in this case, the shipment from the supplier to SBC); (2) that the terminal storage [*19] (here, SBC's warehouse) is a distribution point or local marketing facility; and (3) that transportation from hub to spoke is arranged only after sale or allocation from storage. *Cent. Freight Lines v. I.C.C., 899 F.2d 413, 421 (5th Cir. 1990)*.

[10] The court notes, however, in a case with facts nearly identical to those at hand with respect to SBC's distribution scheme, the Fourth Circuit held that a wholesale beer distributor's operations met the "practical continuity of movement" standard. *See Talton v. I.H. Caffey Distrib. Co., 124 F. App'x 760, 765 (4th Cir. 2005)* (distributor receives 50% of the products it sells from out-of-state suppliers, orders from suppliers based on predictions regarding customer needs, and stores them in its warehouse until customers place an order). Baker attempts to distinguish *Talton* by offering a misplaced comparison: that SBC "does not have an exclusive relationship with its retail customers" like the distributor in *Talton* because SBC's customers "do not have contracts with [SBC] and they are free to buy beer and other products from other wholesalers." Doc. 51 at 19. *See also* doc. 38-19 at 27. However, Baker overlooks that the beer distributor in *Talton* also did not have contracts with its customers, and in fact state law "prohibited . . . [wholesale beer distributors] from requiring [*20] a retailer to purchase their beer pursuant to a contractual purchase agreement." *Talton, 124 Fed. App'x at 761*. Significantly, the appropriate comparison between the cases lies in the fact that SBC undeniably has "exclusive territorial assignments" and distributor agreements which dictate that customers within a particular territory must purchase a particular brand of product from the distributor with the exclusive right to sell that particular brand in the territory. Doc. 38-30 at 1-2. Similarly, the distributor in *Talton* was "the exclusive distributor for certain beer products . . . for several North Carolina counties." *Talton, 124 Fed. App'x at 761*. Furthermore, even accepting that SBC's customers can purchase some of their products (i.e., brands for which SBC does not enjoy an exclusive distribution right) from other distributors, this does not negate a conclusion that the products that SBC *does* sell to customers are in "practical continuity of movement" across state lines.

ERIC MAGNUS

2014 U.S. Dist. LEXIS 172833, *20

record in this case is undisputed with respect to SBC's compliance with various DOT regulations relating to its drivers, including requiring drivers to submit to pre-hire physical examinations, and pre-hire and random alcohol and drug testing, doc. 38-31 at 2, much like the employer in *Thomas. See Thomas, 968 F.2d at 1026*. Ultimately, because [*22] courts have consistently held that the duties of a delivery driver "directly affect highway safety whenever he drives a motor vehicle in interstate or foreign commerce," *Alvarado v. I.G.W.T. Delivery Sys., Inc., 410 F. Supp. 2d 1272, 1277 (S.D. Fla. 2006)* (citing *Levinson v. Spector Motor Service, 330 U.S. 649, 669, 67 S. Ct. 931, 91 L. Ed. 1158 (1947))*, the court rejects Baker's argument that he did not "engage in activities of a character affecting [the] safety" of operation of motor vehicles in interstate commerce, doc. 51 at 22. *See also 29 C.F.R. § 782.3(b)* ("The work of an employee who is a full-duty or partial-duty 'driver,' . . . directly affects 'safety of operation' . . . whenever he drives a motor vehicle in interstate or foreign commerce within the meaning of that act.")

For these reasons, because SBC is a motor carrier engaged in interstate commerce whose activities directly affect the safety of operations of such motor vehicles, and because Baker's business-related activities as a delivery driver directly affect the safety of operation of motor vehicles, the court concludes that the motor carrier exemption applies in this case. Accordingly, the court will grant summary judgment with respect to Baker's claim for unpaid wages under the FLSA. *See Walters, 575 F.3d at 1226*.

*b. FLSA retaliation*

SBC next contends that Baker's retaliation claim fails because Baker cannot establish a *prima facie* [*23] case of retaliation, or, alternatively, because SBC articulated a legitimate, non-pretextual reason for the discharge. Doc. 37 at 25. Indeed, while the FLSA protects persons against retaliation for asserting their rights under the statute, *see 29 U.S.C. § 215(a)(3)*, Baker carries the burden of establishing a *prima facie* case by showing that (1) he engaged in activity protected under the FLSA, (2) he subsequently suffered adverse action by the employer, and (3) a causal connection existed between the employee's activity and the adverse action. *Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342-1343 (11th Cir. 2000)*.

Unfortunately for Baker, he cannot establish a *prima facie* case because he did not engage in a protected activity. In reaching this decision, the court accepts as true Baker's contentions that he repeatedly complained about the failure to pay him overtime, including on the last day that he worked for SBC. Doc. 38-1 at 110, 111, 112, 118. However, in order for Baker's complaints to qualify as a "protected activity," Baker must establish that he "reasonably believed" SBC was engaging in conduct that is unlawful under the FLSA. *See Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1388 (11th Cir.1998)*. Significantly, this "reasonable belief" element has an objective and a subjective component. *See Little v. United Technologies, Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir.1997)*. Stated differently, Baker "must not [*24] only show that he subjectively . . . believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable," and the "objective reasonableness" of Baker's belief is "measured against existing substantive law." *Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir.1999)*. In applying this "objective reasonableness" test, the Eleventh Circuit has held that, where courts have concluded with unanimity that an employer's conduct is lawful, a plaintiff's belief that his employer engaged in an unlawful employment practice was not "objectively reasonable," and the plaintiff's complaints therefore did not qualify as "protected activity." *See Harper, 139 F.3d at 1388. See also Burnette v. Northside Hosp., 342 F. Supp. 2d 1128, 1135 (N.D. Ga. 2004)* (citing *Harper, 139 F.3d at 1388*) (finding plaintiff's belief that employer violated FLSA objectively unreasonable in light of Eleventh Circuit case law and the law of other circuits establishing that employer's conduct was lawful). Based on these principles, and because the law of this Circuit and other circuits provides that SBC was not required to pay overtime wages to Baker under the motor carrier exemption, the court concludes that Baker cannot establish that he engaged in a protected activity. Accordingly, SBC's motion on Baker's FLSA retaliation claim is due to be [*25] granted.[11]

---

[11] The motion is also due to be granted because SBC articulated a legitimate non-retaliatory reason for the discharge—Baker's admitted failure to complete his assigned deliveries—which Baker failed to rebut. *See Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342-1343 (11th Cir. 2000)*. Baker attempts to establish that SBC's articulated reason was pretextual by pointing to the conversation that Lowe overheard between Lankford and Marshall Nichols—who were purportedly talking about firing Baker on his last workday—which prompted Lowe to opine that "they were out to get" Baker, presumably because he had complained

2014 U.S. Dist. LEXIS 172833, *25

**2. _Section 1981_ disparate treatment and hostile work environment claims**

Baker's _Section 1981_ claims rest on two contentions: (1) as to the hostile work environment claim, that he "heard the word 'n*****' at [work] all the time;" and (2) as to the discrimination claim, that SBC discharged him because of his race and that "the articulated reason for [his] termination is [pretextual] because [SBC] has falsely claimed that [Creel] was the decision maker who terminated Baker's employment." _See_ doc. 51 at 30. Even accepting these facts as true for summary judgment purposes, aside from offering various unsubstantiated legal [*27] conclusions, Baker does not elaborate on these issues, or cite to any legal authority to explain their relevance or significance. For example, with respect to the hostile work environment claim, Baker does not even address the last and key element of his prima facie case: that a basis exists to hold SBC liable for the alleged conduct. _See Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999)_. To be sure, because there is no burden on this court "to distill every potential argument that could be made based upon the materials before it on summary judgment . . . [and] the onus is upon the parties to formulate arguments, grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." _Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995)_, cert. denied, _516 U.S. 817, 116 S. Ct. 74, 133 L. Ed. 2d 33 (1995)_. See also _Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1322 (11th Cir.2001)_ (finding claim abandoned where plaintiff alleged the claim in complaint but did not address it in response to motion for summary judgment); _Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1325 (11th Cir. 2000)_ (finding claim effectively abandoned before the district court where party did not present any argument on that claim in its response to motion for summary judgment); _Crayton v. Valued Servs. of Alabama, LLC, 737 F. Supp. 2d 1320, 1330 (M.D. Ala. 2010)_ ("Plaintiff's failure to address Defendant's many arguments with respect to perceived infirmities with her . . . claims amounts to an abandonment of such claims."). On this basis alone, SBC's motion [*28] with respect to Baker's _Section 1981_ claims is due to be granted. Nonetheless, in the interest of thoroughly addressing Baker's claims, the court has carefully reviewed the record before it and concludes that summary judgment is also appropriate for the reasons below.

_a. Race discrimination_

Baker's race discrimination claim—which, according to Baker's response, is based solely on his discharge, _see_ doc. 51 at 27-28,[12]—fails because he cannot establish the requisite discriminatory animus. _See Clark v. Huntsville City Bd. Of Educ., 717 F.2d 525, 529 (11th Cir. 1983)_ (to prove discrimination, a plaintiff "must convince the court that [defendant] operated . . . with a racially discriminatory motive, purpose, or animus"). By Baker's own contentions, SBC discharged him for reasons unrelated to his race, i.e., because he "got on [his supervisor's] nerves" in "asking so much" and complaining about unpaid overtime. _See_ doc. 38-1 at 117. Therefore, the race discrimination claim fails. Alternatively, if Baker is perhaps suggesting the fact that one of his supervisors (Lankford) used the "N" word

---

about overtime. Doc. 51 at 29; doc. 51-1 at 3. Even accepting that Lowe overheard this conversation, the fact that Lankford and Nichols discussed discharging Baker on the day that Baker returned the two stops is not the sort of evidence that suggests "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in SBC's proffered reason suggesting that the reason is pretextual. _See Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997)_. Rather, this evidence is wholly consistent with the contention that SBC discharged Baker for returning the stops since Baker does not identify any aspects of the conversation that suggest any other reason for his discharge. _See_ doc. 51-1 at 3-4. [*26] Furthermore, to the extent Baker contends the fact that he had "two customer stops more than usual" on his truck that day establishes pretext because Lankford was "setting him up" for termination, _see_ doc. 51 at 29, Baker points to no record evidence establishing that he was the only driver assigned two extra stops that day, or that other drivers were assigned extra stops but not discharged for failing to complete them, or any other scenario tending to show that the two extra stops were a "set up." Ultimately, the court has carefully reviewed the evidence before it and finds no evidence of pretext.

[12] While Baker does not state so explicitly in his response, the court concludes that his race discrimination is based solely on his discharge because the only argument he makes in his response is that he can establish a _prima facie_ case of discrimination because he heard the "N" word at work "all the time" and because "the articulated reason for Baker's termination is pretextual." Doc. 51 at 27. The court reads this as Baker's attempt to establish a discriminatory discharge claim by (1) showing that SBC had the requisite discriminatory animus in light of Lankford's [*31] use of "N" word, and (2) rebutting SBC's articulated reason for his discharge. Because Baker does not offer any response to SBC's arguments with respect to pay discrimination and disparate work assignments, Baker has waived those issues. _See McCain, 2013 U.S. Dist. LEXIS 16911, 2013 WL 535541, at *5_.

and "liked to tell racial jokes," doc. 38-1 at 81, 85, alone establishes discriminatory animus, summary judgment is nonetheless appropriate because Baker failed to show that his supervisor's [*29] alleged conduct motivated his discharge. The closest Baker comes as far as this court can discern is his contention that SBC falsely claimed Creel was the one who discharged Baker. Doc. 51 at 30. Presumably, Baker is contending that Lankford actually made the decision to discharge him or played a role in his discharge. Even if Baker is correct, Lankford's involvement does not relieve Baker from his burden of rebutting SBC's articulated reasons for his discharge, i.e., Baker's failure to complete his assigned deliveries. See Clark, 717 F.2d at 529 ("Only when [defendant's] articulated reason is pretext for accomplishing a racially discriminatory purpose will the plaintiff recover.") (citation and internal quotation marks omitted). Ultimately, while Baker believes that he had valid reasons for not completing his deliveries (illness, long hours, etc.) and that he followed the proper procedure for returning the stops, the fact remains that he did not complete the deliveries and he has not shown that SBC discriminatorily enforced its policy. See Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984) ("[Plaintiff] may have shown that he was fired for violating a rule that he did not violate. But Title VII does not take away an employer's right to interpret its rules [*30] as it chooses, and to make determinations as it sees fit under those rules."). More importantly, this court is not a super personnel board and is precluded from second-guessing an employer's business decisions. Alexander v. Fulton Cnty., 207 F.3d 1303, 1341 (11th Cir. 2000) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions."). Accordingly, because an employer may discharge an employee "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason," Nix, 738 F.2d at 1187, and in the absence of any arguments from Baker to support his race discrimination claim, summary judgment is due to be granted.

b. Racial harassment

Baker claims he was subjected to repeated uses of the "N" word. Doc. 51-1 at 4. Specifically, Baker purportedly heard Lankford use the "N" word "all the time" when telling racially inappropriate jokes "talking about blacks and n******." Doc. 38-1 at 81. When asked the number of times he heard Lankford use the "N" word, Baker estimated five times. Id. Baker also heard Marshall Nichols use the "N" word once, and frequently heard Lankford and Nichols "talk the way they talk," i.e., telling racially inappropriate jokes. Id. at 89. Finally, Baker recounts that he heard Mike DeArman, a co-worker, use the "N" word on one or two occasions, that once or twice a week, DeArman would "use racial slurs" about "the n*****, the African," and that DeArman oftentimes, in Baker's opinion, stopped just short of "saying the 'N' word." Id. at 91-92. The alleged language is offensive and simply has no place in civilized society, let alone the workplace. As one court [*32] aptly put it, "far more than a 'mere offensive utterance,' the word '[n*****]' is a pure anathema to African—Americans," and perhaps "no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as '[n*****]' by a supervisor in the presence of his subordinates." Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001) (citation omitted). Given the prevalence of this alleged conduct, the court disagrees with SBC that this evidence—use of the "N" word at least eight times and repeated racially inappropriate jokes about "blacks" and "Africans"—describes "mere offensive utterances" and that Baker cannot establish the severe and pervasive requirement necessary for a hostile work environment claim. See doc. 37 at 36-37.

Nonetheless, despite the evidence of clear severe and pervasive abuse, to prevail, Baker must still establish that a basis exists to hold SBC liable for the actions of Lankford, Nichols and DeArman. Mendoza, 195 F.3d at 1245. Unfortunately, Baker cannot do so in this case because, while an employer can generally be liable for harassment by a supervisor with immediate authority over an employee (in this case, Lankford), the employer is not liable where (1) [*33] it exercises reasonable care to prevent harassing behavior, such as, by promulgating an anti-harassment policy that it distributes to its employees; and (2) the employee fails to take advantage of preventative or corrective opportunities that the employer offers. See Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998); Walton v. Johnson & Johnson Servs., Inc., 347 F.3d 1272, 1286 (11th Cir. 2003).[13] And

---

[13] While this rule, the Faragher defense, does not apply where "the supervisor's [*34] harassment culminates in a tangible employment action, such as discharge," Faragher v. City of Boca Raton, 524 U.S. 775, 808, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998), Baker's discharge in this case does not preclude application of the Faragher defense because he has not shown that he

Case 1:16-cv-01692-SCJ   Document 27-1   Filed 04/20/17   Page 69 of 80

Page 10 of 10
2014 U.S. Dist. LEXIS 172833, *34

indeed, SBC undeniably promulgated an anti-harassment policy which articulated that employees should complain to SBC's human resources manager or Chief Financial Officer, doc. 38-1 at 157, Baker acknowledged receiving that policy in the employee handbook, doc. 38-3 at 12, and Baker admittedly failed to complain to the persons designated in the handbook, *see* doc. 38-1 at 90, 91, 167. In failing to do so, Baker acted unreasonably because "once an employer has promulgated an effective anti-harassment policy and disseminated that policy and associated procedures to its employees, then 'it is incumbent upon the employees to utilize the procedural mechanisms established by the company specifically to address problems and grievances.'" *Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1298, 1300 (11th Cir. 2000)* (quoting *Farley v. American Cast Iron Pipe, 115 F.3d 1548, 1554 (11th Cir.1997))*. Accordingly, summary judgment is appropriate with respect to Baker's hostile work environment claim.

## IV. CONCLUSION

For the reasons stated above, SBC's motion for summary judgment is due to be granted. The court will enter a separate order consistent with this opinion.

**DONE** the 15th day of December, 2014.

/s/ Abdul K. KallonAbdul K. Kallon

ABDUL K. KALLONABDUL K. KALLON

UNITED STATES DISTRICT JUDGE

## ORDER

In accordance with the Memorandum Opinion entered contemporaneously, doc. 58, it is **ORDERED, ADJUDGED,** and **DECREED** that the defendant's motion for summary judgment, doc. 36, is **GRANTED**. This action is **DISMISSED** with prejudice, and costs are taxed against the plaintiff.

**DONE** the 15th day of December, 2014.

/s/ Abdul K. KallonAbdul K. Kallon

**ABDUL K. KALLONABDUL K. KALLON**

UNITED STATES DISTRICT JUDGE

---

End of Document

---

was terminated based on his race rather than his failure to complete his deliveries. *See Walton v. Johnson & Johnson Servs., Inc., 347 F.3d 1272, 1281-82 (11th Cir. 2003)* (Faragher defense applied in a sex harassment case where "there [was] no evidence that [employer], or any of the employees acting on its behalf, considered [plaintiff's] gender when the company terminated her").

ERIC MAGNUS

**①** Cited
As of: April 20, 2017 3:14 PM Z

## *Snipes v. Northeast Pharms.*

United States District Court for the Middle District of Alabama, Northern Division

February 27, 2013, Decided; February 27, 2013, Filed

CIVIL ACTION NO. 2:11cv1000-SRW

**Reporter**
2013 U.S. Dist. LEXIS 26701 *; 20 Wage & Hour Cas. 2d (BNA) 1824; 2013 WL 757628

TIFFANY B. SNIPES, Plaintiff, v. NORTHEAST PHARMACEUTICALS, INC., Defendant.

## Core Terms

depo, pay period, e-mail, exemption, overtime, travel, salary, salary basis, hourly, days, summary judgment, pharmacy, protected activity, contends, paycheck, drive, hotel, travel time, twenty-four, weekly, fail to pay, per hour, retaliation, number of hours, work week, anti-retaliation, semi-monthly, assignments, commuting, complain

**Counsel:** [*1] For Tiffany R. Snipes, Plaintiff: William Braxton Schell, Jr., Braxton Schell, Jr., P.C., Birmingham, AL.

For Northeast Pharmaceuticals, Inc., Defendant: Heather Newsom Leonard, Heather Leonard, PC, Birmingham, AL.

**Judges:** SUSAN RUSS WALKER, CHIEF UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** SUSAN RUSS WALKER

## Opinion

### MEMORANDUM OPINION AND ORDER

Plaintiff Tiffany Snipes, a pharmacist, brings this action against her former employer Northeast Pharmaceuticals, Inc. ("NEP") pursuant to the Fair Labor Standards Act, *29 U.S.C. § 201 et seq.* ("FLSA"). Plaintiff alleges that she worked in excess of forty hours in various work weeks, including her travel time for short-term special assignments, and that NEP willfully refused to pay her the time-and-a-half overtime premium for the excess hours. She further alleges that she complained about defendant's failure to pay her overtime as required by the FLSA and that NEP terminated her employment shortly thereafter in retaliation for her complaint. In Count One, plaintiff asserts a claim for unpaid overtime; Count Two is a retaliatory discharge claim. (Doc. # 1).

This action is presently before the court on the motion for summary judgment filed by defendant on December 17, 2012. (Doc. [*2] # 18). Defendant contends that plaintiff was an exempt employee not entitled to overtime pay under the FLSA and that -- even if she were not – the time she spent in her daily commute between her home in Montgomery and NEP's pharmacy in Dothan is not compensable, and plaintiff has failed to present evidence of any uncompensated work time. Defendant further contends that plaintiff cannot establish either a *prima facie* case of retaliatory discharge or that the reason articulated by the decision-maker – *i.e.,* that he terminated plaintiff's employment because her part-time position was eliminated and she refused NEP's offer of a full-time position – is pretextual. Upon consideration of the motion for summary judgment, the court concludes that it is due to be granted.

2013 U.S. Dist. LEXIS 26701, *2

BACKGROUND[1]

NEP owns and operates several [*3] pharmacies, some of which are located in Alabama. LaTonage Porter is the Regional Pharmacy Director for NEP. The pharmacy managers at each of NEP's five locations report to Porter, and she reports directly to Daniel Mims, NEP's owner and President. Porter hired plaintiff as a part-time pharmacist for NEP in September 2010. Initially, plaintiff worked as a staff pharmacist at NEP's Montgomery pharmacy, under the supervision of James Littlejohn, the pharmacy manager. In April of 2011, plaintiff began working "travel" assignments for NEP; in her new assignment, plaintiff reported directly to Porter.

According to January Green, who handles NEP's Human Resources and payroll function, plaintiff was paid a salary for twenty-four hours of work each week that plaintiff would receive even if she worked fewer hours, and an additional hourly rate for anything in excess of twenty-four hours per week. She testified that plaintiff did not have to turn in a time sheet unless she worked "over twenty-four hours" and that, if Green received a time sheet from plaintiff showing more than twenty-four hours of work, she "paid her for the overage at her straight hourly rate." On the "employee information sheet" [*4] that Green completed when plaintiff was hired, Green did not indicate that plaintiff would earn a base salary. Instead -- on the line following the printed entry "Salary: $" -- Green wrote only "60⁰⁰/hr." Green testified that she did so because she had to use the hourly rate to calculate plaintiff's annual salary. (Green depo., pp. 9-10, 15-34, 42-43 and Exhibit 1; Mims depo., pp. 7, 11, 14, 29-30; Porter depo., p. 29; Snipes depo., pp. 115-16).

Plaintiff testified that she never had any "discussion" with NEP about plaintiff's being paid a base salary and additional compensation for extra hours; instead, "the discussion was that [she] was going to be paid an hourly rate for the hours that [she] worked." (Snipes depo., p. 124; see also pp. 68-70, 75). Plaintiff's pay records reflect that NEP paid plaintiff the same amount ($3,120.00) in each semi-monthly paycheck issued to plaintiff from September 22, 2010 until April 22, 2011. (Snipes depo., pp. 70-71 and Exhibit 6). Plaintiff testified that she received the same amount of pay for each pay period during this time even though the hours that she worked fluctuated between pay periods depending on "how the days of the week fell" in relation [*5] to the semi-monthly pay period. (Snipes depo., pp. 197-98; see also id. pp. 69-70). She stated that, before she began the travel assignment, she was scheduled to work "about twenty-four" hours each week. (Id., p. 61). In September 2010, plaintiff sent two e-mails to January Green, listing the days on which she had worked for each of the two pay periods that month. Plaintiff did so because she thought, at that time, that she was supposed to "submit [her] hours," but that she "later learned that they were keeping up with it and [she] didn't have to." (Snipes depo., pp. 201-02 and Exhibit 20). Plaintiff did not include the number of hours in her e-mails to Green because "[i]t was just an eight-hour shift each day." (Snipes depo., p. 202). Plaintiff's e-mails to Green reflect that plaintiff worked six days in the first pay period for September 2010 and eight days in the second pay period. (Exhibit 20 to Snipes depo.).

Plaintiff's pay records demonstrate that she received the same pay -- $3120.00 -- for both pay periods, despite the difference in hours of work. (Snipes depo., p. 50 (plaintiff's testimony that she was paid a week after the end of the pay period), p. 71, and Exhibit 6 (paychecks [*6] issued 9/22/10 and 10/7/10)). Additionally, plaintiff worked only three days in the final pay period of June 2011, but her paycheck issued on July 7, 2011 was in the amount of $3120.00. (See Snipes depo., pp. 73-74, 100 and Exhibits 7-9, 18, 21).[2] Plaintiff's first paycheck on September 7, 2010 and her final paycheck on July 22, 2011 included only amounts designated by NEP as "Hourly" pay -- $780.00 and $365.00, respectively; the pay records reflect that NEP paid plaintiff no amount designated as "salary" for the pay periods covered by these paychecks. (Exhibit 6 to Snipes depo.). As to the first check, plaintiff testified that when she first started working for NEP, she "didn't work like three days each week. It was like a few hours of training. Those were training hours." (Snipes depo., pp. 196-97). The July 22, 2011, paycheck, according to plaintiff,

---

[1] As it is required to do, the court has viewed the evidence presented on the motion for summary judgment in the light most favorable to the plaintiff. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992). The court considers any objections not made to the use or admissibility of the evidence waived for purposes of this motion. Davis v. Howard, 561 F.2d 565, 570 (5th Cir. 1977).

[2] There is no evidence of record as to the number of hours plaintiff worked [*7] on each of the three days.

2013 U.S. Dist. LEXIS 26701, *7

represented payment for "[t]he last travel sheets [she] submitted." (Id., p. 200). Plaintiff did not perform any work for NEP during July 2011; her last work for NEP was her travel assignment to Dothan from June 20 through June 22. (Snipes depo., pp. 73-74, 100).

When plaintiff first began reporting to Porter, she told Porter that her goal was to transition to a full-time position. Porter told plaintiff that NEP had the hours "available" and would be able to give plaintiff 32 to 40 hours per week in the travel position. (Id., pp. 145-148). Porter told plaintiff that she would receive "full-time pay, which was thirty-two to forty hours, [and] that [she] would be reimbursed for her gas." (Id., p. 128). Plaintiff's first travel assignment was at NEP's pharmacy in Mobile. On April 18, 2011, plaintiff e-mailed Porter about the Mobile assignment:

> I have been considering this trip to Mobile. This endeavor is not proving to be a mutually beneficial opportunity for all parties concerned. Maybe we should have discussed all of the details prior to my commitment. It seems that some things have changed since our initial discussion.
> I will travel to Mobile this week, but I will not be able to continue making the trip after this week.
>
> I will be traveling for six hours, yet I am only being paid for four days of work per week. Yet that is basically five days of time in an allocated work week. Now, instead of getting the straight $50 a [*8] day for food, it is requested that I turn in receipts after I return. I am incurring additional wear-and-tear on my car.
> I am not trying to be difficult. But nothing about this endeavor is benefitting me or in my best interest. I agreed to do this to help the company, but I am almost being made to feel like there is mistrust with the way in which matters are being handled.

(Snipes depo., p. 136 and Exhibit 12). Porter responded:

> Tiffany, we can talk more about this on Thursday. I'm sorry that you feel taken advantage of. I appreciate you working tomorrow and Wednesday but I'll figure something else out for next week and beyond. Your driving time was never discussed before now. We could have worked something out. But that's okay, it probably worked out for the best. I'm driving down right now and shouldn't be texting but I wanted to respond. Have a good evening.

(Id.).

During her deposition, defense counsel asked plaintiff about the e-mail, and inquired what she meant by the second sentence, "Maybe we should have discussed all the details prior to my commitment." (Snipes depo., p. 137). Plaintiff responded:

> I thought that reimbursement for travel time was standard in a travel assignment so [*9] I didn't think that that was something that we needed to discuss because I thought it was just standard in what you were to receive, so that is why I said that. She said that she would take care of me. I took her at her word that she would, not knowing that she didn't include my travel time as part of my hours.

(Id.). Plaintiff further testified that, after the email exchange, she had a telephone conversation with Porter in which "it was determined that [plaintiff] would be compensated for [her] travel time." (Id., p. 138). Thereafter, Porter assigned plaintiff to work on an "as needed" basis – two or three days each week, typically – at NEP's pharmacy in Dothan. Plaintiff initially stayed at hotels in Dothan. After a couple of "bad experiences" with the hotels, plaintiff told Porter that she would be "traveling back and forth" – a drive of approximately two hours each way – to Dothan. (Snipes depo., pp. 106-10, 115-16, 123-24 and Exhibits 12). The time sheets that plaintiff submitted for payment included the hours she spent commuting each day. (Snipes depo., pp. 62-63 and Exhibits 4 and 5). When plaintiff received her paycheck for the first pay period in June, she asked Porter to check [*10] on her pay because plaintiff had not been paid for all of her travel time. Porter spoke to Green, who told her that plaintiff would be paid for her time spent driving down and back only once each week. (Porter depo., pp. 37-46; see also Snipes depo., pp. 44-49).

On June 21, 2011, Porter emailed the following response to plaintiff:

> I have been dreading sending this e-mail. Unfortunately the company has decided not to reimburse your drive time with the exception of 4 hours per week. It was their understanding that we were paying you for time actually worked, reimbursing your meals and gas, in addition to paying you for your hotel stay. I really do not want

Case 1:16-cv-01692-SCJ   Document 27-1   Filed 04/20/17   Page 73 of 80

Page 4 of 9
2013 U.S. Dist. LEXIS 26701, *10

you to feel like you're being taken advantage of because you are appreciated and the company does not have a problem paying for your expenses. It's just that they could not justify paying for 36 hours of drive time when they were willing to pay for your hotel stay. I understand that you did not want to complain but we want you to be comfortable when you stay overnight. Moving forward, please let us know when you are uncomfortable with a hotel stay or any other situation. I hope that you understand.

If you accept the new position, it will [*11] be up to you whether you want to drive or stay overnight. The company will pay you at a set rate that we discussed on yesterday. We can talk when you have time. Tiffany it is and has been a pleasure working with you and I hope that you feel the same and we can move forward. Of course, if you accept the new position, all of this will be a non issue.

(Id; Plaintiff's Exhibit 2 to Green depo.).[3] Porter told plaintiff that "they were not going to pay [plaintiff] for the thirty-two hours because it equated to resulting in them having to pay [plaintiff] overtime." (Snipes depo., pp. 45-48). Including her commuting time to Dothan, plaintiff worked more than forty hours during the week of June 6, 2011. (Id., pp. 48-49 and Exhibit 5).

## THE SUMMARY JUDGMENT STANDARD

A party seeking summary judgment bears the initial burden of demonstrating to the court the basis for its motion, and identifying those portions of the pleadings, [*12] depositions, answers to interrogatories, and admissions that it believes show an absence of any genuine issue of material fact. *Hairston v. Gainesville Publishing Co., 9 F.3d 913 (11th Cir. 1993).*

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Matsushita Electrical Industrial Company v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* The court must view the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party. *Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987).* It is improper for this court to weigh conflicting evidence or make credibility determinations; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson, 477 U.S. at 255.* [*13] Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989)* (citation omitted).

Where the moving party will bear the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact it must support its motion with credible evidence . . . that would entitle it to summary judgment unless the non-moving party, in response, come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

*Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993)*(quoting *United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)*(en banc)).

## DISCUSSION

### Count I - Unpaid Overtime

---

[3] The new position to which Porter referred was for a full-time "floater" pharmacist, a job that plaintiff and Porter had been discussing. NEP offered the position to plaintiff by e-mail later that same day. (See Plaintiff's Exhibit 7 to Green depo.; Porter depo., pp. 46-60).

2013 U.S. Dist. LEXIS 26701, *13

In Count I of her complaint, plaintiff alleges that NEP willfully "failed or refused to pay plaintiff time and a half for her hours over 40 in every work week [a]s required by the FLSA." (Complaint, ¶¶ 12-13). For this alleged violation, she demands judgment against defendant for her unpaid overtime, liquidated damages, attorney's [*14] fees and costs. (Id., Count I). NEP first contends that it is entitled to summary judgment on Count I because plaintiff was an "exempt" employee within the professional and administrative exemption to the FLSA set forth in 29 U.S.C. § 213(a)(1) and, accordingly, was not entitled to overtime pay.

> The FLSA establishes minimum labor standards to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). In other words, the statute was designed to "aid the unprotected, unorganized, and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage." Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 707 n. 18, 65 S.Ct. 895, 902 n. 18, 89 L.Ed. 1296 (1945). One of the standards is to pay employees "engaged in commerce or in the production of commerce" overtime when an employee works more than forty hours in a week. 29 U.S.C. § 207(a)(1). But, an exemption from the overtime pay requirement exists for employees in a "bona fide executive, administrative, or professional capacity" [*15] or "outside salesman," as defined by regulations of the Secretary. 29 U.S.C. § 213(a)(1).

Hogan v. Allstate Ins. Co., 361 F.3d 621, 625 (11th Cir. 2004). The employer bears the burden of proving the exemption, and the court construes the overtime provisions of the FLSA against the employer. Id.

To satisfy its burden of proving that plaintiff is an exempt employee, defendant must show that: (1) plaintiff's "primary duty [is] the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction" and (2) that she is "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week ... exclusive of board, lodging, or other facilities[.]" 29 C.F.R. §§ 541.300(a), 541.301(a), 541.301(c).[4] Plaintiff concedes that her work for NEP satisfies the "duties" element of the exemption; she contends, however, that she was not paid on a salary basis. (See Plaintiff's brief, Doc. # 22 at p. 6 ("Snipes concedes that her education and duties would qualify her for exemption from the FLSA requirements as a professional, except that she was not paid on a 'salary basis' as required by the Act and [*16] regulations."). NEP contends that it paid plaintiff on a salary basis – i.e., a base salary that was calculated at $60.00 per hour for a 24-hour work week, and $60.00 per hour for each hour worked in excess of twenty-four hours; plaintiff contends that NEP paid her on an hourly basis, at a wage of $60.00 per hour.

Generally, "[a]n employee will be considered to be paid on a 'salary basis' ... if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a). "An employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis. [*17] ... [T]he exemption is not lost if an exempt employee who is guaranteed at least $455 each week paid on a salary basis also receives additional compensation based on hours worked for work beyond the normal workweek. Such additional compensation may be paid on any basis (e.g. flat sum, bonus payment, straight-time hourly amount, time and one-half or any other basis)[.]" 29 C.F.R. § 541.604(a). "An exempt employee's earnings may be computed on an hourly, a daily or a shift basis, without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked, and a reasonable relationship exists between the guaranteed amount and the amount earned. The reasonable relationship test will be met if the weekly guarantee is roughly equivalent to the employee's usual earnings at the assigned hourly, daily or shift rate for the employee's normal scheduled workweek." 29 C.F.R. § 541.604(b). Additionally, "[a]n employer is

---

[4] The statute setting forth exemptions from the minimum wage and overtime requirements of the FLSA defers to the Secretary to define by regulation the terms "executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1).

Case 1:16-cv-01692-SCJ   Document 27-1   Filed 04/20/17   Page 75 of 80

Page 6 of 9
2013 U.S. Dist. LEXIS 26701, *17

not required to pay the full salary in the initial or terminal week of employment. Rather, an employer  [*18] may pay a proportionate part of an employee's full salary for the time actually worked in the first and last week of employment. In such cases, the payment of an hourly or daily equivalent of the employee's full salary for the time actually worked will meet the requirement." *29 C.F.R. § 541.602(b)(6)*.[5]

Plaintiff contends that, "[f]or purposes of this motion, plaintiff was an hourly employee" because she "was told that she would be paid $60 per hour" and because "$60/hr" is "reflected on NEP's hiring documentation." (Doc. # 22, pp. 2, 6). As it must, the court accepts plaintiff's testimony as true. However, the relevant inquiry is the manner in which NEP actually paid the plaintiff. See *29 C.F.R. § 541.602(a)*(an employee is paid on a salary basis "if the employee regularly *receives each pay period* on a weekly, or less frequent basis, a predetermined amount ....")(emphasis added). Plaintiff argues that "since [she] regularly worked three days per week until she began traveling the payroll does not provide a basis for finding that she was not hourly." (Doc. # 22, p. 6). However, it is undisputed that NEP did not pay plaintiff weekly but, instead, on a semi-monthly pay period. The Department of Labor's regulatory definition of "salary basis" looks to whether an employee received a predetermined amount within each pay period. See *29 C.F.R. § 541.602(a)*. Additionally, as noted above, an employer does not lose the benefit of the exemption by computing  [*20] an employee's pay on an hourly basis, so long as the employer pays a guaranteed amount of "at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked," and the guaranteed amount bears a reasonable relationship to the amount earned. *29 C.F.R. § 541.604(b)*.

NEP's record of plaintiff's pay, which plaintiff testified accurately represents what NEP paid her, demonstrates that plaintiff received the same amount ($3,120.00) for each semi-monthly pay period from the first pay period in September through the first pay period in April. Thereafter, when plaintiff worked in the travel assignment, plaintiff's pay included an additional hourly amount above $3,120.00. Plaintiff testified that she worked "about 24 hours" in each week before she began the travel assignment, and that she was paid the same amount in each semi-monthly pay period even though the number of hours she worked fluctuated between pay periods, depending on how the pay period fell in relation to the work week. Plaintiff received less than $3,120.00 for only one pay period in which she performed any work for NEP – NEP paid her $780 in her first paycheck, issued on  [*21] September 7, 2010. Plaintiff testified that this was payment for a few hours of training when she started working for the company.

It is undisputed that plaintiff's pay was calculated on the basis of a pay rate of sixty dollars per hour. Green's testimony that she used the pay rate of "$60/hr" to calculate plaintiff's annual salary (Green depo., pp. 30-31) is supported by the pay records; the amount plaintiff received for every pay period before she began the travel assignment – $3,120.00 – is equivalent to 24 hours/week multiplied by 52 weeks/year, divided by 24 pay periods/year, multiplied by $60/hour. In the first pay period of September 2010, plaintiff worked only forty-eight hours but was paid $3,120.00 – *i.e.*, an amount in excess of $60 per hour of work. (Snipes depo., pp. 61, 70-71, 196-98 and Exhibits 6 and 20). The fact that NEP paid plaintiff an hourly amount for work in excess of twenty-four hours each week, and that her pay for those periods in which she worked more than twenty-four hours each week equates to an hourly rate of $60 per hour, does not defeat NEP's claim of exemption. (See *29 C.F.R. § 541.604*). Plaintiff's pay of $3,120.00 for each semi-monthly pay period translates  [*22] to a weekly pay amount of $1,440.00, well in excess of the minimum weekly pay of $455 (see *§ 541.300(a)(1)*) required for the "professional employee" exemption.

---

[5] Although whether plaintiff is paid on a salary basis is critical, neither party cited any of the Department of Labor regulations in *29 C.F.R. Part 541, Subpart G*, "Salary Requirements[.]" Both parties cited an obsolete regulatory provision – 29 C.F.R. § 541.118 – and, on this issue, the sole case cited by defense counsel is an out-of-circuit decision applying the obsolete regulation. (See Defendant's brief, Doc. #20, p. 14; Plaintiff's brief, Doc. # 22, p. 6; Defendant's reply brief, Doc. # 26, pp. 3-4). It is undisputed that plaintiff's claims arose after August 23, 2004, the effective date of the new regulatory provisions defining the FLSA's "white collar" exemption. See *69 FR 22260*, "Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees" (Apr. 23, 2004). Therefore, the court looks to Subpart G – *29 C.F.R. §§ 541.600 through 541.606*  [*19] – in analyzing the "salary basis" issue.

2013 U.S. Dist. LEXIS 26701, *19

Defendant has satisfied its burden of demonstrating that plaintiff is subject to the exemption set forth in 29 U.S.C. § 213(a)(1) from the FLSA's overtime pay requirement. It has introduced evidence affirmatively establishing that plaintiff was paid on a salary basis. The only evidence plaintiff cites as demonstrating a dispute of fact is her testimony that she was told she would be paid hourly and the employment form on which Green annotated "60/hr" on the "Salary" line. (See Plaintiff's brief, Doc. # 22, pp. 2, 6). However, the record as a whole – including the evidence cited by plaintiff – does not permit a reasonable conclusion that plaintiff was not paid on a salary basis. Accordingly, NEP is entitled to summary judgment on Count I, plaintiff's claim for unpaid overtime.[6]

## Count II - Retaliatory Discharge

In Count II, plaintiff complains that NEP terminated her employment "on or about June 22, 2011 in retaliation for complaining about defendant's violation of the Fair Labor Standards Act by failing to pay her overtime as required." (Doc. # 1, Count II). Pursuant to the FLSA's anti-retaliation provision, it is unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]." 29 U.S.C. § 215(a)(3). To establish a prima facie case of retaliation under the FLSA, plaintiff must show that (1) she engaged in activity protected under the FLSA; (2) she suffered adverse action; and (3) a causal connection between her protected activity and the adverse action. Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342-43 (11th Cir. 2000). [*24] Defendant concedes an adverse action but contends that plaintiff can establish neither protected activity nor causation.[7] Plaintiff's retaliation claim rests on an e-mail she sent to Mims on June 22, 2011. (See Plaintiff's brief, Doc. # 22, p. 8). Defendant contends that this e-mail does not constitute protected activity under the FLSA because "there was nothing in Ms. Snipes['] complaint to NEP that was specific enough to alert the company she was complaining of any unlawful conduct under the FLSA." (Doc. # 20, pp. 22-24). Plaintiff responds that, "[w]hile she does not mention the FLSA, 'magic words' are not required. Her email clearly addresses the failure to pay her for time worked and the fact that this was a special assignment. That is a complaint involving her rights under this statute." (Doc. # 22, p. 8).

In her e-mail to Mims, plaintiff wrote:

    Daniel,

---

[6] NEP's argument that plaintiff's commuting time is non-compensable under the Portal-to-Portal Act (29 U.S.C. § 251, et seq.) ignores plaintiff's testimony, which must be construed in plaintiff's favor on this motion, that she and Porter agreed that she "would [*23] be compensated for her travel time" (Snipes depo., p. 138; see also id. at pp. 176,184 and Exhibit 19) and 29 U.S.C. § 254(b)(providing that employer is not relieved from liability if an activity that is otherwise non-compensable under the statute is compensable by a written or non-written contract between the employee and employer).

[7] Defendant argues that plaintiff cannot establish the causation element because she "relies solely on temporal proximity between her email to Daniel Mims and her employment ending as evidence of causation." (Doc. # 20, p. 24). Defendant cites Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000), as authority in support of its argument that "[t]emporal proximity [*25] alone is not enough to establish a causal connection between an alleged protected act and an adverse action." (Doc. # 20, p. 25; see also Defendant's reply brief, Doc. # 26, p. 8 ("Timing alone does not establish causation.")(citing Brungart). Plaintiff complained to Mims about her pay by e-mail on the afternoon of June 22, 2011; he responded to her by e-mail on Friday, June 24th, observing that "[t]he fact that you have consistently gone over LaTonage to contact me with your concerns gives us the impression that you are obstinate and insubordinate[;]" and plaintiff's employment was terminated on the morning of June 25th, at Mims' direction. (Exhibits 17, 18 and 19 to Snipes depo.; Mims depo., pp. 42-44). In Brungart, the Eleventh Circuit observed that "[t]he general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection. However, there is this exception: temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have [*26] knowledge that the employee engaged in protected conduct." 231 F.3d at 799 (citations omitted)(emphasis added). Here, Mims knew of plaintiff's complaint when he told Porter to offer the full-time position to someone else. Defendant's citation to Brungart is disingenuous, and its "temporal proximity" argument is frivolous. See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007)("The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action.")(citing Brungart).

ERIC MAGNUS

2013 U.S. Dist. LEXIS 26701, *26

I am writing to you because I feel that there is a divide somewhere in what has been communicated to me and what is getting back to you with regards to this travel assignment. I received an email from LaTonya on yesterday stating that the company would only pay for 4 hours of travel time per week. So, I called her to get a better understanding of what she was saying to me and that is when I learned that my check would be deficient 32 hours. What LaTonya neglected to tell everyone involved in this situation is that from the beginning she gave me an option to drive every day or stay [*27] at a hotel and told me that at any time those two options were strictly up to me. So, after I had two bad experiences (mold in the bathrooms; dirty water coming out of the shower and faucets) with hotels, I decided to drive instead of arranging a hotel stay. So, when I get a call from her to tell me that the company would not be paying me, that just left me with hurt feelings because I am questioning what I have done to deserve this type of treatment.

I have put in some long hours and hard work during this entire Dothan experience, as well as the Mobile pharmacy experience because I worked both outpatient and inpatient sides due to the death of K-Ray's mother and Gregg being on vacation my first week there.

And, at every turn, something has changed with regards to my compensation, hours, hotel arrangements, etc when I have consistently worked hard and given my best. To learn that I will not receive pay for hours and time that I have worked when I was given the okay is not fair. How would you feel if this were you? If you were placed in the same situation in which I have been placed, would you feel that this is fair? If we are all growing in the best way to do travel assignments from this point [*28] further, that is fine. I am not trying to place blame or point fingers. I am just requesting a better line of communication moving forward and consistency in what I am told. In observing situations where problems have occurred in the company whether with personal or external customers, communication has been the principal issue.

Thanks for your time!
Sincerely,
Dr. Tiffany R. Snipes
(Exhibit 19 to Snipes depo.).

The court agrees with plaintiff's premise that a complaint need not reference the FLSA expressly to support a claim under § 215(a)(3), the FLSA's anti-retaliation provision. See *Johnson v. Advertiser Co., 778 F.Supp.2d 1270, 1278 (M.D. Ala. 2011)*("Even though Johnson may not have mentioned the FLSA by name in any of his internal complaints, this does not disqualify his statements from being considered protected activity."). However, to constitute protected activity, a complaint must be "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the [FLSA] and a call for their protection." *Kasten v. Saint-Gobain Performance Plastics Corp., ___ U.S. ___ , 131 S.Ct. 1325, 1335, 179 L. Ed. 2d 379 (2011)*. [*29] Plaintiff's e-mail to Mims makes clear that plaintiff believed that NEP was treating her unfairly by refusing, after plaintiff "was given the okay[,]" to pay her for 32 hours of commuting time to Dothan. However, nothing in plaintiff's e-mail suggests that she believes NEP's conduct to be unlawful. In the concluding paragraph of her e-mail, plaintiff states, "If we are all growing in the best way to do travel assignments from this point further, that is fine. I am not trying to place blame or point fingers. I am just requesting a better line of communication moving forward and consistency in what I am told." (Exhibit 19 to Snipes depo.). This statement suggests that plaintiff's complaint is that NEP's failure to pay for the 32 hours of travel time was not consistent with what Porter had told plaintiff, not that plaintiff believed the failure to pay was unlawful. Plaintiff does not complain (as she alleges in her complaint) that defendant failed "to pay her overtime as required" -- her e-mail does not allude to non-payment of overtime, and does not indicate that the thirty-two hours at issue were worked in excess of forty hours in a work week. Neither does plaintiff's e-mail suggest [*30] that NEP's failure to pay for her time spent commuting each day to Dothan constituted a failure to pay plaintiff the minimum wage mandated by the FLSA. The evidence of record is simply not sufficient to permit a reasonable conclusion that a reasonable employer would have understood that plaintiff was asserting a violation of her rights under the FLSA. Plaintiff's complaint to Mims is not activity protected

2013 U.S. Dist. LEXIS 26701, *30

by the FLSA's anti-retaliation provision.[8] In the absence of protected activity, plaintiff cannot establish a *prima facie* case of retaliation. Therefore, NEP is entitled to summary judgment on Count II, plaintiff's FLSA retaliation claim.[9]

**CONCLUSION**

For the foregoing reasons, it is

ORDERED that defendant's motion for [*32] summary judgment (Doc. # 18) is GRANTED. A separate judgment will be entered.

DONE, this 27th day of February, 2013.

/s/ Susan Russ Walker

SUSAN RUSS WALKER

CHIEF UNITED STATES MAGISTRATE JUDGE

End of Document

---

[8] Even if the e-mail could reasonably be understood to complain of a failure to pay overtime pursuant to the FLSA, plaintiff's belief that she was an hourly wage employee entitled to overtime was not objectively reasonable in view of the fact that she received the same amount of pay in every pay period ($3,120.00) while she was working shifts as a pharmacist at NEP's Montgomery pharmacy, even though – as she testified – she did not work the same number of hours in each such pay period. For this additional reason, plaintiff's complaint to Mims is [*31] not activity protected by the FLSA's anti-retaliation provision. *See Howard v. Walgreen Co., 605 F.3d 1239, 1245 (11th Cir. 2010)*(no statutorily protected conduct under Title VII's anti-retaliation provision, where plaintiff's belief that his supervisor had discriminated against him was not objectively reasonable, even if subjectively held); *Butler v. Alabama Dept. of Transportation, 536 F.3d 1209, 1213 (11th Cir. 2008)*(no protected activity for purposes of Title VII's anti-retaliation provision where, assuming that plaintiff subjectively believed that co-worker's use of racial epithets constituted an unlawful employment practice by her employer, any such belief was not objectively reasonable); *Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1328 (11th Cir. 1998)*(employee's request for accommodation did not constitute protected activity for purposes of retaliation claim under the ADA, in the absence of evidence that plaintiff's belief that his back injury rendered him disabled was objectively reasonable).

[9] The court does not, accordingly, reach defendant's argument that plaintiff cannot establish pretext.

ERIC MAGNUS

No *Shepard's* Signal™
As of: April 20, 2017 3:14 PM Z

## *Allen v. Bruister & Assocs.*

United States District Court for the Southern District of Alabama, Southern Division

July 13, 2007, Decided; July 13, 2007, Filed

CIVIL ACTION 07-0479-WS-M

**Reporter**
2007 U.S. Dist. LEXIS 51790 *; 2007 WL 2081454

TERRY F. ALLEN, Plaintiff, v. BRUISTER & ASSOCIATES, INC., Defendant.

## Core Terms

removal, federal court, Notice, subject matter jurisdiction

**Counsel:** **[*1]** Terry F. Allen, Plaintiff, Pro se, Mobile, AL.

For Bruister & Associates, Inc., Defendant: Charles A. Powell, IV, Hans Peter Schmidt, LEAD ATTORNEYS, Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., Birmingham, AL.

**Judges:** WILLIAM H. STEELE, UNITED STATES DISTRICT JUDGE.

**Opinion by:** WILLIAM H. STEELE

## Opinion

### ORDER

This matter is before the Court *sua sponte* based on the undersigned's preliminary review of the Notice of Removal (doc. 1) filed by defendant, Bruister & Associates, Inc. ("Bruister").

The court file reflects that on May 23, 2007, plaintiff Terry F. Allen, proceeding *pro se,* filed a one-paragraph Complaint against Bruister in the Circuit Court of Mobile County, Alabama. The Complaint does not specifically identify the legal theory or theories under which Allen is proceeding; however, he complains that Bruister "paid [him] a paycheck that was not correct," that after he notified Bruister of the error he "rec[ei]ved another incorrect check," and that after he complained again he learned that he "was no longer an employee" of Bruister. (Complaint, at 1.) Allen asserts that he has "still not been compensated fully for the work [he] performed." (*Id.*)

Based on no further information or allegation than that, **[*2]** Bruister filed a Notice of Removal (doc. 1) removing this action to this District Court. Defendant's explanation for removing this action to federal court is, in its entirety, as follows: "Based on the nature of the allegations on the face of the complaint, Plaintiff appears to be asserting a claim under the Fair Labor Standards Act, *29 U.S.C. § 201, et seq.* As such, this court has jurisdiction over these claims pursuant to *28 U.S.C. § 1331,* and the Complaint is removable pursuant to *28 U.S.C. § 1441 (a)* and *(b).*" (Notice of Removal, P 2.) Aside from the foregoing conclusory statement, Bruister offers no explanation for its belief that Allen is suing under the FLSA, as opposed to any of a number of potential state-law theories.

Because federal courts have narrowly circumscribed jurisdiction, this Court bears an affirmative duty to inquire *sua sponte* whenever it appears that subject matter jurisdiction may be lacking. *See Fitzgerald v. Seaboard System R.R., Inc., 760 F.2d 1249, 1251 (11th Cir. 1985)* ("A federal court not only has the power but also the obligation at any time to inquire into jurisdiction whenever the possibility that jurisdiction does not exist arises."); *Smith v. GTE*

2007 U.S. Dist. LEXIS 51790, *2

*Corp., 236 F.3d 1292, 1299 (11th Cir. 2001)* [*3] ("[B]ecause a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case, and should itself raise the question of subject matter jurisdiction at any point in the litigation where a doubt about jurisdiction arises.").

Nothing on the face of the Complaint supports a reasonable conclusion that Allen is suing Bruister under the Fair Labor Standards Act ("FLSA") or any other federal statute, much less that the FLSA would preempt any state-law claim that Bruister might be bringing. "The FLSA establishes minimum labor standards to eliminate labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." *Hogan v. Allstate Ins. Co., 361 F.3d 621, 625 (11th Cir. 2004)* (citation omitted) (referencing minimum wage and overtime provisions of the Act). But that statute does not create a federal remedy for every worker who receives an "incorrect check" from his employer or who has "not been compensated fully" for work performed. The FLSA entitles workers to sue their employers to recover unpaid minimum wages or [*4] unpaid overtime compensation. *See 29 U.S.C. § 216(b)*. It also entitles workers to sue if they are discharged or otherwise discriminated against for having filed complaints, instituted proceedings, or provided testimony in any proceedings under or related to the FLSA. *See id.* However, the FLSA is not a general payment of wages statute. Unless Allen's claim is predicated on unpaid minimum wages or overtime compensation, or alleges unlawful retaliation for protected activity under the FLSA, then, his Complaint cannot arise under the FLSA. There is no reason to believe that Allen's claim has anything to do with unpaid overtime or minimum wages; rather, on its face, the Complaint merely references two paychecks being "incorrect" in unspecified ways and states plaintiff's belief that he has "not been compensated fully" for work he performed for Bruister. Such alleged wrongs may be actionable under any number of state-law theories, and it is only through wild conjecture and rank speculation that the defendant could possibly conclude from reading the Complaint that Allen's claim is predicated on an alleged violation of the FLSA.

Defendant's removal of this action to federal court and its contention [*5] that Allen is bringing an FLSA action so as to give rise to federal question jurisdiction under *28 U.S.C. § 1331* amounts to mere speculation. This is improper. The Eleventh Circuit recently explained that in assessing the propriety of removal, "the district court has before it only the limited universe of evidence available when the motion to remand is filed - i.e., the notice of removal and accompanying documents. If that evidence is insufficient to establish that removal was proper or that jurisdiction was present, neither the defendants nor the court may speculate in an attempt to make up for the notice's failings." *Lowery v. Alabama Power Co., 483 F.3d 1184, 1213-15 (11th Cir. 2007)* (footnotes and citations omitted). Nor would it be appropriate to authorize defendant to conduct discovery in federal court in a post hoc attempt to rationalize its shoot-first-ask-questions-later stratagem. *See id. at 1217* (declaring that district courts "should not reserve ruling on a motion to remand in order to allow the defendant to discover the potential factual basis of jurisdiction" because "[s]uch fishing expeditions would clog the federal jurisdictional machinery").

For all of these reasons, [*6] Bruister's removal of this action to federal court was precipitous, at best. The law is clear and mandatory that "if at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded to the state court from whence it came." *University of South Alabama v. American Tobacco Co., 168 F.3d 405, 410 (11th Cir. 1999)* (citation omitted); *see generally Beard v. Lehman Bros. Holdings, Inc., 458 F. Supp.2d 1314, 1317 (M.D. Ala. 2006)* ("Because federal court jurisdiction is limited, the Eleventh Circuit favors remand of removed cases where federal jurisdiction is not absolutely clear."). That being precisely the case here, this action is hereby **remanded** to the Circuit Court of Mobile County, Alabama, for further proceedings, on the grounds that the Notice of Removal and Complaint are insufficient to establish the presence of federal subject matter jurisdiction.

DONE and ORDERED this 13th day of July, 2007.

s/ WILLIAM H. STEELE

UNITED STATES DISTRICT JUDGE